**EXHIBIT A**

**(STATE COURT DOCUMENTS: SUMMONS AND COMPLAINT)**

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF RICHLAND | IN THE COURT OF COMMON PLEAS<br>FOR THE FIFTH JUDICIAL CIRCUIT |

| | |
|---|---|
| METZLER ASSET MANAGEMENT GmbH<br>and JOSEPH HEINZ, on Behalf of<br>Themselves and All Others Similarly<br>Situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>GREGORY E. ALIFF, JAMES A.<br>BENNETT, JOHN F.A.V. CECIL, SHARON<br>A. DECKER, D. MAYBANK HAGOOD,<br>LYNNE M. MILLER, JAMES W.<br>ROQUEMORE, MACEO K. SLOAN,<br>ALFREDO TRUJILLO, DOMINION<br>ENERGY, INC., and SEDONA CORP.,<br><br>          Defendants. | Civil Action No.: _____<br><br><br><br>**SUMMONS**<br>**JURY TRIAL DEMANDED** |

TO:    THE DEFENDANTS, ABOVE-NAMED:

    YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to said complaint upon the subscriber, at his office at 2801 Devine Street, Suite 300, Columbia, SC 29205, within thirty (30) days after the service thereof, exclusive of the day of such service, and if you fail to answer the complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the complaint.

*[SIGNATURE BLOCK ON FOLLOWING PAGE]*

Dated:  February 7, 2018

Respectfully submitted,

**CHAPPELL SMITH & ARDEN, P.A.**

Graham Newman
2801 Devine Street, Suite 300
Columbia, SC 29205
Tel:  803-929-3600
Fax:  803-929-3604
gnewman@csa-law.com

*Liaison Counsel for Plaintiffs*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Melissa A. Fortunato
Todd H. Henderson
885 Third Avenue, Suite 3040
New York, New York 10022
Tel:  212-308-5858
Fax:  212-486-0462
eagel@bespc.com
fortunato@bespc.com
henderson@bespc.com

**STURMAN LLC**
Deborah Sturman
600 Third Avenue, Suite 2101
New York, New York 10016
Tel:  212-367-7017
Fax:  917-546-2544
sturman@sturman.ch

*Counsel for Plaintiffs*

STATE OF SOUTH CAROLINA
COUNTY OF RICHLAND

IN THE COURT OF COMMON PLEAS
FOR THE FIFTH JUDICIAL CIRCUIT

---

METZLER ASSET MANAGEMENT GmbH
and JOSEPH HEINZ, on Behalf of
Themselves and All Others Similarly
Situated,

                Plaintiffs,

    v.

GREGORY E. ALIFF, JAMES A.
BENNETT, JOHN F.A.V. CECIL, SHARON
A. DECKER, D. MAYBANK HAGOOD,
LYNNE M. MILLER, JAMES W.
ROQUEMORE, MACEO K. SLOAN,
ALFREDO TRUJILLO, DOMINION
ENERGY, INC., and SEDONA CORP.,

                Defendants.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## SHAREHOLDER CLASS ACTION COMPLAINT

Metzler Asset Management GmbH ("Metzler") and Joseph Heinz ("Heinz," and collectively, "Plaintiffs"), on behalf of themselves and the other public shareholders of SCANA Corporation ("SCANA or the "Company"), by their attorneys, bring this Class Action Complaint against SCANA's Board of Directors[1] (the "Board" or the "Individual Defendants"), Dominion Energy Inc. ("Dominion"), and Sedona Corp. Plaintiffs' allegations are based on personal knowledge as to themselves, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

---

[1]  Gregory E. Aliff ("Aliff"), James A. Bennett ("Bennet"), John F.A.V. Cecil ("Cecil"), Sharon A. Decker ("Decker"), D. Maybank Hagood ("Hagood"), Lynne M. Miller ("Miller"), James W. Roquemore ("Roquemore"), Maceo K. Sloan ("Sloan"), and Alfredo Trujillo ("Trujillo").

## NATURE OF THE ACTION

1.      This class action arises from a failed multi-year, multi-billion dollar nuclear reactor project that led the Individual Defendants to undertake a severely flawed sales process and agree to the inadequately priced sale of the Company to Dominion (the "Proposed Transaction"). Rather than seeking to maximize shareholder value in the sale of the Company, the Board sought to escape personal liability for their wrongdoing by selling the Company as quickly as possible for an inadequate price. By doing so, the Board failed to act reasonably in good faith and, as a result, breached their fiduciary duties to SCANA's public shareholders.

2.      SCANA is principally engaged in regulated electric and natural gas utility operations throughout North Carolina, South Carolina, and Georgia. The Company also owns nuclear, coal, hydroelectricity, biomass, and solar generating facilities as well as gas reserves in Louisiana and Texas.

3.      In 2006, SCANA announced that, together with its subsidiary South Carolina Electric & Gas ("SCE&G"), it planned to construct two nuclear reactors at SCANA's Virgil C. Summer Nuclear Generating Station (the "V.C." Summer Nuclear Station") located in Fairfield County, approximately twenty miles from Columbia, South Carolina (the "Nuclear Project"). The Nuclear Project was a partnership with South Carolina's state-owned electric and water utility, South Carolina Public Service Authority ("Santee Cooper"), with SCANA owning a 55% stake in the Nuclear Project.

4.      Before committing to the Nuclear Project, SCANA pursued passage of the Base Load Review Act ("BLRA") by the South Carolina legislature. The BLRA, which became law in 2007, has been described as a utility company "wish list" and allowed SCANA to transfer the risks and costs of the Nuclear Project to ratepayers. Unsurprisingly, in the year before passage of the

BLRA, SCANA's political contributions to South Carolina political candidates increased by nearly 300%.

5.       On March 31, 2008, SCANA submitted an application to the Nuclear Regulatory Commission ("NRC") for a combined construction and operating license.  At the time the application was submitted, SCANA expected the review process to require three to four years.

6.       On May 27, 2008, SCANA announced a contractual agreement with Westinghouse Electric Company, LLC ("Westinghouse") and Stone & Webster, Inc.[2] for the design and construction of the Nuclear Project.

7.       On May 30, 2008, SCANA submitted its application for a Certificate of Environmental Compatibility, Public Convenience and Necessity, and for a Base Load Review Order to the South Carolina Public Service Commission ("PSC") and the South Carolina Office of Regulatory Staff ("ORS").  SCANA stated that it expected the first reactor unit to come on line in 2016 and the second reactor unit in 2019, at a cost of approximately $9.8 billion, of which SCANA's share was $5.4 billion.  Further, SCANA claimed that the BLRA would save South Carolina ratepayers approximately $4 billion over the life of the new units.

8.       In February 2009, the PSC and ORS approved the Nuclear Project and, in March 2012, the NRC approved SCANA's combined construction and operating licenses for the Nuclear Project.  Construction began on March 9, 2013.

9.       From the start, the Nuclear Project suffered repeated delays, cost overruns, and design and construction issues.

---

[2]  In 2012, Chicago Bridge & Iron Company N.V. ("CB&I") acquired Stone & Webster's nuclear construction business and formed a new subsidiary, CB&I Stone & Webster.  CB&I Stone & Webster was ultimately purchased by Westinghouse in 2015.

10.     On May 6, 2014, Kevin Marsh ("Marsh"), SCANA's then chief executive officer ("CEO") and Chairman of the Board, and Lonnie Carter ("Carter"), Santee Cooper's CEO, sent a letter (the "May 6, 2014 Letter") to Westinghouse President and CEO, Danny Roderick, and CB&I President and CEO, Philip Asheman, in which they outlined numerous issues with the Nuclear Project dating back to May 2008.   According to Marsh and Carter, the Nuclear Project was consistently behind schedule and over budget.  The letter also included a reminder to Westinghouse that the delays had already resulted in additional costs in excess of $100 million.  Carter and Marsh noted that the performance deficiencies and associated delays may constitute a breach of contract and suggested that the parties hold a meeting to discuss mitigating strategies.  It is clear from the letter that SCANA and the Individual Defendants were exceedingly aware of the mounting issues with the Nuclear Project.

11.     On August 6, 2015, Bechtel Corporation ("Bechtel") was hired by SCANA and Santee Cooper to conduct an audit of the Nuclear Project at a cost of more than $1 million. Bechtel delivered its initial findings to the Company on October 22, 2015 and, on November 9, 2015, submitted a first draft of its report.   In the following weeks, George Wenick ("Wenick"), an attorney hired by SCANA, battled with Bechtel about the contents of the final report.  Wenick wanted any mention of the reactors not being finished before 2020 (the deadline to receive billions of dollars in federal tax credits) removed from the report along with criticism of SCANA's oversight.  Ultimately, more than thirty pages were removed from the report.

12.     Despite receiving Bechtel's initial findings in late 2015, SCANA did not disclose the findings to shareholders or regulators and, instead, while assuring the PSC that the Nuclear Project was proceeding as expected, requested that the PSC increase its nuclear budget by $800 million, which the PSC agreed to do.

13.    Bechtel provided the final report to SCANA on February 5, 2016 (the "Bechtel Report"). The Bechtel Report highlighted, among other things, the lack of a construction schedule, the flawed nature of the reactor design, Westinghouse's complete lack of organization, and the apparent lack of commercial motivation among the contractors to complete the Nuclear Project. Again, rather than share the findings with shareholders and regulators, SCANA concealed the report.

14.    On March 29, 2017, Westinghouse filed for bankruptcy protection. Westinghouse's bankruptcy was widely viewed as a result of the myriad problems with the Nuclear Project. It was reported at the time that Westinghouse's decision to use a completely novel reactor design and hire an inexperienced subcontractor to assist with construction were both risky moves that contributed to the Nuclear Project's repeated delays and price overruns.

15.    Despite the publicity surrounding the Westinghouse bankruptcy and the reasons for the bankruptcy, SCANA continued to claim that the construction of the reactors was proceeding as promised, with Stephen Byrne ("Byrne"), then Executive Vice President of SCANA, stating to the PSC on April 12, 2017, that "work continues onsite without substantial disruption" and providing a power point presentation showing that the Nuclear Project was nearing completion.

16.    Just three months later, on July 31, 2017, SCANA announced that it was abandoning the Nuclear Project and that it would file a petition with the PSC seeking approval of its abandonment plan. SCANA concluded that completing the Nuclear Project would be prohibitively expensive, estimating that completion of the units would cost approximately $9.9 billion, and that the reactor units could not be brought online until December 31, 2022 and March 31, 2024 (well after the expiration of the federal tax credit in 2020). Further, pursuant to the

BLRA, SCANA stated its intention to seek amortization of the failed Nuclear Project's costs – estimated by SCANA at $4.9 billion – into electricity rates over sixty years.

17.    Following SCANA's announcement of the abandonment of construction of the Nuclear Project, on August 4, 2017, South Carolina Attorney General Alan Wilson ("Wilson") announced an investigation and state Senate leaders called for a special legislative session.  Soon thereafter, state lawmakers learned of the existence of the Bechtel Report and demanded that SCANA and Santee Cooper release it.  Not until South Carolina Governor Henry McMaster ("Governor McMaster") demanded the report pursuant to his authority under the South Carolina Constitution did Santee Cooper finally turn the report over to Governor McMaster on September 3, 2017.  Governor McMaster, over Santee Cooper's objection, released the Becthel Report to the public on September 4, 2017.

18.    Following public release of the Bechtel Report, and the coinciding revelation that SCANA knew of the numerous problems with the Nuclear Project long before they were announced publicly, the South Carolina House held a committee hearing on September 15, 2017 to discuss the Nuclear Project's failure.  A panel of eighteen legislators questioned SCANA executives about who was responsible for the failure, but the focus of the hearing was on the concealment of the Bechtel Report.  SCANA executives claimed that the report was not released because it was being used in preparation for litigation against the contractors on the Project, but members of the House said that the audit was proof of SCANA's failure to effectively manage the Nuclear Project and that SCANA should be responsible for the remaining $2.2 billion in costs on the Nuclear Project.

19.    On September 21, 2017, SCANA reported that it received a subpoena issued by the U.S. Attorney's Office for the District of South Carolina.  On September 25, 2017, state lawmakers

asked the South Carolina Law Enforcement Division ("SLED") to investigate potential criminal activity by SCANA related to the Nuclear Project. On October 17, 2017, SCANA reported that it received a document subpoena from the Securities and Exchange Commission ("SEC"). The Company is also subject to numerous consumer class actions, securities class actions, and derivative actions.

20.     Under pressure from South Carolina lawmakers, on October 31, 2017, SCANA announced that Marsh and Byrne would retire, effective December 31, 2017. Pursuant to their employment agreements, Marsh was eligible for $13.8 million in severance payments and Byrne was eligible for $6.5 million in severance payments. This is in addition to millions of dollars in accelerated restricted stock and performance shares.

21.     On November 16, 2017, SCANA issued a press release outlining what the Company claimed was a "proposed solution" to the failed Nuclear Project whereby SCANA's shareholders would absorb billions of dollars of costs. Under this proposal, however, ratepayers would still pay an average of $25 per month, totaling $29.5 million per month, for the failed Nuclear Project, and shareholders would be on the hook for billions of dollars.

22.     In response to SCANA's proposal, state lawmakers were outraged. Representative Kirkman Finlay said, "They have created a whole new world of bad blood. I don't think it received anywhere near the reception they hoped for. I don't think there is anyone in the General Assembly that is impressed by this plan." Representative Finlay's response was echoed by other South Carolina lawmakers such as Senate President Hugh Leatherman who called the proposal "an insult to ratepayers."

23.     In late November 2017, Dominion approached SCANA regarding a potential transaction and, on November 27, 2017, executives from the companies met and discussed a

potential transaction. Barely five weeks later, desperate to escape the massive liability they faced as a result of the failed Nuclear Project, the Board approved the agreement and plan of merger with Dominion (the "Merger Agreement") on January 2, 2018, and it was announced on January 3, 2018.

24.    Pursuant to the terms of the Merger Agreement, Dominion will acquire the Company in a stock-for-stock transaction whereby SCANA shareholders will receive 0.669 shares of Dominion stock for each share of SCANA stock they own (the "Proposed Consideration"). The implied price per share using Dominion's weighted average price for the 30 trading days before the Proposed Transaction was announced is $55.35. However, using Dominion's closing share price on February 6, 2018, the Proposed Consideration is only $49.58 per SCANA share.

25.    The Proposed Consideration undervalues SCANA and enriches insiders. Recently retired SCANA executives Marsh and Byrne, along with current CEO Jimmy Addison ("Addison"), will benefit immensely from the Proposed Transaction. Pursuant to Section 2.02 of the Merger Agreement, restricted stock and performance share awards will immediately vest at their "target" levels. Targets that SCANA would never have otherwise met following abandonment of the Nuclear Project.

26.    On July 31, 2017, the day the abandonment of the Nuclear Project was announced, SCANA shares closed at $64.37. On the day before the Proposed Transaction was announced, January 2, 2018, they closed at $38.87. Further, despite abandonment of the Nuclear Project and the Individual Defendants' wrongdoing and cover-up, several securities analysts continued to have share price targets significantly above the Proposed Consideration. As of December 6, 2017, the consensus analyst price target was $61.44 per share – 24% higher than the Proposed Consideration as of February 6, 2018.

27.    The Individual Defendants, admittedly, made no effort to seek a suitor willing to pay a higher price than Dominion.  On January 11, 2018, Addison acknowledged during a public hearing before the PSC on the Proposed Transaction that the Individual Defendants did not exercise reasonable due diligence to shop SCANA, stating that they "didn't try very hard" to identify other potential buyers.

28.    Compounding the failure to shop the Company to other potential buyers, the Board agreed to preclusive deal protection devices designed to prevent another bidder from emerging with a superior offer.  The Merger Agreement includes, *inter alia*, the following deal protection devices:  (i) a "no solicitation" provision (section 4.01(a)); (ii) a "matching rights" provision (section 4.02(f)); and (iii) a "termination fee" provision obligating the Company to pay Dominion $240 million under certain circumstances (section 7.02).  Further, the Individual Defendants negotiated an indemnification provision (section 5.08) protecting themselves and SCANA's executives from liability related to the Nuclear Project, including liability related to criminal proceedings.

29.    Even more egregious, the Individual Defendants and Dominion included provisions in the Merger Agreement designed to dissuade the South Carolina government from blocking the Proposed Transaction, namely requiring that the PSC approve Dominion's petition to recover the costs related to the Nuclear Project.  If the PSC fails to approve the petition, Dominion is entitled to walk away with the $240 million termination fee.

30.    The unfairness of the Proposed Consideration is further demonstrated by Dominion's acknowledgement that the Proposed Transaction will be immediately accretive to Dominion's earnings and is expected to increase Dominion's annual earnings growth targets to 8% or higher through 2020.  Further, SCANA's assets in the Southeast are complementary to

Dominion's and the Merger Consideration fails to consider the valuable synergies that will result from combining the companies. As noted by an analyst from BofA/Merrill, the Proposed Transaction "is the 'most attractive' acquisition in recent memory across the utility sector given the discounted implied multiple."

31.    Having failed to maximize the sale price for the Company, the Individual Defendants have breached the fiduciary duties they owe to Plaintiffs and the Company's public shareholders because the Company has been improperly valued and shareholders will not receive adequate or fair value for their SCANA common stock in the Proposed Transaction. The Board's actions, taken as a whole, are inconsistent with its obligation to seek out and obtain the highest value attainable for the Company's shareholders.

32.    Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiffs and SCANA's other public shareholders, who will not receive the highest value available for their stock.

33.    Plaintiffs seek to enjoin, preliminarily and permanently, the Proposed Transaction, or alternatively, in the event the Proposed Transaction is consummated, recover damages from the Individual Defendants for their breaches of fiduciary duty and from Dominion and Sedona Corp. for aiding and abetting those fiduciary breaches.

## JURISDICTION AND VENUE

34.    Jurisdiction is proper pursuant to South Carolina Code Section 36-2-803 because SCANA is headquartered in South Carolina, certain of the Defendants are citizens of South Carolina, and the majority of the acts alleged herein occurred in South Carolina.

35.    Venue is proper in Richland County. Many of the acts and omissions giving rise to this claim occurred in substantial part in Richland County and certain Defendants are residents and citizens of Richland County.

## PARTIES

**Plaintiffs**

36.    Metzler is the asset management division of the German bank, Metzler Bank. Metzler is based in Frankfurt am Main, Germany and provides investment services to institutional clients and financial intermediaries.  Metzler currently holds 9,009 shares of SCANA common stock in its G52 and L15 funds and has continuously held those shares at all times relevant hereto. The G52 and L15 funds do not hold Dominion stock.

37.    Heinz currently holds 403 shares of SCANA common stock and has continuously held those shares at all times relevant hereto.  Heinz does not hold Dominion stock.

**Defendants**

38.    Aliff has been a director of SCANA since October 2015.  Aliff is Chairman of the Audit Committee and a member of the Nominating and Governance and Executive Committees. Aliff is also the Company's "audit committee financial expert" as defined by Item 407(d)(5) of SEC Regulation S-K, 17 CFR § 229.407(d)(5).  Aliff is a citizen and resident of Virginia.  Aliff's total compensation for 2015 and 2016 was $48,250 and $213,500, respectively.

39.    Bennett has been a director of SCANA since 1997.  Bennett is Chairman of the Compensation Committee and a member of the Audit and Executive Committees.  Bennett is a citizen and resident of Richland County, South Carolina.  Bennet's total compensation for 2015 and 2016 was $194,157 and $215,867, respectively.

40.    Cecil has been a director of SCANA since 2013.  Cecil is a member of the Compensation and Audit Committees.  Cecil is a citizen and resident of North Carolina.  Cecil's total compensation for 2015 and 2016 was $193,000 and $206,000, respectively.

41.    Decker was a director of SCANA from 2005 until 2013 and again from 2015 through the present.  Decker is a member of both the Compensation and the Nuclear Oversight

Committees. Decker is a citizen and resident of North Carolina. Decker's total compensation for 2015 and 2016 was $48,250 and $206,000, respectively.

42.    Hagood has been a director of SCANA since 1999 and is the Lead Director. Hagood is a member of the Nominating and Governance, Nuclear Oversight, and Executive Committees. Hagood is a citizen and resident of Charleston County, South Carolina. Hagood's total compensation for 2015 and 2016 was $207,000 and $225,500, respectively.

43.    Miller has been a director of SCANA since 1997. Miller is a member of the Nominating and Governance and Audit Committees. Miller is a citizen and resident of Virginia. Miller's total compensation for 2015 and 2016 was $197,000 and $206,000, respectively.

44.    Roquemore has been a director of SCANA since 2007. Roquemore is Chairman of the Nuclear Oversight Committee and a member of the Compensation and Executive Committees. Roquemore is a citizen and resident of Orangeburg County, South Carolina. Roquemore's total compensation for 2015 and 2016 was $197,000 and $216,000, respectively.

45.    Sloan has been a director of SCANA since 1997. Sloan is a member of the Nuclear Oversight and Compensation Committees. Sloan is a citizen and resident of North Carolina. Sloan's total compensation for 2015 and 2016 was $201,000 and $210,000, respectively.

46.    Trujillo has been a director of SCANA since 2013. Trujillo is a member of the Nominating and Governance and Nuclear Oversight Committees. Trujillo is a citizen and resident of Georgia. Trujillo's total compensation for 2015 and 2016 was $193,000 and $206,000, respectively.

47.    Dominion is a Virginia Corporation with its principal office located at 120 Tredegar Street, Richmond, Virginia. Dominion is one of the largest producers and transporters of energy in the United States, with a portfolio of approximately 25,600 megawatts of electric generation,

15,000 miles of natural gas transmission, gathering, storage and distribution pipeline, and 6,600 miles of electric transmission and distribution lines. Dominion also operates one of the largest natural gas storage systems in the United States, with 1 trillion cubic feet of capacity, and serves more than 6 million utility and retail energy customers. Dominion was formerly known as Dominion Resources, Inc. and changed its name to Dominion Energy, Inc. in May 2017. It was founded in 1909, currently employs approximately 16,200 people, and has operations in 18 states.

48.    Sedona Corp. is a South Carolina corporation and is a wholly-owned subsidiary of Dominion created solely to effectuate the Proposed Transaction. Upon completion of the Proposed Transaction, Sedona Corp. will merge with and into the Company, with SCANA continuing as the surviving corporation and a wholly-owned subsidiary of Dominion.

49.    The Individual Defendants, Dominion, and Sedona Corp. are collectively referred to herein as "Defendants."

## RELEVANT NON-PARTIES

50.    SCANA is a corporation existing and organized under the laws of South Carolina. The Company's principal place of business and executive offices are located at 110 Operations Way, Cayce, South Carolina.

51.    Addison joined the Company as Controller in 1991 and has served as the Chief Financial Officer ("CFO") of SCANA since April 2006 and Executive Vice President since January 2012. Addison assumed responsibility as the CEO in January 2018. Addison has also served as the president of both SCANA Energy Georgia, and SCANA Energy Marketing since 2013. Addison's total compensation for 2014, 2015, and 2016 was $2,525,942, $2,405,419, and $2,580,874, respectively.

52.    Byrne joined SCANA in 1995 and held various positions until he retired in December 2017. Byrne served as an Executive Vice President of SCANA from 2009 until his

retirement, and as President, Generation and Transmission and Chief Operating Officer of SCE&G from 2011 until his retirement. Byrne's total compensation for 2014, 2015, and 2016 was $2,366,224, $2,314,038, and $2,582,141, respectively.

53. Marsh served as CEO and Chairman of the Board of SCANA from December 2011 through December 2017. Before assuming the CEO position, Marsh served as the President and Chief Operating Officer of SCANA beginning in January 2011. Marsh also served as a Senior Vice President from 1998 to January 2011, and was the President of SCANA's principal subsidiary, SCE&G, from April 2006 to November 2011. Marsh's total compensation for 2014, 2015, and 2016 was $5,710,448, $5,733,258, and $6,108,804, respectively.

## CLASS ACTION ALLEGATIONS

54. Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the South Carolina Rules of Civil Procedure on behalf of themselves and the public shareholders of the Company (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with Defendants.

55. This action is properly maintainable as a class action.

56. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of December 29, 2017, there were approximately 143 million shares of common stock issued and outstanding, held by hundreds, if not thousands, of geographically dispersed shareholders.

57. There are questions of law and fact that are common to the Class, including, *inter alia*, whether: (i) Defendants have and are breaching their fiduciary duties to the detriment of Plaintiffs and the Class; (ii) the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the sale of SCANA; (iii) the

Proposed Consideration is unfair and inadequate; and (iv) Plaintiffs and the Class will be irreparably harmed if the Proposed Transaction is consummated.

58.      Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and the Class have and will continue to sustain damages arising out of Defendants' breaches of their fiduciary duties.  Plaintiffs do not have any interests that are adverse or antagonistic to those of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.  Accordingly, Plaintiffs are adequate Class representatives.

59.      The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

60.      Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

61.      Where the directors of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's public shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)    Adversely affects the value provided to the corporation's shareholders;

(b)    Will unnecessarily discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)    Contractually prohibits themselves from complying with their fiduciary duties;

(d)    Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

62.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of SCANA, are obligated to refrain from:

(a)    Participating in any transaction in which their loyalties are divided;

(b)    Participating in any transaction in which they receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the Company; and/or

(c)    Unjustly enriching themselves at the expense or to the detriment of the public shareholders.

63.    Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiffs and the Class.  The Individual Defendants are engaging in self-dealing, are obtaining for themselves personal benefits not shared equally by Plaintiffs and the Class, and/or are aiding and abetting other Defendants' breaches.  As a result of the Individual Defendants' self-dealing and divided

16

loyalties, neither Plaintiffs nor the Class are being treated fairly in connection with the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

64.    SCANA was incorporated in 1984 following the merger of SCE&G and Carolina Energies, Incorporated.  In November 1982, two years before SCANA was formed, SCE&G received an operating license for a nuclear reactor at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina.  The plant cost $1.3 billion to construct and began commercial operation on January 1, 1984.

65.    In the late 1980s, US energy producers began to move away from costly nuclear energy construction and instead re-focused on natural gas and coal.  SCANA followed the natural gas trend.  As deregulation increased during the 1990s, SCANA looked to expand by diversifying its holdings and increasing its customer base.  Between 1990 and 1993, SCANA purchased natural gas reserves in Texas, Louisiana, and Oklahoma, bringing the Company's total natural gas reserves to 283 billion cubic feet.  By the early 2000s, however, interest in nuclear energy projects was renewed and power companies in Georgia and South Carolina, including Westinghouse and SCANA, started to plan for new construction.

**The Failed Expansion of the Virgil C. Summer Nuclear Generating Station**

66.    In February 2006, SCANA began plans to expand the Virgil C. Summer Nuclear Generating Station ("V.C. Summer Nuclear Station") by building two additional nuclear reactors at the site.  The Nuclear Project was planned in partnership with Santee Cooper, with SCANA owning a 55% stake in the Project.

67.    SCANA's first step was securing passage of the BLRA.  The BLRA is a legislative guarantee that a utility that builds a power plant in South Carolina can increase customers' electric rates to finance the costs of the project.  Pursuant to the BLRA, once the South Carolina PSC

approves a project, the utility can request annual increases in allowable costs – increases that are virtually guaranteed to receive approval.

68.    The BLRA has been referred to as a utility company "wish list" and it: (i) shifted the risk of the Nuclear Project from SCANA to South Carolina power customers; (ii) made it more difficult to challenge and defeat Nuclear Project-related rate increases that SCANA requested from the PSC; and (iii) gave SCANA (and, with the Proposed Transaction, Dominion) the right to charge customers for the costs associated with the Nuclear Project's failure.

69.    The BLRA was introduced in the South Carolina Senate on February 13, 2007, the South Carolina House on April 17, 2007, and was passed by the General Assembly two days later, on April 19, 2007. The BLRA became law less than three months after its introduction, on May 3, 2007.

70.    SCANA played an active role in assuring the successful passage of the BLRA by making campaign contributions and hiring lobbyists. According to a September 16, 2017 article published by *The State* titled "How SCANA Spent $1.25 Million at State House Before Nuclear Project Collapsed," SCANA has donated more than $1.25 million to South Carolina political candidates since 2000. As reported in the article, the Company donated an additional $80,000 "to legislators on a committee that names the members of a state board [the PSC] that regulates SCANA," and over $90,000 "to 31 of the 32 legislators now trying to unravel how the [Nuclear Project] failed." According to campaign finance data collected by the National Institute on Money in State Politics, SCANA's contributions to lawmakers increased exponentially – from $64,705 in 2003-2004 to $138,850 in 2005-2006 – in the year before the BLRA was passed. According to the Center for Responsive Politics, a nonpartisan research group, SCANA also spent more than $6.3 million on lobbyists between 2005 and 2012.

71.    Following passage of the BLRA, on March 27, 2008, SCANA applied for a Combined Construction and Operating License with the NRC and, on May 27, 2008, entered into a contract with Westinghouse and CB&I for the design and construction of the Nuclear Project. As expected, the review process took approximately four years, and, on March 30, 2012, the NRC issued the Nuclear Project's license. The approval was met with great excitement by leaders in the nuclear energy industry. In a March 30, 2012 press release, Marvin Fertel, president and CEO of the Nuclear Energy Institute, commended the NRC's approval of the Project:

> The Nuclear Energy Institute congratulates South Carolina Electric & Gas, partner Santee Cooper, Westinghouse Electric, the Shaw Group and other project participants on this important milestone. This will be one of the largest construction and engineering projects in South Carolina history. It will create thousands of well-paying jobs during construction and provide careers for several hundred more people over the decades that the new reactors will generate electricity.

> The V.C. Summer expansion will contribute to the electricity reliability and diversity of South Carolina and enhance its energy security. America's energy future is getting stronger thanks to projects like this.

72.    Construction began on March 9, 2013, with expected completion by 2018. From the start, the Nuclear Project was plagued with problems, cost overruns, and delays.

73.    As later reported, SCANA was aware of numerous problems before construction even began. In January 2011, the NRC attempted to inspect the construction site, but had to cancel the inspection because not enough progress had been made to warrant inspection. When the NRC returned to the site in November 2011, they issued a "Notice of Nonconformance" with their quality assurance program. By July 2012, only 21 of 72 modules, which were vital components for construction, had been delivered to the site, and SCANA and Westinghouse were thus forced to revise their contractual agreement to delay the substantial completion dates for the two units. By September 2012, at least 30 of the construction milestone dates had passed "without completion

of the associated milestone event" and yet another NRC "Notice of Nonconformance" had been issued.

74.    As later discovered during a South Carolina house committee hearing in August 2017, at the time construction was to begin, SCANA was using an unreliable construction timetable and a generic schedule that made it incapable of estimating project costs.  One witness stated that, deviating from standard practice in large, complex construction projects, SCANA executives allowed the Project to move ahead without ever having received a fully integrated construction schedule from Westinghouse.  Before ground was broken on the Nuclear Project, SCANA had already requested and received two pre-construction capital cost forecast increases – $174 million in November 2010 and $283 million in May 2012.

75.    The construction delays and cost increases did not slow after construction began. Instead, five months after construction began, in September 2013, design deficiencies in the Nuclear Project's foundation were identified which forced a delay in construction while the deficiencies were corrected.

76.    In response to the constant problems with the Nuclear Project, SCANA sent the May 6, 2014 Letter to Westinghouse detailing numerous issues with the Nuclear Project dating back to 2008.  The May 6, 2014 Letter was ultimately published by *The Post and Courier* on September 29, 2017.  The May 6, 2014 Letter revealed that SCANA executives were aware early on that the Project was plagued by significant delays in material delivery and construction, nonconformance with the NRC's quality assurance program, and design deficiencies, among other issues.  The May 6, 2014 Letter detailed SCANA's substantial concerns with the Nuclear Project as early as May 23, 2008:

> The events since May 23, 2008 have tested our resolve . . . .  We regret that this letter is necessary and regret its length.  Your poor performance has made both

necessary. A complete description of our grievances would make this letter even longer. Consequently, we have chosen to focus on the events and issues concerning the structural modules, primarily CA-20 and CA-01, as well as certain design issues, and their combined effect on the expected completion date and cost of the project. We selected these examples to illustrate our dissatisfaction. They are not an exhaustive listing of your every shortcoming.

The letter went on to detail specific grievances from each year between 2011 and 2014.

77.    As reflected in the May 6, 2014 Letter, SCANA executives were aware that Westinghouse was not complying with NRC quality assurance requirements, was unable to adhere to construction deadlines, and was using flawed designs and defective components for construction. Despite that knowledge and their demand that Westinghouse "demonstrate a renewed commitment to this [P]roject," SCANA executives apparently did not act to ameliorate any of these problems and the delays and cost overruns continued while the Individual Defendants and SCANA's executives continued to pocket millions of dollars in compensation and from stock sales.

78.    In addition to the numerous delays and cost overruns, there were serious concerns about the integrity of the designs being used in the construction of the reactors. An article published on September 24, 2017 by *The Post and Courier* titled "Stamped for failure: Westinghouse and SCANA Used Unlicensed Workers to Design Abandoned S.C. Nuclear Reactors," reported that mechanical and electrical blueprints were often "unstamped" or not officially sealed by state regulators. The article further reported that engineers were discouraged from approaching management with their concerns – "it put us in a terrible situation, because if we raised the issue, we were tagged as troublemakers." The May 6, 2014 Letter identified similar issues, stating that the NRC wrote a letter in October 2012 documenting a "chilled work environment" at one facility "which was causing employees to believe that they are not free to

raise safety concerns using all available avenues and that individuals have been retaliated against for raising safety concerns."

79.    On August 6, 2015, SCANA and Santee Cooper hired Bechtel to conduct an audit of the Nuclear Project at a cost of more than $1 million.  Bechtel delivered its initial findings to the Company on October 22, 2015, and, on November 9, 2015, submitted a first draft of its report. In the following weeks, Wenick, an attorney hired by SCANA, battled with Bechtel about the contents of the final report.  Wenick wanted any mention of the reactors not being finished before 2020 (the deadline to receive billions of dollars in federal tax credits) removed from the report along with criticism of SCANA's oversight.  Ultimately, Wenick's efforts resulted in more than thirty pages being removed from the report.

80.    Despite receiving Bechtel's initial findings in late 2015, SCANA did not disclose the findings to shareholders or regulators and, instead, while assuring the PSC that the Nuclear Project was proceeding as planned, requested that the PSC increase its nuclear budget by $800 million, which the PSC agreed to do.  This $800 million increase was in addition to a $698 million increase in March 2015 and a $1.2 billion increase in October 2014.

81.    Bechtel provided the final report to SCANA on February 5, 2016.  The Bechtel Report highlighted, among other things, the lack of a construction schedule, the flawed nature of the reactor design, Westinghouse's complete lack of organization, and the apparent lack of commercial motivation among the contractors to complete the Nuclear Project.  Again, rather than share the findings with shareholders and regulators, SCANA concealed the report.

82.    Following receipt of the Bechtel Report, there is no evidence that SCANA made any effort to address the myriad problems with the Nuclear Project. *The State*, on September 27, 2017, reported that "an internal Santee Cooper memo written a month after the Bechtel Report was

issued said the utilities needed to begin 'intrusive verification' of work the contractors were doing and suggested moving to a 'construction milestone payment schedule,' whereby contractors would only be paid as they met specific milestones." SCANA never acted on this recommendation and instead continued spending $120 million a month on the Nuclear Project despite knowledge that completion was becoming increasingly less likely.

83.     Less than one month after the Bechtel Report was presented to the Individual Defendants, three Company insiders, Russell Harris, a senior vice president, Mark Cannon, a vice president and treasurer, and James Micali, a former board member, sold a combined 11,500 shares for approximately $750,000. Using Dominion's closing share price on February 6, 2018, these sales would have been worth only $570,171, or more than 30% less.

84.     In March 2016, a month after receiving the Bechtel Report, Marsh wrote a letter to shareholders with assurances that, "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

85.     Not to be outdone by Marsh's fabrications, Byrne held a conference call with analysts and investors on April 28, 2016, in which he stated that construction crews were doing a "tremendous job" and that a key component of the reactor was going to be "better than we expected."

86.     SCANA's reports to analysts and investors were similarly optimistic following receipt of the Bechtel Report. During the second quarter earnings conference call, on July 28, 2016, Byrne once again failed to be forthcoming about the true progress of the Nuclear Project:

> [Analyst]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do – or hear back from Flour as to more of an integrated schedule update for the overall project.

> [Byrne]: Yes, Julien, this is Steve. The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see

anything to change those. Flour's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Flour is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. So I don't expect anything dramatic to come from that.

87.    In a September 2016 video presented at the "V.C. Summer Media Day" Byrne stated, "I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." He also enthused, "[w]e're excited about where we are, we've had challenges, we've been able to work through those challenges."

88.    On February 16, 2017, just five months before SCANA announced it was abandoning the Nuclear Project, Marsh stated during the fourth quarter 2016 earnings call that:

We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, we still anticipate completing our two new nuclear units, which will enable us to provide our customers with safe, reliable energy for decades to come. . . . As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.

On the same call, Byrne reiterated Marsh's assurances, stating that SCANA would still meet the 2020 deadline thanks to increased efficiency factors.

89.    According to a September 7, 2017 article in *The State* titled "SCE&G Failed to Heed Santee Cooper Warnings at Bungled Nuke Project, Records Show," Santee Cooper, since May 2014, had urged SCE&G, SCANA's subsidiary, to address growing problems with the failing Nuclear Project. On November 28, 2016, Santee Cooper wrote to Marsh, stating: "SCANA's project management team . . . does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities." Further, Santee Cooper wrote that SCE&G's refusal to release

the Bechtel Report created "an untenable position" for both companies and, in June 2016, that the

Bechtel report "was sufficient for Santee Cooper to recognize the need (for) onboard experts to

help to work on key issues and improve management of the project." SCE&G did not respond to

the June email.

90.    Then, on March 29, 2017, Westinghouse filed for bankruptcy protection.    In

response, SCANA continued to claim that the construction of the reactors was nearing completion.

As later revealed, SCANA knew as early as March 2016 that Westinghouse was facing financial

troubles that could impact the Nuclear Project.    On March 21, 2016, Santee Cooper and SCANA

met to discuss Westinghouse and the state utility asked that a bankruptcy lawyer be retained.

**Despite Knowledge that the Nuclear Project was Failing, the Individual Defendants
Continued to Approve Exorbitant Compensation**

91.    SCANA's annual incentive compensation plan is based on evaluating SCANA's

earnings per share and each executive's level of performance in helping SCANA achieve its

business objectives.    SCANA's 2017 proxy statement (the "2017 Proxy") states that in 2016, all

of SCANA's named executive officers earned 100% of their annual incentive awards.    In addition

to their regular salaries, Marsh received stock awards worth over $2.9 million and incentive plan

compensation of more than $1.4 million; Addison received stock awards worth over $1 million

and incentive plan compensation of over $600,000; and Byrne received stock awards worth over

$1 million and incentive plan compensation of over $600,000.

92.    These awards were tied directly to the success of the Nuclear Project.    In explaining

the reasons behind the awards, the 2017 Proxy states that "Mr. Marsh's award was based on his

oversight and support of our new nuclear construction activities," while both Addison's and

Byrne's awards were based on their "efforts to secure financing related to our new nuclear

construction project; completing an evaluation of pricing options under the amended Engineering,

Procurement and Construction Agreement relating to our new nuclear construction, and overseeing regulatory approval of additional costs associated with the selected option."

93.    SCANA would not have achieved its target earnings per share, and executives would not have received millions of dollars in compensation if the truth about the Nuclear Project had been known.

**SCANA Announces That It Is Abandoning The Nuclear Project**

94.    On July 31, 2017, over a year after the Bechtel Report and just five months after SCANA assured investors and the public that progress continued to be made towards the Nuclear Project's completion, SCANA announced that it would abandon construction of the Nuclear Project. At the time that the decision to abandon the Nuclear Project was announced – four years after construction began – the reactors were less than 40% complete.[3]

95.    South Carolina Attorney General Wilson quickly announced an investigation into SCANA's abandonment of the Nuclear Project on August 4, 2017.

96.    SCANA's share price dropped precipitously following its announcement to abandon the Nuclear Project – declining from $65.97 on July 31, 2017 to just $38.86 by January 2, 2018, the day before the Proposed Transaction was announced – a decline of more than 41%.

97.    On September 4, 2017, upon a mandate from South Carolina Governor McMaster, the Bechtel Report was finally released to the press, revealing that the Individual Defendants had caused SCANA to purposefully conceal the Bechtel Report from the public for eighteen months. Soon after, a South Carolina House Committee held a hearing in which it lambasted SCANA officials, stating that the Bechtel Report clearly showed that SCANA failed to effectively manage

---

[3]  On May 1, 2017, less than three months before the Nuclear Project was abandoned, Martin Phalen, a senior vice president, sold 42,023 shares of stock for approximately $2.7 million.

both the Nuclear Project and Westinghouse. House Committee members went on to suggest that SCANA should "eat" the $2 billion in remaining costs for the Nuclear Project rather than charge ratepayers.

98.    On September 21, 2017, SCANA announced that it had received a subpoena from the U.S. Attorney's Office for the District of South Carolina requesting audits, project assessments, and due diligence reports associated with the Nuclear Project. The next day, on September 22, 2017, the Speaker of the South Carolina House of Representatives requested that SLED launch a criminal investigation related to the Nuclear Project. SCANA's willful concealment of the Bechtel Report from regulators and other state officials is paramount to the investigation.

99.    On October 17, 2017, SCANA reported that it received a subpoena from the SEC in connection with the Nuclear Project. The SEC subpoena expands the increasingly long list of investigations and lawsuits faced by SCANA as a result of the Individual Defendants' malfeasance.

100.    In addition to federal and state-led investigations, the environmental interest groups, Friends of the Earth and the Sierra Club, and others have filed actions before the PSC to prevent SCANA from continuing to charge utility customers for the costs of the failed Nuclear Project. SCANA currently collects more than $445 million a year from ratepayers. Some of the actions before the PSC have also requested refunds for the nearly $2 billion that customers have already paid for the Nuclear Project.

101.    Another group of lawsuits, brought by South Carolina utility customers, is pending in state court where ratepayers are seeking damages for having been forced to pay elevated rates for the failed Project.

102.    SCANA is also a defendant, and thus faces substantial liability, in multiple federal lawsuits brought by shareholders.  On January 18, 2018, U.S. District Court Judge Margaret Seymour designated lead plaintiffs in a class of federal shareholder lawsuits against SCANA in connection with the enormous losses shareholders incurred as a result of SCANA misleading investors regarding the successful completion of the Project in violation of Section 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5.  If the shareholders prevail, SCANA will have to pay significant monetary damages.

103.    On the same day, Judge Seymour designated lead plaintiffs in a group of federal shareholder derivative actions, which allege that SCANA and its officers exposed the Company to liability in connection with the Nuclear Project by violating the Exchange Act.  Three derivative actions have also been filed in South Carolina state court that allege the same wrongdoing as the federal derivative action, and additionally allege that SCANA's executives failed to manage the Nuclear Project and actively concealed its shortcomings, and that the Individual Defendants failed to hold management accountable for their wrongful conduct and instead rewarded management and themselves with unwarranted compensation.  The federal and state derivative claims against the Individual Defendants and certain current and former executives include breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the Nuclear Project.  If plaintiffs are successful in the derivative cases, SCANA officers and Board members could be compelled to return some of their profits to the Company, such as annual performance awards.  As such, the Company has valuable claims against certain executives and the Individual Defendants for breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the Nuclear Project.  These claims will pass to Dominion in the Proposed

Transaction, but Dominion has made apparent that it will not pursue these valuable claims because it has agreed to indemnify the wrongdoers in the Merger Agreement.

104.    Marsh and Byrne appear to have escaped liability for their part in the Nuclear Project's ultimate failure.  Both executives announced their retirements on October 31, 2017, effective on December 31, 2017.  While the Board, no doubt under pressure from the public and South Carolina lawmakers, elected to withhold severance packages from Marsh and Byrne, Marsh retired with a pension worth over $3 million, and with 47,000 shares of SCANA stock, currently valued at approximately $2 million.  Byrne retired with a pension in excess of $1.4 million and 32,000 shares currently valued at approximately $1.4 million.  On information and belief, there has been no discussion of potential clawbacks of either executive's compensation to account for the huge losses SCANA suffered, and will continue to suffer, as a result of the mismanagement of the Nuclear Project.  Further, the Merger Agreement provided indemnification for wrongdoing related to the Nuclear Project.

105.    In furtherance of their own self-interest and out of loyalty to former executives, the Individual Defendants have approved the Proposed Transaction at a time when the abandonment of the Nuclear Project and resulting fallout have depressed SCANA's stock price and made it an attractive takeover target.  Now that Company insiders and the Individual Defendants have benefited from the corporate waste and unjust enrichment alleged in the derivative actions, they seek to sell the entire Company at a price that is unfair to its current shareholders, and to insulate themselves from their liability to the Company resulting from their gross mismanagement of the Nuclear Project.

**The Proposed Transaction Is Announced**

106.    In the wake of the abandonment of the Nuclear Project and revelations of the Individual Defendants' mismanagement – depressing SCANA's stock price and subjecting the

Company and the Individual Defendants to massive liability – Dominion approached SCANA

about a potential transaction in late November 2017, and executives from the companies met to

discuss terms on November 27, 2017. Barely five weeks later, on January 3, 2018, SCANA and

Dominion announced that Dominion had agreed to acquire SCANA in the Proposed Transaction.

The joint press release stated, in relevant part:

> RICHMOND, Va. and CAYCE, S.C., Jan. 3, 2018 /PRNewswire/ -- Dominion
> Energy, Inc. (NYSE: D) and SCANA Corporation (NYSE: SCG) today announced
> an agreement for the companies to combine in a stock-for-stock merger in which
> SCANA shareholders would receive 0.6690 shares of Dominion Energy common
> stock for each share of SCANA common stock, the equivalent of $55.35 per share,
> or about $7.9 billion based on Dominion Energy's volume-weighted average stock
> price of the last 30 trading days ended Jan. 2, 2018. Including assumption of debt,
> the value of the transaction is approximately $14.6 billion.
>
> The agreement also calls for significant benefits to SCANA's South Carolina
> Electric & Gas Company subsidiary (SCE&G) electric customers to offset previous
> and future costs related to the withdrawn V.C. Summer Units 2 and 3 project. After
> the closing of the merger and subject to regulatory approvals, this includes:
>
> A $1.3 billion cash payment within 90 days upon completion of the merger to all
> customers, worth $1,000 for the average residential electric customer. Payments
> would vary based on the amount of electricity used in the 12 months prior to the
> merger closing.
>
> - An estimated additional 5 percent rate reduction from current levels, equal
>   to more than $7 a month for a typical SCE&G residential customer,
>   resulting from a $575 million refund of amounts previously collected from
>   customers and savings of lower federal corporate taxes under recently
>   enacted federal tax reform.
> - A more than $1.7 billion write-off of existing V.C. Summer 2 and 3 capital
>   and regulatory assets, which would never be collected from customers. This
>   allows for the elimination of all related customer costs over 20 years instead
>   of over the previously proposed 50-60 years.
> - Completion of the $180 million purchase of natural-gas fired power station
>   (Columbia Energy Center) at no cost to customers to fulfill generation
>   needs.
>
> In addition, Dominion Energy would provide funding for $1 million a year in
> increased charitable contributions in SCANA's communities for at least five years,
> and SCANA employees would have employment protections until 2020.

SCANA would operate as a wholly owned subsidiary of Dominion Energy. It would maintain its significant community presence, local management structure and the headquarters of its SCE&G utility in South Carolina.

The transaction would be accretive to Dominion Energy's earnings upon closing, which is expected in 2018 upon receipt of regulatory and shareholder approvals. The merger also would increase Dominion Energy's compounded annual earnings-per-share target growth rate through 2020 to 8 percent or higher.

Thomas F. Farrell, II, chairman, president and chief executive officer of Dominion Energy, said: "We believe this merger will provide significant benefits to SCE&G's customers, SCANA's shareholders and the communities SCANA serves. It would lock in significant and immediate savings for SCE&G customers – including what we believe is the largest utility customer cash refund in history – and guarantee a rapidly declining impact from the V.C. Summer project. There also are potential benefits to natural gas customers in South Carolina, North Carolina and Georgia and to their communities. And, this agreement protects employees and treats fairly SCANA shareholders, many of whom are working families and retirees in SCANA's communities. The combined resources of our two companies make all this possible."

"Dominion Energy is a strong, well-regarded company in the utility industry and its commitment to customers and communities aligns well with our values," said Jimmy Addison, chief executive officer of SCANA. "Joining with Dominion Energy strengthens our company and provides resources that will enable us to once again focus on our core operations and best serve our customers."

## Strategic combination

The combination with SCANA would solidify Dominion Energy's position among the nation's largest and fastest-growing energy utility companies by adding significantly to its presence in the expanding Southeast markets. SCANA's operations include service to approximately 1.6 million electric and natural gas residential and business accounts in South Carolina and North Carolina and 5,800 megawatts of electric generation capacity. SCANA continues to experience strong growth in both customer count (more than 2 percent on average annually at SCE&G and PSNC Energy) and weather-normalized energy sales.

"SCANA is a natural fit for Dominion Energy," Farrell said. "Our current operations in the Carolinas – the Dominion Energy Carolina Gas Transmission, Dominion Energy North Carolina and the Atlantic Coast Pipeline – complement SCANA's, SCE&G's and PSNC Energy's operations. This combination can open new expansion opportunities as we seek to meet the energy needs of people and industry in the Southeast."

Once the merger is completed, the combined company would operate in 18 states from Connecticut to California. The company would deliver energy to

approximately 6.5 million regulated customer accounts in eight states and have an electric generating portfolio of 31,400 megawatts and 93,600 miles of electric transmission and distribution lines. It also would have a natural gas pipeline network totaling 106,400 miles and operate one of the nation's largest natural gas storage systems with 1 trillion cubic feet of capacity.

### Regulatory, shareholder approvals and conditions

The merger is contingent upon approval of SCANA's shareholders, clearance from the U.S. Federal Trade Commission (FTC)/the U.S. Department of Justice (DOJ) under the Hart-Scott-Rodino Act, and authorization of the Nuclear Regulatory Commission (NRC) and Federal Energy Regulatory Commission (FERC).

SCANA and Dominion Energy also will file for review and approval from the public service commissions of South Carolina, North Carolina, and Georgia.

"We will seek the approval of the Public Service Commission of South Carolina for the immediate customer payments, rate refunds over time and other conditions related to resolution of the V.C. Summer Units 2 and 3 situation," said Dominion Energy's Farrell. "We believe it is in the best interests of all parties to reach an agreement on this critical issue. Having certainty on this issue can act as a catalyst for economic development and it is essential for the Dominion Energy-SCANA merger to move forward. The availability, reliability and cost of energy are often the deciding factors when businesses consider investing – and we want businesses to have every reason to continue investing in SCANA's communities."

### For SCANA shareholders

Under the terms of the merger agreement, SCANA common shareholders are to receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock held. Based on Dominion Energy's volume-weighted average stock price of the last 30 trading days ended Jan. 2, 2018, this equates to a value of approximately $55.35 per SCANA share. This represents an approximate 30.6 percent premium to the volume-weighted average stock price of SCANA's last 30 trading days ended Jan. 2, 2018. Upon closing of the merger, SCANA shareholders would own an estimated 13 percent of the combined company.

The transaction structure contemplates that the receipt of Dominion Energy shares will be tax-deferred for SCANA shareholders.

**The Proposed Consideration Is Inadequate**

107.    The Proposed Consideration is grossly inadequate because, among other things, the intrinsic value of SCANA is materially in excess of the Proposed Consideration. Having failed to maximize the sale price for the Company, the Individual Defendants breached the fiduciary duties

they owe to the Company's public shareholders because the Company has been improperly valued and shareholders will not receive adequate or fair value for their SCANA common stock in the Proposed Transaction. Moreover, due to their receipt of just 0.669 of a share of Dominion, SCANA shareholders will own only approximately 13% of the post-merger company, which will prevent them from meaningfully participating in the Company's long-term prospects.

108.    At the effective time of the Proposed Transaction, the Company's shareholders will receive 0.669 of a share of Dominion stock for each share of SCANA stock they own. According to the joint press release, using Dominion's volume-weighted average stock price for the 30 trading days before the Proposed Transaction was announced, this is equivalent to $55.35 per SCANA share and represents an approximate 30.6% premium.

109.    The hyped premium is illusory. The Proposed Consideration actually represents a 12% *discount* to SCANA's stock price on July 31, 2017, the day the Company announced it was abandoning the Nuclear Project. This significant discount shows that the Individual Defendants did not negotiate for, and Dominion is not paying for, the valuable claims that Dominion can pursue against the Individual Defendants and SCANA executives following the Proposed Transaction.

110.    Moreover, since the Proposed Transaction was announced, Dominion's stock price has steadily declined. Using the closing price of Dominion shares on February 6, 2018 of $74.11, the implied per share consideration is only $49.58. This represents a 23% *discount* from SCANA's stock price of $64.37 on July 31, 2017, the day the Company announced its plan to abandon the Nuclear Project. Even assuming an implied price of $55.35 per share, this is still a 14% *discount* to SCANA's closing price on July 31, 2017. In their rush to finalize a deal to shield themselves

from liability, the Individual Defendants failed to negotiate a collar to protect SCANA's shareholders from a falling Dominion stock price, in contravention of their fiduciary duties.

111.    As of December 6, 2017, the consensus price target for SCANA was $61.44 per share – over 19% more than the Proposed Consideration as of February 6, 2018. Moreover, before the Proposed Transaction was announced, several analysts had price targets for SCANA well above the Proposed Consideration. For example, on August 10, 2017, Morgan Stanley Investment Research had a price target of $58.00-$59.00, and on August 28, 2017, Mizuho Securities USA Inc. had a price target of $58.50. A September 1, 2017 article in the Analyst Journal titled "Is SCANA Corporation (SCG) Sell Now?" states: "The analysts offering 12 month price targets for SCANA Corporation have a median target of $65, with a high estimate of $80 and a low estimate of $54." On September 18, 2017, Williams Capital's price objective for SCANA was $70. The average 12-month price target among analysts that have issues ratings on SCANA's stock in the last year is $63.07. As such, the Proposed Consideration severely undervalues the Company.

112.    Moreover, the Proposed Consideration fails to adequately account for the valuable claims against the Individual Defendants and SCANA executives that Dominion will acquire in the Proposed Transaction. In fact, the value of these claims does not appear to have been factored into the amount of the Proposed Consideration at all, and because Dominion has agreed to indemnify the wrongdoers in the Merger Agreement, it is unlikely that Dominion will pursue these claims if the Proposed Transaction is consummated.

113.    Several commentators have noted that Dominion is taking advantage of SCANA and South Carolina legislators' misfortunes following SCANA's decision to abandon the Nuclear Project. As a January 3, 2018 article in the *Wall Street Journal* titled "Dominion Pounces on Scana's Nuclear Woes," put it: Dominion's bid for SCANA "is nothing short of masterful – a

bold move to take advantage of [SCANA's] and local politicians' misfortune." Discussing Dominion's insistence that South Carolina ratepayers foot the $6 billion still owed for the failed Nuclear Project, the article noted that South Carolina regulators and politicians "will have a hard time saying 'no.'" The article concludes by noting that "Dominion is paying around $7.43 billion excluding debt for a company that would have cost it $14 billion last summer with a similar deal premium. A master stroke."

114.    Similarly, a January 3, 2018 article on *Bloomberg Gadfly* titled "Dominion Aims to Clean Up a Nuclear Disaster" points out that SCANA's stock fell by almost half in 2017 as a result of the abandoned Nuclear Project. Dominion, on the other hand, along with the energy sector as a whole, rose approximately 6%. "Hence, while the 42 percent premium implied by Dominion's all-stock offer looks high, it looks less so when you compare the exchange ratio – 0.669 shares per SCANA share – with history:  Dominion's offer of 0.669 shares per SCANA share is well above the current ratio, but still significantly below the historical average." As recently as July 31, 2017, the day SCANA announced abandonment of the Nuclear Project, the ratio of SCANA's stock price to Dominion's was 0.834. At that ratio, based on Dominion' stock price of $74.11 on February 6, 2018, the consideration would be $61.80, or nearly 25% higher.

115.    On the other hand, if the Proposed Transaction is consummated, it will be immediately accretive to Dominion's earnings and is expected to increase Dominion's annual earnings per share target growth to 8% or higher through 2020. The Proposed Transaction will also complement Dominion's pre-existing operations in South Carolina and strengthen its grip on energy production and delivery in the Southeast region. According to Dominion's website, the company currently delivers natural gas to wholesale and direct customers in South Carolina and operates approximately 1,500 miles of transmission pipelines in South Carolina and Georgia, all

of which would be greatly augmented by acquiring SCANA. Despite this, the Proposed Consideration fails to adequately reflect the synergies anticipated to be generated as a result of the Proposed Transaction.

**The Individual Defendants Rush To Make A Deal With Dominion To The Exclusion Of Other Potential Suitors**

116.    As reported on January 12, 2018 in a *The Post and Courier* article titled "CEO: SCANA didn't push to land competing offers before inking Dominion deal," Addison testified before the South Carolina PSC, in response to a question about whether the Company had "tried very hard" to find buyers, that, "No. I didn't mean to even imply that." Rather, negotiations were carried out over the course of less than five weeks, while the Individual Defendants were feeling enormous pressure to clean up the mess they had made and insulate themselves from personal liability.

117.    According to the same article, Dominion had been interested in a potential transaction with SCANA in the summer of 2017, "before the abandoned expansion of the V.C. Summer Nuclear Station had exploded into a political and financial crisis." These discussions never advanced to the point of negotiating the terms of a potential transaction. Unsurprisingly, once the Nuclear Project was abandoned, the Individual Defendants sought a transaction, any transaction, that would protect them from personal liability.

118.    Addison said the Company tried to find a solution to the problems caused by the abandonment of the Nuclear Project but was unable to do so. Specifically, according to Addison's testimony before the PSC on January 11, 2018, there was little public support for SCANA's initial proposed solution to the abandonment of the Project, which involved "an immediate rate reduction of 3½ percent, shortening the recovery period from 60 to 50 years, a shareholder-funded base-load power plant of over 500 megawatts providing 40 percent of the energy that was to come from our

36

55 percent portion of Units 2 and 3 of Summer." South Carolina lawmakers were openly hostile to SCANA's proposal, with the Senate President calling it an "insult to ratepayers."

119.    This proposal was announced on November 16, 2017, and a week later Dominion reached out to Addison regarding a potential merger. On November 27, 2017, SCANA executives met with the CEO of Dominion, Thomas Farrell ("Farrell"), where he and Dominion's CFO presented a proposed transaction. Two days later, the Board met to discuss the terms of a potential combination with Dominion, and on January 2, 2018, after only five weeks of negotiations, the Board unanimously approved the Proposed Transaction.

120.    While the Board rushed to escape personal liability by inking a deal with Dominion that severely undervalues the Company, they would have been able to secure a more valuable deal for SCANA's public shareholders if they had initiated a sales process. According to a January 18, 2018 article in *The State* titled "Should SC accept Dominion's buyout of SCANA? Lawmakers are skeptical," Florida-based NextEra Energy and North Carolina-based Duke Energy are interested in buying SCANA, too. While neither utility has publicly announced an offer to acquire SCANA, both utilities had representatives monitoring legislative hearings regarding the Proposed Transaction.

121.    Moreover, the Proposed Transaction is structured to make it prohibitively risky for SCANA to walk away while facilitating a quick exit by Dominion if certain conditions are not met. For example, Dominion CEO, Farrell, told the South Carolina Legislature on January 17, 2018, that Dominion would walk away from the Proposed Transaction if lawmakers move forward with their plans to repeal parts of the BLRA that would allow Dominion to continue to charge utility customers for the price of the botched Nuclear Project. Farrell also said that Dominion would walk away if the South Carolina Supreme Court finds that the BLRA was unconstitutional

when it was passed, an assertion that the Office of the Attorney General has made since September 2017. Dominion has also threatened to scrap the Proposed Transaction if state courts or regulators find that SCANA fraudulently obtained previous rate hikes for the Nuclear Project – thereby forcing Dominion to refund the money to SCANA's customers.

122.    These deal-killing provisions are not merely hypothetical. According to a January 23, 2018 article in *The State* titled "Gov. McMaster to Veto Any Bill That Keeps the Dominion-SCANA Deal Alive," the South Carolina House and Senate are already considering a proposal, supported by Governor McMaster, that would ensure that South Carolina ratepayers would not continue to pay for the failed Nuclear Project.

**The Individual Defendants and SCANA Executives Negotiate Unwarranted Financial Rewards**

123.    While the unfair price and process will cause Plaintiffs and the Company's public shareholders to receive less than the full value of their SCANA holdings in the Proposed Transaction, the Merger Agreement provides unwarranted financial rewards to the very executives and directors that were responsible for placing SCANA and its shareholders in their current position.

124.    Pursuant to SCANA's Long-Term Equity Compensation Plan, executive officers may receive two types of awards for their service. The first, Performance Share Awards, are denominated in shares of SCANA common stock in values based on comparative Total Shareholder Return ("TSR")[4] and earnings per share growth components measured each year, over a three-year time period. Specifically, one half of the award amount is determined by comparing

---

[4]  TSR is equal to the change in SCANA's common stock price, plus cash dividends paid on SCANA common stock during the period, divided by the common stock price as of the beginning of the period.

SCANA's TSR with similarly situated utility companies (the "peer group") and the other half is earned based on the level of growth SCANA achieved in "GAAP-adjusted net earnings per share targets." For an executive to receive 100% of the first half of their target award, the Company's performance would have to rank in the fiftieth percentile in relation to the peer group's TSR during a one-year cycle. Executives could receive 100% of the second half of their target payouts for every year in which SCANA had growth of 4.5% or more.

125.    The second type of award granted to SCANA executives are Restricted Stock Unit Awards ("RSUs"). RSUs are not performance based, are subject to a three-year vesting period, and are based on the fair market value of SCANA common stock on the day that they are granted. Both RSUs and Performance Share Awards accrue dividends prior to vesting.

126.    In February 2015, the Compensation Committee recommended a number of changes in the criteria for awards, which would change the measurement of performance cycles (from one to three years), increase the maximum award payout, and change the mix of performance shares and RSUs.[5]

127.    Once the gross mismanagement by SCANA executives with respect to the Nuclear Project and the Individual Defendants' failure to oversee management finally became public in July 2017, SCANA was not going to reach the targeted performance goals. Hence, shares awards to executives like Marsh, Byrne, and Addison would not have vested at target levels. However, pursuant to Section 2.02(a) of the Merger Agreement, upon approval of the Proposed Transaction, Performance Share Awards will vest at 100% of target levels and executives will be paid as though they had achieved their growth and return goals. Under Section 2.02(b) of the Merger Agreement,

---

[5] Prior to February 2015, executive compensation was 80% performance based awards and 20% RSUs. This ratio changed to 70% / 30% after February 2015.

the RSUs that were granted to executives during the previous performance cycles will also vest, despite time restrictions that may have otherwise delayed the payout.

128.    According to the 2017 Proxy, Marsh had $2.24 million in unvested performance share awards, while Byrne and Addison each had approximately $813,000 in unvested performance share award.  Thus, while shareholders are being asked to approve a transaction that severely undervalues their investment in SCANA, the executives directly responsible for SCANA's tremendous loss in market capitalization will be entitled to a tremendous payout that they would not otherwise have received absent the Proposed Transaction.

**The Preclusive Deal Protection Measures**

129.    In addition to the inadequate Proposed Consideration, the Board also agreed to onerous deal protection devices that preclude a full and fair sales process for the Company and effectively lock out competing bidders to the detriment of SCANA's public shareholders.  The Merger Agreement substantially favors Dominion and is calculated to unreasonably dissuade potential suitors from making competing offers.  Therefore, not only did the Board fail to run a full and fair sales process on the front-end of the Proposed Transaction, it also ensured no competing bid would be forthcoming on the back-end.   When viewed collectively, these provisions, detailed below, further the interests of Dominion, the Individual Defendants, and the relevant non-parties, to the detriment of SCANA's public shareholders, and are not a justified, appropriate, or proportionate response to any threat posed by a potential third-party bidder.  This is a clear violation of the Board's fiduciary duty to maximize shareholder value.

130.    The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 4.02(a) of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish

to submit or have submitted unsolicited alternative proposals. Under this section, the Company may not solicit or initiate, knowingly encourage, induce, facilitate, or cooperate with any inquiries or proposals that would reasonably be expected to lead to an alternative bid or to participate in any negotiations or discussions with third parties. In addition, under Section 4.02(b), the Company must immediately cease any and all discussions or negotiations with third parties that had begun before the Merger Agreement was signed.

131.    Further, pursuant to Section 4.02(c) of the Merger Agreement, the Company is required to promptly notify Dominion, within forty-eight hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal. Dominion may then use this unfettered access to confidential, non-public information about competing proposals from third parties to formulate a matching bid under Section 4.02(f) of the Merger Agreement, virtually eliminating any leverage that the Company has in receiving the unsolicited offer, and significantly deterring an alternative buyer from coming forward.

132.    Section 4.02(f) of the Merger Agreement severely limits the Board's ability to recommend alternative proposals to shareholders because it provides Dominion with four businesses days to submit a superior offer. During this period, the Company must negotiate in good faith with Dominion, at Dominion's discretion, and allow Dominion to amend the terms of the Merger Agreement to make a counteroffer, should the Board decide to enter into a transaction with a third party. Moreover, Dominion need only match, not top, a superior proposal.

133.    The matching rights provision functions to deter potential suitors from expending the cost and effort of launching a superior proposal in the knowledge that they will effectively serve as a "stalking horse," and that Dominion will be allowed to merely piggy-back upon the

additional due diligence of the second bidder, after which Dominion will only have to match the second bidder's offer to retain its right to acquire SCANA.

134.    Although the Merger Agreement contains a fiduciary out provision, it is extremely limited and only allows the Board to enter into discussions and negotiations in response to an unsolicited acquisition proposal under very limited situations.  This is because the acquisition proposal must be one that:  (a) was not the result of any breach of, or any action inconsistent with any of the other provisions set forth in Sections 4.02(a) and (b) of the Merger Agreement; and (b) can reasonably lead to a superior proposal.  Even then, the Board must also conclude in good faith, after having consulted with its outside legal counsel, that failure to take action in response to the acquisition proposal would reasonably constitute a breach of the fiduciary duties of the Board to the Company's shareholders under applicable law.  Because the Company is prevented from offering access to non-public information, ultimately this provision provides little to no opportunity for a superior proposal to emerge.

135.    Further locking up control of the Company in favor of Dominion is an exorbitant termination fee.  Section 7.02 of the Merger Agreement contains a termination fee provision which provides that if the Board rescinds its recommendation in favor of the Proposed Transaction and agrees to a competing proposal pursuant to the lawful exercise of its fiduciary duties, the Company must pay Dominion an onerous $240 million termination fee, which is over 3% of the total value of the Proposed Transaction at the time it was announced.  This further reduces the possibility of maximizing shareholder value through a superior proposal from a third party because a competing bidder would ultimately be required to pay the termination fee.  The termination fee essentially requires that any competing bidder agree to pay a naked premium for the right to provide shareholders with a superior offer.

136.    As reported by *The State* in a January 5, 2018 article titled, "SCANA would have to pay $240 million to walk away from Dominion deal," Addison stated, "[Any would-be acquiror] would have to consider the [termination fee] because that would really be a cost they would end up having to pay as part of the proposal." The article went on to note that "Wall Street analysts say the breakup fee is evidence Dominion wants to ward off other SCANA bidders."

137.    This termination fee is also payable if SCANA's public shareholders do not vote to approve the Proposed Transaction, or if the Proposed Transaction does not close by certain dates as detailed in the Merger Agreement. Most egregious is that a prerequisite to closing is the approval by the PSC of a petition submitted by Dominion and SCANA that will allow Dominion to continue to charge South Carolina ratepayers for the costs of the failed Nuclear Project.

138.    In addition, given the substantial liability faced by SCANA's directors and officers as a result of their wrongdoing in connection with the Nuclear Project, it is of little surprise that the Individual Defendants would make every attempt to lock-up the Proposed Transaction and protect themselves. Section 5.08 of the Merger Agreement contains an indemnification provision which states in relevant part:

> Parent shall indemnify and hold harmless . . . each present and former director of the Company and its Subsidiaries from and against any and all expenses, judgments, fines, losses, claims, damages, and liabilities incurred in connection with any Proceeding or investigation whether civil, criminal, administrative or investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time.

139.    Leaving no doubt as to the purpose of Section 5.08, and the Proposed Transaction itself, the Merger Agreement goes on to specify:

> [T]he foregoing obligation of Parent shall apply with respect to, and remain in full force and effect as to any pending or future claim, hearing, investigation or Proceeding relating to or arising out of the construction, or cessation of the construction, of nuclear power Units 2 and 3 at the Summer Station or the bankruptcy of Westinghouse Electric Company, LLC.

140.    Thus, not only did the Individual Defendants fail to negotiate for the value of the valuable claims that exist against SCANA's executives and directors be included in the Proposed Consideration, they all but guaranteed that Dominion would not pursue those claims if the Proposed Transaction is consummated.

141.    Taken together, the preclusive deal protection devices and indemnification clause substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives.    Even though the Proposed Transaction was negotiated in less than six weeks, the Individual Defendants have agreed to terms in the Merger Agreement that will prevent any true auction of the Company from occurring.  The deal protection provisions operate conjunctively to make the Proposed Transaction a *fait accompli*, and ensure that no competing offers will emerge and that SCANA's shareholders will never learn what their investment in SCANA is truly worth.  In fact, to date, no competing offers have been made, despite some South Carolina lawmakers publicly asking for another bidder to step forward.  By agreeing to these onerous deal protections, the Individual Defendants have breached their fiduciary duties to SCANA's public shareholders, and Dominion has actively aided and abetted such breaches.

142.    As a result, the Individual Defendants have breached their fiduciary duties that they owe to Plaintiffs and the Class because the shareholders will not receive adequate or fair value for their SCANA common stock in the Proposed Transaction.

143.    Accordingly, Plaintiffs seek injunctive relief and other equitable relief to prevent the irreparable injury that Plaintiffs and the Class will continue to suffer absent judicial intervention.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against the Individual Defendants)

144.    Plaintiffs incorporate by reference and reallege every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

145.    The Individual Defendants have violated their fiduciary duties of care, loyalty, and good faith owed to Plaintiffs and the public shareholders of SCANA.  By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, are attempting to deprive Plaintiffs and the Class of the value of their investment in SCANA.

146.    As members of the Company's Board, the Individual Defendants have fiduciary obligations to:  (a) undertake an appropriate evaluation of SCANA's value as a merger/acquisition candidate; (b) take all appropriate steps to enhance SCANA's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public shareholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of SCANA's public shareholders; and (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value in any sale of SCANA.

147.    The Individual Defendants have breached their fiduciary duties to Plaintiffs and the Class.

148.    As alleged herein, the Individual Defendants have initiated a process to sell SCANA that undervalues the Company.  In addition, by agreeing to the Proposed Transaction, the Individual Defendants have capped the price of SCANA at a price that does not adequately reflect

the Company's true value. The Individual Defendants also failed to sufficiently inform themselves of SCANA's value, or disregarded the true value of the Company. Further, any alternate acquiror will be faced with engaging in discussions with a management team and Board that are committed to the Proposed Transaction.

149.    As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiffs and the Class, and will further a process that inhibits the maximization of shareholder value.

150.    Plaintiffs and the Class have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty
### (Against Dominion and Sedona Corp.)

151.    Plaintiffs incorporate by reference and reallege every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

152.    Dominion and Sedona Corp. knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred. In connection with discussions regarding the Proposed Transaction, the Individual Defendants provided, and Dominion and Sedona Corp. obtained, sensitive non-public information concerning SCANA and thus had unfair advantages that are enabling Dominion to pursue the Proposed Transaction, which offers unfair and inadequate consideration to Plaintiffs and the Class.

153.    As a result of this conduct, Plaintiffs and the Class have been and will be irreparably harmed in that they have been and will be prevented from obtaining fair consideration for their SCANA shares. Unless the actions of Dominion and Sedona Corp. are enjoined by the Court,

46

Dominion and Sedona Corp. will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiffs and the Class.

154.    Plaintiffs and the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring that this action may be maintained as a class action and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.    In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiffs and the Class;

D.    Directing Defendants to account to Plaintiffs and the Class for their damages sustained because of the wrongs complained of herein;

E.    Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

F.    Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  February 7, 2018                    Respectfully submitted,

                                            **CHAPPELL SMITH & ARDEN, P.A.**

                                            Graham Newman
                                            2801 Devine Street, Suite 300
                                            Columbia, SC 29205
                                            Tel:  803-929-3600
                                            Fax:  803-929-3604
                                            gnewman@csa-law.com

                                            *Liaison Counsel for Plaintiffs*

                                            **BRAGAR EAGEL & SQUIRE, P.C.**
                                            Lawrence P. Eagel
                                            Melissa A. Fortunato
                                            Todd H. Henderson
                                            885 Third Avenue, Suite 3040
                                            New York, New York 10022
                                            Tel:  212-308-5858
                                            Fax:  212-486-0462
                                            eagel@bespc.com
                                            fortunato@bespc.com
                                            henderson@bespc.com

                                            **STURMAN LLC**
                                            Deborah Sturman
                                            600 Third Avenue, Suite 2101
                                            New York, New York 10016
                                            Tel:  212-367-7017
                                            Fax:  917-546-2544
                                            sturman@sturman.ch

                                            *Counsel for Plaintiffs*

STATE OF SOUTH CAROLINA )
 )
COUNTY OF RICHLAND )

Metzler Asset Management GmbH and
Joseph Heinz, on Behalf of Themselves and
All Others Similarly Situated,

Plaintiff,

v.

Gregory E. Aliff, James A. Bennett, John
F.A.V. Cecil, Sharon A. Decker, D. Maybank
Hagood, Lynne M. Miller, James W.
Roquemore, Maceo K. Sloan, and Alfredo
Trujillo, Dominion Energy, Inc. and Sedona
Corp.,

Defendants.

IN THE COURT OF COMMON PLEAS
FIFTH JUDICIAL CIRCUIT

Civil Action No. 2017-CP-40-00816

MOTION AND ORDER INFORMATION
FORM AND COVERSHEET

JEANNETTE W. MCBRIDE
C.C.P. & G.S.
2018 FEB 14 PM 2: 49
RICHLAND COUNTY
FILED

| Plaintiff's Attorney: | Defendant's Attorney: |
|---|---|
| Graham Newman | Steven J. Pugh, Bar No. 14341 |
| Chappel Smith & Arden, P.A. | Richardson Plowden & Robinson, P.A. |
| 2801 Devine Street, Suite 300 | Post Office Drawer 7788 |
| Columbia, South Carolina 29205 | Columbia, South Carolina 29202 |
| 803-929-3600 (Phone) 803-929-3604 (Fax) | 803-771-4400 (Phone) 803-779-0016 (Fax) |
| E-Mail: gnewman@csa-law.com | E-Mail: spugh@richardsonplowden.com |

☐ **MOTION HEARING REQUESTED (attached written motion and complete SECTIONS I and III)**
☐ **FORM MOTION, NO HEARING REQUESTED (complete SECTIONS II and III)**
☒ **PROPOSED ORDER / CONSENT ORDER (complete SECTIONS II and III)**

**SECTION I: Hearing Information**
Nature of Motion: Motion for Case Assignment to the Business Court Program
Estimated Time Needed: _____    Court Reporter Needed: ☐ YES / ☐ NO

**SECTION II: Motion/Order Type**
☐ Written motion attached
☒ Form Motion/Order
    I hereby move for relief or action by the court as set forth in the attached proposed order.

_____    2/14/2018
Signature of Attorney for ☐ Plaintiff/☒ Defendant    Date Submitted

**SECTION III: Motion Fee**
☒ PAID – AMOUNT: $_____
☐ EXEMPT:    ☐ Rule to Show Cause in Child or Spousal Support
  (check reason)    ☐ Domestic Abuse or Abuse and Neglect
    ☐ Indigent Status        ☐ State Agency v. Indigent Party
    ☐ Sexually Violent Predator Act    ☐ Post-Conviction Relief
    ☐ Motion for Stay in Bankruptcy
    ☐ Motion for Publication    ☐ Motion for Execution (Rule 69, SCRCP)
    ☐ Proposed order submitted at request of the court; or, reduced to writing from
       motion made in open court per judge's instructions
    ☐ Name of Court Reporter: _____
    ☐ Other: _____

| **JUDGE'S SECTION:** | |
|---|---|
| ☐ Motion fee to be paid upon filing of the attached order. | JUDGE CODE:_____ |

Metts ✓ 2/14/18

| ☐ Other: _____ | Date: _____ |
|---|---|

**CLERK'S VERIFICATION**

Collected by: _____     Date Filed: _____.
☐ MOTION FEE COLLECTED: $_____
☐ CONTESTED – AMOUNT DUE: $_____

SCCA 233 (11/2003)

STATE OF SOUTH CAROLINA    )    IN THE COURT OF COMMON PLEAS
                           )    FOR THE FIFTH JUDICIAL CIRCUIT
COUNTY OF RICHLAND         )

METZLER ASSET MANAGEMENT    )    Civil Action No. 2018-CP-40-00816
GMBH and JOSEPH HEINZ, on   )
Behalf of Themselves and All Others )
Similarly Situated,         )
                            )
                  Plaintiffs, )
                            )
       v.                   )
                            )
GREGORY E. ALIFF, JAMES A.  )
BENNETT, JOHN F.A.V. CECIL, )
SHARON A. DECKER, D.        )
MAYBANK HAGOOD, LYNNE M.    )
MILLER, JAMES W. ROQUEMORE, )
MACEO K. SLOAN, and ALFREDO )
TRUJILLO, DOMINION ENERGY,  )
INC., and SEDONA CORP.,     )
                            )
                  Defendants. )
                            )

## DEFENDANTS' MOTION FOR CASE ASSIGNMENT
## TO THE BUSINESS COURT PROGRAM

1.  As counsel for a party who has appeared in this action, we move for an order of the Chief Business Court Judge assigning this case to the Business Court Program of the South Carolina Circuit Courts. We certify that as of the date of this Motion, no more than 180 days have passed since the commencement of this action. In addition, we certify that all parties have been notified of this request.

2.  The principal claim or claims made in the above-referenced matter are made under the following Titles of the South Carolina Code and the matter is appropriate for assignment to the Business Court Program.

**(Note: Please check all that are applicable, and attach a description of the claims made in the above-referenced lawsuit.)**

☒ Title 33—South Carolina Business Corporation Act of 1988;
☐ Title 35—South Carolina Uniform Securities Act of 2005;
☐ Title 36, Chapter 8—South Carolina Uniform Commercial Code: Investment Securities;
☐ Title 39, Chapter 3—Trade and Commerce: Trusts, Monopolies, and Restraints of Trade;
☐ Title 39, Chapter 8—Trade and Commerce: The South Carolina Trade Secrets Act;
☐ Title 39, Chapter 15—Trade and Commerce: Labels and Trademarks; or
☐ Other Appropriate Matter determined by the Chief Justice.

3.  Indicate whether the non-moving party or parties ☒ consents, ☐ does not oppose, ☐ opposes; ☐ position on assignment is unknown.



**Non-Moving Party Signature (if applicable)**

**Signature**

Steven J. Pugh
Benjamin P. Carlton
Richardson Plowden & Robinson, P.A.
Post Office Drawer 7788 (29202)
1900 Barnwell Street
Columbia, South Carolina 29201
(803) 771-4400
spugh@richardsonplowden.com
bcarlton@richardsonplowden.com

and

I.S. Leevy Johnson
George Johnson
Johnson Toal & Battiste, P.A.
1615 Barnwell Street
Columbia, South Carolina 29201
(803) 252-9700
islj@jtbpa.com

Michael R. Smith, Esquire[1]
Alexandra S. Peurach, Esquire[1]
King & Spalding, LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
mrsmith@kslaw.com
apeurach@kslaw.com

ATTORNEYS FOR DEFENDANTS
REGORY E. ALIFF, JAMES A.
BENNETT, JOHN F.A.V. CECIL,
SHARON A. DECKER, D. MAYBANK
HAGOOD, LYNNE M. MILLER, JAMES
W. ROQUEMORE, MACEO K. SLOAN,
and ALFREDO TRUJILLO

February 14, 2018

---

[1] Attorney Pugh will be filing Applications and Motions for *Pro Hac Vice* Admission of attorneys Michael R. Smith and Alexandra S. Peurach.

## Description of claims in *Metzler Asset Mgmt. GmbH v. Aliff, et al.*<br>Richland County Court of Common Pleas – 2018-CP-40-00816

Plaintiffs Metzler Asset Management GmbH and Joseph Heinz, alleged shareholders of SCANA Corp. ("SCANA"), seek to assert claims on behalf of itself and a putative class of SCANA shareholders pursuant to Section 33-8-300 of the South Carolina Business Corporation Act of 1988 against certain members of SCANA's Board of Directors (the "Individual Defendants") for breach of fiduciary duties, and against Dominion Energy, Inc. ("Dominion") and Sedona Corporation (a subsidiary of Dominion) for aiding and abetting breaches of fiduciary duties, related to the proposed acquisition of SCANA by Dominion that was announced on January 3, 2018 (the "Proposed Merger"). Plaintiffs specifically allege that the Individual Defendants breached their fiduciary duties by conducting a flawed sales process and agreeing to an inadequate price for SCANA shareholders in the Proposed Merger, and that Dominion and Sedona aided and abetted the Individual Defendants' breaches of fiduciary duties by knowingly participating in the underlying breaches.

Plaintiffs attempt to assert two claims for relief: (1) Breach of fiduciary duties against the Individual Defendants; and (2) Aiding and abetting breaches of fiduciary duties against Dominion and Sedona. Plaintiffs seek to enjoin the Proposed Merger and/or rescind the merger agreement, or in the alternative, monetary damages, as well as costs, attorneys' fees and other relief, and demand a trial by jury.

STATE OF SOUTH CAROLINA ) IN THE COURT OF COMMON PLEAS
                        ) FOR THE FIFTH JUDICIAL CIRCUIT
COUNTY OF RICHLAND      )

METZLER ASSET MANAGEMENT    )    Civil Action No. 2018-CP-40-00816
GMBH and JOSEPH HEINZ, on   )
Behalf of Themselves and All Others )
Similarly Situated,         )
                            )
                Plaintiffs, )
                            )
        v.                  )
                            )
GREGORY E. ALIFF, JAMES A.  )
BENNETT, JOHN F.A.V. CECIL, )
SHARON A. DECKER, D.        )
MAYBANK HAGOOD, LYNNE M.    )
MILLER, JAMES W. ROQUEMORE, )
MACEO K. SLOAN, and ALFREDO )
TRUJILLO, DOMINION ENERGY,  )
INC., and SEDONA CORP.,     )
                            )
                Defendants. )

## [PROPOSED] ORDER FOR CASE ASSIGNMENT
## TO THE BUSINESS COURT PROGRAM

☒ It is hereby ordered that assignment to the Business Court Program for

County is **granted**. It is further ordered that exclusive jurisdiction over this case

be assigned to the Honorable        to hear and handle all pretrial motions and other

matters pertaining to this case.

And it is SO ORDERED.

_____
Roger M. Young, Sr., Chief Business Court Judge

This _____ day of _____

_____, South Carolina

**STATE OF SOUTH CAROLINA**
**COUNTY OF RICHLAND**

**IN THE COURT OF COMMON PLEAS**
**FOR THE FIFTH JUDICIAL CIRCUIT**

METZLER ASSET MANAGEMENT
GmbH and JOSEPH HEINZ, on Behalf of
Themselves and All Others Similarly
Situated,

               Plaintiffs,

     v.

GREGORY E. ALIFF, JAMES A.
BENNETT, JOHN F.A.V. CECIL,
SHARON A. DECKER, D. MAYBANK
HAGOOD, LYNNE M. MILLER,
JAMES W. ROQUEMORE, MACEO K.
SLOAN, ALFREDO TRUJILLO,
DOMINION ENERGY, INC., and
SEDONA CORP.,

               Defendants.

Civil Action No.:  2018-CP-400-0816

**JURY TRIAL DEMANDED**

RICHLAND COUNTY
FILED
2018 FEB 21  PM 12:59
JEANNETTE W. MCBRIDE
C.C.P. & G.S.

     I, Brian E. Pumphrey, of McGuireWoods LLP, have been authorized by my clients,

Dominion Energy, Inc. and Sedona Corp., to accept service of the Summons and

Complaint, in the above-referenced matter and hereby acknowledge service by my

signature below.

_____
Brian E. Pumphrey

Richmond, VA

16th day of February, 2018