IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| In re SCANA CORPORATION PUBLIC SHAREHOLDER LITIGATION, | ) ) ) ) | Lead Case No. 3:18-CV-0505-MBS |
| | | SHAREHOLDER CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiffs Metzler Asset Management GmbH ("Metzler") and City of Warren Police and Fire Retirement System ("Warren") (collectively, "Plaintiffs"), former shareholders of SCANA Corporation ("SCANA" or the "Company"), on behalf of themselves and the other former public shareholders of SCANA, by their attorneys, bring this Shareholder Consolidated Amended Class Action Complaint against former members of SCANA's Board of Directors (the "Board") at the time of SCANA's agreement to merge with Dominion Energy, Inc. ("Dominion"), its wholly owned subsidiary Sedona Corp. ("Sedona"), and former Chief Executive Officer ("CEO"), Jimmy Addison ("Addison" and together with the Board, the "Individual Defendants"). Plaintiffs' allegations are based on personal knowledge as to themselves, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## PRELIMINARY STATEMENT

1.      This class action arises from the Individual Defendants' fraudulent cover up of a failed multi-year, multi-billion dollar nuclear reactor project that led the Individual Defendants to undertake a severely flawed sales process and agree to the inadequately priced sale of the Company to Dominion (the "Merger"). Rather than seeking to maximize shareholder value in the sale of the Company, the Individual Defendants sought to escape personal liability for their wrongdoing by selling the Company as quickly as possible for an inadequate price. By doing so, the Individual Defendants failed to act reasonably in good faith and, as a result, breached their fiduciary duties to SCANA's public shareholders.

2.      As explained herein, rather than seeking to maximize shareholder value in the sale of the Company, the Individual Defendants engaged in a fire sale to shield themselves from liability for their fraudulent conduct in covering up the failure of SCANA's ratepayer-funded

- 1 -

nuclear power project, and then failed to secure a fair price for SCANA's public shareholders in the Merger.

3.    Prior to mid-2017, the Company experienced years of strong financial performance and ever-increasing stock prices. Indeed, SCANA's stock price traded above the implied value of the merger consideration at virtually all times from mid-2014 to mid-2017. Then, on July 31, 2017, SCANA announced that it would be abandoning its multi-billion dollar project to build two new nuclear reactors at the existing Virgil C. Summer Nuclear Generating Station (the "Nuclear Project"). By this time, SCANA had spent roughly $5 billion on the Nuclear Project, but only recovered $1.7 billion from ratepayers. SCANA sought to recover the remaining $3.3 billion from ratepayers even though it had abandoned the project, which it was permitted to do under the Base Load Review Act (the "BLRA").

4.    On the heels of this announcement, several public and private parties began looking into the Individual Defendants' and other Company insiders' actions related to the Nuclear Project, concentrating primarily on whether they concealed material information from stockholders and ratepayers. This led to a litany of criminal and civil investigations, regulatory actions, and shareholder lawsuits brought by private parties. These actions would reveal an extensive fraudulent cover-up by the Individual Defendants. As the fraud was revealed over the next few months, SCANA's shareholders would suffer significant and extensive economic harm, as the Company's stock price plummeted from $65.97 on July 31, 2017, to just $38.86 on January 2, 2018, the day before the Merger was announced. This decline of 41% wiped out $3.8 billion in shareholder equity.

5.    Rather than publicly face the mounting civil and criminal investigations and the inevitable wrath of shareholders, the Board decided to quickly sell the Company at a fire-sale price.

4816-8880-4009.v2-10/15/19

After conducting a brief sales process that was tilted towards Dominion, on January 3, 2018 SCANA and Dominion announced they had entered the Merger Agreement.

6.      The Merger Agreement provided the Individual Defendants with exactly what they wanted.  The Merger Agreement indemnified the Individual Defendants for their acts as officers and directors of the Company, meaning they are protected financially from the numerous pending suits against them for their actions related to the Nuclear Project and the Merger.

7.      The terms of the Merger Agreement demonstrate the lack of bargaining power that the Individual Defendants had to extract anything resembling a fair price for shareholders.  Of particular importance to this litigation, Dominion secured an absolute right to walk away from the Merger if there was any change to the BLRA that prevented SCANA from recovering the remaining $3.3 billion needed to pay for the outstanding costs of the failed Nuclear Project.  Thus the Individual Defendants were only able to bargain for SCANA's value without the benefits of the BLRA.  The Merger would only close if those benefits were provided to Dominion post-close, and not to SCANA on a stand-alone basis.

8.      The consideration SCANA shareholders received in the Merger showed that they were not being compensated for the damage caused to SCANA and its shareholders by the Individual Defendants' fraudulent cover-up of the failed Nuclear Project.  On January 2, 2019, the day the Merger closed, the 0.669 exchange ratio represented an implied price per share of only $47.62.  By contrast, on July 31, 2017, the day the market was made aware that SCANA was abandoning the Nuclear Project, SCANA shares closed at $64.37.  Thus, the Merger consideration undervalued the damage caused by the Individual Defendants' fraud by $2.4 billion dollars.

9.      Shareholders were also not compensated for the remaining intrinsic value of the Company which was attributable in large part to the potential for SCANA to recover from ratepayers the remaining outstanding costs of the failed Nuclear Project.  As events unfolded after

- 3 -

the Individual Defendants' fraud was exposed, and the announcement of the Merger, SCANA and Dominion negotiated extensively with regulators and legislators and eventually secured an agreement for Dominion to recover $2.5 billion of the cost form the failed Nuclear Project from ratepayers. This money should have inured directly to SCANA shareholders, who incurred the costs from the failed Nuclear Project, and not Dominion, which did not pay fair value for this asset. Thus, the Individual Defendants' fraudulent cover-up of the failed Nuclear Project, and resulting fire sale to Dominion to escape liability for their fraud, collectively damaged shareholders by at least $4.9 billion.

10.     The Board also agreed to coercive terms in the Merger Agreement to secure shareholder approval of the unfair Merger. Pursuant to §7.02(b)(ii)(A)(1) of the Merger Agreement, if SCANA shareholders did not vote to approve the Merger, the Company would have been contractually obligated to pay Dominion a "Naked No Vote" termination fee of $240,000,000. This coercive provision is undoubtedly the reason why shareholders voted to approve the Merger on July 31, 2018. The alternative would have been devastating to the Company and its shareholders.

11.     On February 14, 2018, Dominion and SCANA disseminated to SCANA shareholders a preliminary Registration Statement on Form S-4 (the "Proxy"), which was subsequently amended and declared effective by the Securities and Exchange Commission ("SEC") on June 15, 2018. Through the Proxy, the Individual Defendants sought to convince shareholders to vote in favor of the Acquisition.

12.     The Proxy, which generally described the process leading to the Merger and the financial analyses conducted by the Board's financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and RBC Capital Markets, LLC ("RBC"), did not provide shareholders with all the material information regarding the Merger. The Individual Defendants withheld from the

Proxy materials information concerning, among other things: (i) the flawed sales process for the Company; (ii) the Individual Defendants' timing and motivations for the Merger; (iii) potential competing proposals for the Company; (iv) the Individual Defendants' conflicts of interest; and (v) Morgan Stanley's and RBC's financial analyses in support of their "fairness opinions."

13.     On July 31, 2018, SCANA shareholders were misled and coerced into voting in favor of the Merger.

14.     In connection with the Merger, each Individual Defendant breached his or her fiduciary duties owed to Plaintiffs and the rest of SCANA's common stockholders, by, among other things: (i) using the Merger to escape monetary liability for their fraudulent cover-up of the failed Nuclear Project (the "Inseparable Fraud"); (ii) prioritizing significant personal benefits above obtaining the best possible price for SCANA stockholders; (iii) fire-selling SCANA for insufficient consideration; (iv) adopting preclusive deal protection devices that prevented any alternative bidder from surfacing; and (v) failing to conduct an appropriate sale process that protected against their conflicts.

15.     Plaintiffs seek to recover damages from the Individual Defendants for their breaches of fiduciary duty and other misconduct as alleged herein.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), in that the putative class has more than 100 members, the amount in controversy exceeds five million dollars (exclusive of interest and costs) and the parties are minimally diverse in citizenship.

17.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because a substantial portion of the events, transactions and wrongs complained of herein occurred in this district.

4816-8880-4009.v2-10/15/19

## PARTIES

**Plaintiffs**

18.    Plaintiff Metzler is an asset management division of the German bank, Metzler Bank.  Metzler is based in Frankfurt am Main, Germany and provides investment services to institutional clients and financial institutions.  Metzler was a SCANA shareholder prior to the consummation of the Merger, and held SCANA stock throughout the transactions, acts, and omissions complained of herein.  Metzler held 9,009 shares of SCANA common stock.

19.    Plaintiff Warren is a single employer, defined benefit governmental retirement system providing retirement, disability and death benefits to active and retired police officers and firefighters of the City of Warren, Michigan with assets under management of approximately $300 million.  Warren was a SCANA shareholder prior to the consummation of the Merger, and held SCANA stock throughout the transactions, acts, and omissions complained of herein.  Warren held 552 shares of SCANA common stock.

**Defendants**

20.    Gregory E. Aliff ("Aliff") served as a director of SCANA from October 2015 until the Merger closed.  Aliff was Chairman of the Audit Committee and a member of the Nominating and Governance and Executive Committees.  Aliff was also the Company's "audit committee financial expert" as defined by Item 407(d)(5) of SEC Regulation S-K, 17 C.F.R. §229.407(d)(5). Aliff is a citizen and resident of Virginia.  Aliff's total compensation for 2015, 2016, and 2017 was $48,250, $213,500, and $234,000, respectively.

21.    James A. Bennett ("Bennett") served as a director of SCANA beginning in 1997. Bennett was Chairman of the Compensation Committee and a member of the Audit and Executive Committees.  Bennett is a citizen and resident of Richland County, South Carolina.  Bennet's total compensation for 2015, 2016, and 2017 was $194,157, $215,867, and $235,551, respectively.

- 6 -

22.     John F.A.V. Cecil ("Cecil") served as a director of SCANA beginning in 2013. Cecil was a member of the Compensation and Audit Committees. Cecil is a citizen and resident of North Carolina. Cecil's total compensation for 2015, 2016, and 2017 was $193,000, $206,000, and $219,000, respectively.

23.     Sharon A. Decker ("Decker") served as a director of SCANA from 2005 until 2013 and again from 2015 through the closing of the Merger. Decker was a member of both the Compensation and the Nuclear Oversight Committees. Decker is a citizen and resident of North Carolina. Decker's total compensation for 2015, 2016, and 2017 was $48,250, $206,000, and $219,000, respectively.

24.     D. Maybank Hagood ("Hagood") served as a director of SCANA beginning in 1999 and was the Lead Director. Hagood was a member of the Nominating and Governance, Nuclear Oversight, and Executive Committees. Hagood is a citizen and resident of Charleston County, South Carolina. Hagood's total compensation for 2015, 2016, and 2017 was $207,000, $225,500, and $244,000, respectively.

25.     Lynn M. Miller ("Miller") served as a director of SCANA beginning in 1997. Miller was a member of the Nominating and Governance and Audit Committees. Miller is a citizen and resident of Virginia. Miller's total compensation for 2015, 2016, and 2017 was $197,000, $206,000, and $219,000, respectively.

26.     James W. Roquemore ("Roquemore") served as a director of SCANA beginning in 2007. Roquemore was Chairman of the Nuclear Oversight Committee and a member of the Compensation and Executive Committees. Roquemore is a citizen and resident of Orangeburg County, South Carolina. Roquemore's total compensation for 2015, 2016, and 2017 was $197,000, $216,000, and $231,000, respectively.

4816-8880-4009.v2-10/15/19

27.    Maceo K. Sloan ("Sloan") served as a director of SCANA beginning in 1997. Sloan was a member of the Nuclear Oversight and Compensation Committees. Sloan is a citizen and resident of North Carolina. Sloan's total compensation for 2015, 2016, and 2017 was $201,000, $210,000, and $219,000, respectively.

28.    Alfredo Trujillo ("Trujillo") served as a director of SCANA beginning in 2013. Trujillo was a member of the Nominating and Governance and Nuclear Oversight Committees. Trujillo is a citizen and resident of Georgia. Trujillo's total compensation for 2015, 2016, and 2017 was $193,000 $206,000, and $224,000, respectively.

29.    Addison joined the Company as Controller in 1991 and served as the Chief Financial Officer ("CFO") of SCANA beginning in April 2006 and the Executive Vice President beginning in January 2012. Addison assumed responsibility as the CEO in January 2018 until the Merger closed. Addison also served as the president of both SCANA Energy Georgia, and SCANA Energy Marketing beginning in 2013. Addison is a citizen of South Carolina. Addison's total compensation for 2015, 2016, and 2017 was $2,405,419, $2,580,874, and $2,140,632, respectively. Addison retired on February 1, 2019 and will receive approximately $9.7 million in stock payouts as a result of the Merger.

## RELEVANT NON-PARTIES

30.    SCANA was a corporation existing and organized under the laws of the State of South Carolina. The Company's principal place of business and executive offices was located at 110 Operations Way, Cayce, South Carolina. After the Merger, SCANA became a wholly-owned subsidiary of Dominion.

31.    Dominion is a Virginia Corporation with its principal office located at 120 Tredegar Street, Richmond, Virginia. Dominion is one of the largest producers and transporters of energy in the United States, with a portfolio of approximately 25,600 megawatts of electric generation,

- 8 -

15,000 miles of natural gas transmission, gathering, storage and distribution pipeline, and 6,600 miles of electric transmission and distribution lines.  Dominion also operates one of the largest natural gas storage systems in the United States, with 1 trillion cubic feet of capacity, and serves more than 6 million utility and retail energy customers.  Dominion was formerly known as Dominion Resources, Inc. and changed its name to Dominion Energy, Inc. in May 2017.  It was founded in 1909, currently employs approximately 16,200 people, and has operations in 18 states.

33.    Sedona was a South Carolina corporation and a wholly-owned subsidiary of Dominion created solely to effectuate the Merger.  Upon completion of the Merger, Sedona merged with and into the Company, with SCANA continuing as the surviving corporation and a wholly-owned subsidiary of Dominion.

33.    Stephen Byrne ("Byrne") joined SCANA in 1995 and held various positions until he retired in December 2017.  Byrne served as an Executive Vice President of SCANA from 2009 until his retirement, and as President, Generation and Transmission and Chief Operating Officer of SCE&G (defined below) from 2011 until his retirement.  Byrne's total compensation for 2014, 2015, and 2016 was $2,366,224, $2,314,038, and $2,582,141, respectively.

34.    Kevin Marsh ("Marsh") served as CEO and Chairman of the Board from December 2011 through December 2017.  Before assuming the CEO position, Marsh served as the President and Chief Operating Officer of SCANA beginning in January 2011.  Marsh also served as a Senior Vice President from 1998 to January 2011, and was the President of SCANA's principal subsidiary, SCE&G, from April 2006 to November 2011.  Marsh's total compensation for 2014, 2015, and 2016 was $5,710,448, $5,733,258, and $6,108,804, respectively.

## CLASS ACTION ALLEGATIONS

35.    Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the public shareholders of the

- 9 -

Company as of January 3, 2018, the date the Merger was announced, through and including July 31, 2018, the date of the shareholder vote on the Merger (the "Class").  Excluded from the Class are the defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with Defendants.

36.    This action is properly maintainable as a class action.  The Class is so numerous that joinder of all members is impracticable.  According to the Company's Proxy Statement filed with the SEC on August 10, 2018, there were approximately 143 million shares of SCANA common stock issued and outstanding, held by hundreds, if not thousands, of geographically dispersed shareholders.

37.    There are questions of law and fact that are common to the Class, including, *inter alia*, whether:  (i) the Individual Defendants have breached their fiduciary duties to the detriment of Plaintiffs and the Class; (ii) the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the sale of SCANA; (iii) the Individual Defendants committed Inseparable Fraud; (iv) the Merger Consideration was unfair and inadequate; and (v) Plaintiffs and the Class were harmed as a result of the consummation of the Merger.

38.    Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs and the Class have sustained damages arising out of the Individual Defendants' breaches of their fiduciary duties.  Plaintiffs do not have any interests that are adverse or antagonistic to those of the Class and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel competent and experienced in this type of litigation.  Accordingly, Plaintiffs are adequate Class representatives.

39.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that

4816-8880-4009.v2-10/15/19

would establish incompatible standards of conduct for the Individual Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

40.    The Individual Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, relief on behalf of the Class as a whole is appropriate.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

41.    Where the directors and/or officers of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors and/or officers have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's public shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    will unnecessarily discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits themselves from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

- 11 -

42.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of SCANA, were obligated to refrain from:

(a)     participating in any transaction in which their loyalties are divided;

(b)     participating in any transaction in which they receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the Company;

(c)     committing inseparable fraud; and/or

(d)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

43.     Plaintiffs allege herein that the Individual Defendants, separately and together, in connection with the Merger, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiffs and the Class.  The Individual Defendants engaged in self-dealing, obtaining for themselves personal benefits not shared equally by Plaintiffs and the Class and committed inseparable fraud.

44.     As a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiffs nor the Class were treated fairly in connection with the Merger.

45.     To discharge their duties, the Individual Defendants were required to act in good faith and in furtherance of the best interests of SCANA and its shareholders.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     manage, conduct, supervise, and direct the business affairs of SCANA in accordance with all applicable law (including federal and state laws, government rules and regulations, and SCANA's corporate charter and bylaws);

(b)     neither violate nor knowingly permit any officer, director, or employee of SCANA to violate any applicable laws, rules, and/or regulations;

(c)     remain informed as to the status of SCANA's operations and, upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

(d)     maintain and implement an adequate, functioning system of internal controls, such that SCANA's affairs and operations are conducted in accordance with all applicable laws, rules, and regulations.

46.     Under the federal securities laws, directors and officers have a duty to speak fully and truthfully to shareholders once they undertake the affirmative act of communicating or disseminating information.  It is blackletter law that an omission is actionable under the federal securities laws if it creates "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

47.     SCANA was incorporated in 1984 following the merger of South Carolina Electric & Gas ("SCE&G") and Carolina Energies, Incorporated.  In November 1982, two years before SCANA was formed, SCE&G received an operating license for a nuclear reactor at the V.C. Summer Nuclear Generating Station in Jenkinsville, South Carolina.  The plant cost $1.3 billion to construct and began commercial operation on January 1, 1984.

48.     In the late 1980s, U.S. energy producers began to move away from costly nuclear energy construction and instead re-focused on natural gas and coal.  SCANA followed the natural gas trend.  As deregulation increased during the 1990s, SCANA looked to expand by diversifying its holdings and increasing its customer base.  Between 1990 and 1993, SCANA purchased natural gas reserves in Texas, Louisiana, and Oklahoma, bringing the Company's total natural gas reserves

to 283 billion cubic feet.  By the early 2000s, however, interest in nuclear energy projects was renewed and power companies in Georgia and South Carolina, including Westinghouse and SCANA, started to plan for new construction.

**The Failed Expansion of the V.C. Summer Nuclear Generating Station**

49.     In 2006, SCANA announced that, together with its subsidiary SCE&G, it planned to construct two nuclear reactors at SCANA's Virgil C. Summer Nuclear Generating Station (the "V.C. Summer Station") located in Fairfield County, approximately twenty miles from Columbia, South Carolina.  The Nuclear Project was a partnership with South Carolina's state-owned electric and water utility, South Carolina Public Service Authority ("Santee Cooper"), with SCANA owning a 55% stake.

50.     Before committing to the Nuclear Project, SCANA strategically pursued passage of the BLRA by the South Carolina legislature.  The BLRA, which became law in 2007, has been described as a utility company "wish list" and allowed SCANA to transfer the risks and costs of the Nuclear Project to ratepayers.   Unsurprisingly, in the year before passage of the BLRA, SCANA's political contributions to South Carolina political candidates increased by nearly 300%.

51.     The BLRA:  (i) shifted the risk of the Nuclear Project from SCANA to South Carolina power customers; (ii) made it more difficult to challenge and defeat Nuclear Project-related rate increases that SCANA requested from the PSC; and (iii) gave SCANA (and, with the Merger, Dominion) the right to charge customers for the costs associated with the Nuclear Project's failure.

52.     The BLRA was introduced in the South Carolina Senate on February 13, 2007, in the South Carolina House on April 17, 2007, and was passed by the General Assembly two days later, on April 19, 2007.  The BLRA became law less than three months after its introduction, on May 3, 2007.

- 14 -

53.    SCANA played an active role in assuring the successful passage of the BLRA by making campaign contributions and hiring lobbyists.  According to a September 16, 2017 article published by *The State* titled "How SCANA Spent $1.25 Million at State House Before Nuclear Project Collapsed," SCANA has donated more than $1.25 million to South Carolina political candidates since 2000.  As reported in the article, the Company donated an additional $80,000 "to legislators on a committee that names the members of a state board [the PSC] that regulates SCANA," and over $90,000 "to 31 of the 32 legislators now trying to unravel how the [Nuclear Project] failed."  According to campaign finance data collected by the National Institute on Money in State Politics, SCANA's contributions to lawmakers increased exponentially – from $64,705 in 2003-2004 to $138,850 in 2005-2006 – in the year before the BLRA was passed.  According to the Center for Responsive Politics, a nonpartisan research group, SCANA also spent more than $6.3 million on lobbyists between 2005 and 2012.

54.    On March 31, 2008, SCANA submitted an application to the Nuclear Regulatory Commission ("NRC") for a combined construction and operating license.  At the time the application was submitted, SCANA expected the review process to require three to four years.

55.    On May 27, 2008, SCANA announced a contractual agreement with Westinghouse Electric Company, LLC ("Westinghouse") and Stone & Webster, Inc. ("Stone & Webster")[1] for the design and construction of the Nuclear Project.

56.    On May 30, 2008, SCANA submitted its application for a Certificate of Environmental Compatibility, Public Convenience and Necessity, and for a Base Load Review Order to the South Carolina Public Service Commission ("PSC") and the South Carolina Office

---

[1]    In 2012, Chicago Bridge & Iron Company N.V. ("CB&I") acquired Stone & Webster's nuclear construction business and formed a new subsidiary, CB&I Stone & Webster.  CB&I Stone & Webster was ultimately purchased by Westinghouse in 2015.

of Regulatory Staff ("ORS").  SCANA stated that it expected the first reactor unit to come on line

in 2016 and the second reactor unit in 2019, at a cost of approximately $9.8 billion, of which

SCANA's share was $5.4 billion.  Further, SCANA claimed that the BLRA would save South

Carolina ratepayers approximately $4 billion over the life of the new units.

57.    In February 2009, the PSC and ORS approved the Nuclear Project and, in March

2012, the NRC approved SCANA's combined construction and operating licenses for the Nuclear

Project.

58.    The approval was met with great excitement by leaders in the nuclear energy

industry.  In a March 30, 2012 press release, Marvin Fertel, president and CEO of the Nuclear

Energy Institute, commended the NRC's approval of the Nuclear Project:

> The Nuclear Energy Institute congratulates South Carolina Electric & Gas, partner
> Santee Cooper, Westinghouse Electric, the Shaw Group and other project
> participants on this important milestone.  This will be one of the largest construction
> and engineering projects in South Carolina history.  It will create thousands of well-
> paying jobs during construction and provide careers for several hundred more
> people over the decades that the new reactors will generate electricity.
>
> The V.C. Summer expansion will contribute to the electricity reliability and
> diversity of South Carolina and enhance its energy security.  America's energy
> future is getting stronger thanks to projects like this.

59.    Construction began on March 9, 2013 with expected completion by 2018, and from

the start, the Nuclear Project was plagued with problems, cost overruns, and delays.

60.    As later reported, SCANA was aware of numerous problems before construction

even began.  In January 2011, the NRC attempted to inspect the construction site, but had to cancel

the inspection because not enough progress had been made to warrant it.  When the NRC returned

to the site in November 2011, it issued a "Notice of Nonconformance" with its quality assurance

program.  By July 2012, only 21 of 72 modules, which were vital components for construction,

had been delivered to the site, and SCANA and Westinghouse were thus forced to revise their

contractual agreement to delay the substantial completion dates for the two units.  By September

- 16 -

2012, at least 30 of the construction milestone dates had passed "without completion of the associated milestone event" and yet another NRC Notice of Nonconformance had been issued.

61.    As later discovered during a South Carolina house committee hearing in August 2017, at the time construction was to begin, SCANA was using an unreliable construction timetable and a generic schedule that made it incapable of estimating project costs. One witness stated that, deviating from standard practice in large, complex construction projects, SCANA executives allowed the Nuclear Project to move ahead without ever having received a fully integrated construction schedule from Westinghouse. Before ground was broken on the Nuclear Project, SCANA had already requested and received two pre-construction capital cost forecast increases – $174 million in November 2010 and $283 million in May 2012.

62.    The construction delays and cost increases continued even after construction began. In September 2013, five months after construction began, design deficiencies in the Nuclear Project's foundation were identified which forced a delay in construction while the deficiencies were corrected. The Company's concerns over the delays were reflected in a September 5, 2013 email from Marsh, who warned Westinghouse that SCANA and Santee Cooper had serious concerns about cost overruns and design delays that put "potentially unrecoverable stress" on the existing construction schedule. In June 2017, Marsh also wrote to the CEO of Toshiba, Westinghouse's parent company, stating that, "we have no doubt that we have been the victim of financial malfeasance by Westinghouse and Toshiba."

63.    Notwithstanding the knowledge and concern of certain SCANA executives and employees with respect to the immediate construction delays and cost overruns, SCANA's officers continually represented to the public that everything was progressing well and on schedule. In a June 2013 call with investors, Byrne stated, "[w]e hear about nuclear project's being over budget or costs being rampant. I want to reinforce that is not the case with this project."

- 17 -

64.     On May 6, 2014, Marsh, SCANA's then CEO and Chairman of the Board, and Lonnie Carter ("Carter"), Santee Cooper's CEO, sent a letter (the "May 6, 2014 Letter") to Westinghouse President and CEO, Danny Roderick, and CB&I President and CEO, Philip Asherman, in which they outlined numerous issues with the Nuclear Project dating back to May 2008.

65.     The May 6, 2014 Letter was ultimately published by *The Post and Courier* on September 29, 2017.  The May 6, 2014 Letter revealed that SCANA executives were aware early on that the Nuclear Project was plagued by significant delays in material delivery and construction, nonconformance with the NRC's quality assurance program, and design deficiencies, among other issues.  The May 6, 2014 Letter detailed SCANA's substantial concerns with the Nuclear Project as early as May 23, 2008:

> The events since May 23, 2008 have tested our resolve . . . .  We regret that this letter is necessary and regret its length.  Your poor performance has made both necessary.  A complete description of our grievances would make this letter even longer.  Consequently, we have chosen to focus on the events and issues concerning the structural modules, primarily CA-20 and CA-01, as well as certain design issues, and their combined effect on the expected completion date and cost of the project.  We selected these examples to illustrate our dissatisfaction.  They are not an exhaustive listing of your every shortcoming.

The letter went on to detail specific grievances from each year between 2011 and 2014.

66.     As reflected in the May 6, 2014 Letter, SCANA executives were aware that Westinghouse was not complying with NRC quality assurance requirements, was unable to adhere to construction deadlines, and was using flawed designs and defective components for construction.  Despite that knowledge and their demand that Westinghouse "demonstrate a renewed commitment to this [P]roject," SCANA executives apparently did not act to ameliorate any of these problems and the delays and cost overruns continued while the Individual Defendants and SCANA's executives continued to pocket millions of dollars in compensation and from stock sales.

- 18 -

67.     In a July 2014 letter from Westinghouse CEO, Danny Roderick, Westinghouse placed the blame with SCANA, stating that the Company's executives knew that Westinghouse did not have a finished design for the Nuclear Project when they signed the contract in 2008 and that the Company also understood that Westinghouse had yet to finish its designs for the reactors when construction first began in 2012.

68.     In addition to the numerous delays and cost overruns, there were serious concerns about the integrity of the designs being used in the construction of the reactors.  An article published on September 24, 2017 by *The Post and Courier* titled "Stamped for failure: Westinghouse and SCANA Used Unlicensed Workers to Design Abandoned S.C. Nuclear Reactors," reported that mechanical and electrical blueprints were often "unstamped" or not officially sealed by state regulators.  The article further reported that engineers were discouraged from approaching management with their concerns – "it put us in a terrible situation, because if we raised the issue, we're tagged as troublemakers."  The May 6, 2014 Letter identified similar issues, stating that the NRC wrote a letter in October 2012 documenting a "chilled work environment" at one facility "which was causing employees to believe that they are not free to raise safety concerns using all available avenues and that individuals have been retaliated against for raising safety concerns."

69.     On August 6, 2015, SCANA and Santee Cooper hired Bechtel to conduct an audit of the Nuclear Project at a cost of more than $1 million.  Bechtel delivered its initial findings to the Company on October 22, 2015, and, on November 9, 2015, submitted a first draft of its report. In the following weeks, George Wenick ("Wenick"), an attorney hired by SCANA, battled with Bechtel about the contents of the final report.  Wenick wanted any mention of the reactors not being finished before 2020 (the deadline to receive billions of dollars in federal tax credits)

removed from the report along with criticism of SCANA's oversight.  Ultimately, Wenick's efforts resulted in more than thirty pages being removed from the report.

70.     Despite receiving Bechtel's initial findings in late 2015, SCANA did not disclose the findings to shareholders or regulators and, instead, while assuring the PSC that the Nuclear Project was proceeding as planned, requested that the PSC increase its nuclear budget by $800 million, which the PSC agreed to do.  This $800 million increase was in addition to a $698 million increase in March 2015 and a $1.2 billion increase in October 2014.

71.     Bechtel provided the final report to SCANA on February 5, 2016.  The Bechtel Report highlighted, among other things, the lack of a construction schedule, the flawed nature of the reactor design, Westinghouse's complete lack of organization, and the apparent lack of commercial motivation among the contractors to complete the Nuclear Project.  Again, rather than share the findings with shareholders and regulators, SCANA concealed the report.

72.     Following receipt of the Bechtel Report, there is no evidence that SCANA made any effort to address the myriad problems with the Nuclear Project.  On September 27, 2017, *The State* reported that "an internal Santee Cooper memo written a month after the Bechtel Report was issued said the utilities needed to begin 'intrusive verification' of work the contractors were doing and suggested moving to a 'construction milestone payment schedule,' whereby contractors would only be paid as they met specific milestones."  SCANA never acted on this recommendation and instead continued spending $120 million *a month* on the Nuclear Project despite knowledge that completion was becoming increasingly less likely.

73.     In May 2016, Carlette Walker ("Walker"), SCANA's former vice president of finance for nuclear construction, accused the Company's executives of mismanaging the Nuclear Project and propping up the stock price as a method of ensuring that they would receive the full amount of incentive compensation.  At the time, Walker left a voicemail with an employee at

- 20 -

Santee Cooper stating that SCANA's executive team had broken myriad laws and had failed to adequately and timely disclose problems with the construction schedule in 2015. After expressing her concerns with the Nuclear Project, Walker was placed on a three-month medical leave by Marsh and subsequently resigned from the Company.

74.    Less than one month after the Bechtel Report was presented to the Company, three Company insiders, Russell Harris, a senior vice president, Mark Cannon, a vice president and treasurer, and James Micali, a former board member, sold a combined 11,500 shares for approximately $750,000.[2] Using the price per share of the Merger Consideration, these shares would have been worth only $547,630, or 27% less.

75.    In March 2016, a month after receiving the Bechtel Report, Marsh wrote a letter to shareholders with assurances that SCANA "continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

76.    Not to be outdone by Marsh's fabrications, Byrne held a conference call with analysts and investors on April 28, 2016, during which he stated that construction crews were doing a "tremendous job" and that a key component of the reactors was going to be "better than we expected."

77.    SCANA's reports to analysts and investors were similarly falsely optimistic following receipt of the Bechtel Report. During the second quarter earnings conference call, on July 28, 2016, Byrne once again failed to be forthcoming about the true progress of the Nuclear Project:

> [Analyst]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of

---

[2]    On May 1, 2017, less than three months before the Nuclear Project was abandoned, Martin Phalen, a senior vice president, sold 42,023 shares of stock for approximately $2.7 million.

an update there; and ultimately, if and/or when you expect to do – or hear back from Flour as to more of an integrated schedule update for the overall project.

[Byrne]:  Yes, Julien, this is Steve.  The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3.  We don't see anything to change those.  Flour's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse.  And remember that on the project now, we're dealing just with Westinghouse; Flour is a subcontractor to Westinghouse.  I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing.  So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates.  So I don't expect anything dramatic to come from that.

78.    In a September 2016 video presented at the "V.C. Summer Media Day" Byrne stated, "I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future."  He also enthused, "[w]e're excited about where we are, we've had challenges, we've been able to work through those challenges."

79.    On February 16, 2017, just five months before SCANA announced it was abandoning the Nuclear Project, Marsh stated during the fourth quarter 2016 earnings call that:

We continue to monitor Toshiba's financial situation and their proposed recovery plans.  Although ideally Toshiba would be without these stresses, we still anticipate completing our two new nuclear units, which will enable us to provide our customers with safe, reliable energy for decades to come. . . .  As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion.  Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.

80.    On the same call, Byrne reiterated Marsh's assurances, stating that SCANA would still meet the 2020 deadline thanks to increased efficiency factors.

81.    According to a September 7, 2017 article in *The State* titled "SCE&G Failed to Heed Santee Cooper Warnings at Bungled Nuke Project, Records Show," Santee Cooper, since May 2014, had urged SCE&G, SCANA's subsidiary, to address growing problems with the failing Nuclear Project.  On November 28, 2016, Santee Cooper wrote to Marsh, stating:  "SCANA's project management team . . . does not have the comprehensive skills and depth of experience

- 22 -

necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities." Further, Santee Cooper wrote that SCE&G's refusal to release the Bechtel Report created "an untenable position" for both companies and, in a June 2016 email, that the Bechtel report "was sufficient for Santee Cooper to recognize the need (for) onboard experts to help to work on key issues and improve management of the project." SCANA did not respond to the June email.

82.    Then, on March 29, 2017, Westinghouse filed for bankruptcy protection. In response, SCANA continued to claim that the construction of the reactors was nearing completion. As later revealed, SCANA knew as early as March 2016 that Westinghouse was facing financial troubles that could impact the Nuclear Project. In fact, on March 21, 2016, Santee Cooper and SCANA met to discuss Westinghouse and the state utility asked that a bankruptcy lawyer be retained.

83.    Despite the publicity surrounding the Westinghouse bankruptcy and the reasons for the bankruptcy, SCANA continued to claim that construction of the reactors was proceeding as promised, with Byrne, then Executive Vice President of SCANA, stating to the PSC on April 12, 2017 that "work continues onsite without substantial disruption" and providing a power point presentation showing that the Nuclear Project was nearing completion.

**Despite Knowledge that the Nuclear Project
was Failing, the Individual Defendants Continued
to Approve Exorbitant Compensation**

84.    SCANA's annual incentive compensation plan was based on evaluating SCANA's earnings per share and each executive's level of performance in helping SCANA achieve its business objectives. SCANA's 2017 Proxy Statement (the "2017 Proxy"), filed with the SEC on Schedule 14A on March 24, 2017, stated that in 2016, all of SCANA's named executive officers earned 100% of their annual incentive awards. In addition to their regular salaries, Marsh received

- 23 -

stock awards worth over $2.9 million and incentive plan compensation of more than $1.4 million; Addison received stock awards worth over $1 million and incentive plan compensation of over $600,000; and Byrne received stock awards worth over $1 million and incentive plan compensation of over $600,000.

85.    These awards were tied directly to the supposed success of the Nuclear Project.  In explaining the reasons behind the awards, the 2017 Proxy stated that "Mr. Marsh's award was based on his oversight and support of our new nuclear construction activities," while both Addison's and Byrne's awards were based on their "efforts to secure financing related to our new nuclear construction project; completing an evaluation of pricing options under the amended Engineering, Procurement and Construction Agreement relating to our new nuclear construction, and overseeing regulatory approval of additional costs associated with the selected option."

86.    SCANA would not have achieved its targeted earnings per share, and executives, in turn, would not have received millions of dollars in compensation, if the truth about the Nuclear Project had been known.

**SCANA Announces That It Is Abandoning the Nuclear Project**

87.    Just three months later, on July 31, 2017, SCANA announced that it was abandoning the Nuclear Project and that it would file a petition with the PSC seeking approval of its abandonment plan.  SCANA concluded that completing the Nuclear Project would be prohibitively expensive, estimating that completion of the units would cost approximately $9.9 billion, and that the reactor units could not be brought on line until December 31, 2022 and March 31, 2024 (well after the expiration of the federal tax credit in 2020).  Further, pursuant to the BLRA, SCANA stated its intention to seek amortization of the failed Nuclear Project's costs – estimated by SCANA at $4.9 billion – into electricity rates over sixty years.

88.     Following SCANA's announcement of the abandonment of construction of the Nuclear Project, on August 4, 2017, South Carolina Attorney General Alan Wilson ("Wilson") announced an investigation and state Senate leaders called for a special legislative session.  Soon thereafter, state lawmakers learned of the existence of the Bechtel Report and demanded that SCANA and Santee Cooper release it.  But it was not until South Carolina Governor Henry McMaster ("Governor McMaster") demanded the report pursuant to his authority under the South Carolina Constitution that Santee Cooper begrudgingly turned the report over to Governor McMaster on September 3, 2017.

89.     Following public release of the Bechtel Report, and the coinciding revelation that SCANA knew of the numerous problems with the Nuclear Project long before they were announced publicly, the South Carolina House held a committee hearing on September 15, 2017 to discuss the Nuclear Project's failure.  A panel of eighteen legislators questioned SCANA executives about who was responsible for the failure, but the focus of the hearing was on the concealment of the Bechtel Report.  SCANA executives claimed that the report was not released because it was being used in preparation for litigation against the contractors on the Nuclear Project, but members of the House said that the audit was proof of SCANA's failure to manage the Nuclear Project effectively and that SCANA should be responsible for the remaining $2.2 billion in costs on the Nuclear Project.

90.     On September 4, 2017, upon a mandate from South Carolina Governor McMaster, the Bechtel Report was finally released to the press, revealing that SCANA's officers and directors had caused SCANA purposefully to conceal the Bechtel Report from the public for eighteen months.  Soon after, a South Carolina House Committee held a hearing in which it lambasted SCANA officials, stating that the Bechtel Report clearly showed that SCANA failed to manage effectively both the Nuclear Project and Westinghouse.  House Committee members went on to

suggest that SCANA should "eat" the $2 billion in remaining costs for the Nuclear Project rather than charge ratepayers.

91.    Under pressure from South Carolina lawmakers, on October 31, 2017, SCANA announced that Marsh and Byrne would retire, effective December 31, 2017.

92.    SCANA's share price dropped precipitously following its announcement that it would abandon the Nuclear Project – declining from $65.97 on July 31, 2017 to just $38.86 by January 2, 2018, the day before the Merger was announced – a decline of more than 41%.

93.    On November 16, 2017, SCANA issued a press release outlining what the Company claimed was a "proposed solution" to the failed Nuclear Project whereby SCANA's shareholders would absorb billions of dollars of costs.  Under this proposal, however, ratepayers would have still paid an average of $25 per month, totaling $29.5 million per month, for the failed Nuclear Project, and shareholders would have been on the hook for billions of dollars.

94.    State lawmakers were outraged by SCANA's proposal.  Representative Kirkman Finlay said: "They have created a whole new world of bad blood.  I don't think it received anywhere near the reception they hoped for.  I don't think there is anyone in the General Assembly that is impressed by this plan."  Representative Finlay's response was echoed by other South Carolina lawmakers such as Senate President Hugh Leatherman who called the proposal "an insult to ratepayers."

95.    On September 21, 2017, SCANA reported that it received a subpoena issued by the U.S. Attorney's Office for the District of South Carolina.  On September 25, 2017, state lawmakers asked the South Carolina Law Enforcement Division ("SLED") to investigate potential criminal activity by SCANA related to the Nuclear Project.  On October 17, 2017, SCANA reported that it received a document subpoena from the SEC.  The Company is also subject to numerous consumer

class actions, securities class actions, and derivative actions in connection with the failed Nuclear Project.

96.    In addition to federal and state-led investigations, environmental interest groups including Friends of the Earth and the Sierra Club  filed actions before the PSC to prevent SCANA from continuing to charge utility customers for the costs of the failed Nuclear Project.  Prior to the Merger, SCANA was collecting more than $445 million a year from ratepayers.  One of the actions before the PSC requested refunds for the nearly $2 billion that customers have already paid for the Nuclear Project.

97.    Another group of lawsuits brought by South Carolina utility customers in state court sought damages for ratepayers having been forced to pay elevated rates for the failed Nuclear Project.  On December 4, 2018, SCANA reached a settlement with its 730,000 South Carolina electric customers in the amount of $2.1 billion to refund the inflated electric bills used to fund the failed Nuclear Project.

98.    SCANA is also a defendant, and thus faces substantial liability, in multiple federal lawsuits brought by shareholders.  On January 18, 2018, this Court designated lead plaintiffs in a federal class action shareholder lawsuit against SCANA in connection with the enormous losses shareholders incurred as a result of SCANA misleading investors regarding the successful completion of the Nuclear Project in violation of §§10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5.  That case has survived a motion to dismiss and lead plaintiffs moved for class certification on June 28, 2019.  In denying the motion to dismiss, the Court noted that "the amended complaint plausibly demonstrates that the Individual Defendants acted at least recklessly and possibly deliberately" in issuing false statements regarding the progress of the Nuclear Project.  *In re SCANA Corp. Sec. Litig.*, C.A. No. 3:17-2616-MBS, 2019

4816-8880-4009.v2-10/15/19

U.S. Dist. LEXIS 54176, at *38 (D.S.C. Mar. 29, 2019).  If the shareholders ultimately prevail

there will be significant monetary damages.

**The Derivative Claims Set Forth Defendants' Inseparable Fraud**

99.    On January 18, 2018, this Court designated lead plaintiffs in a group of federal

shareholder derivative actions, which alleged, *inter alia*, that SCANA and its officers and directors

exposed the Company to liability in connection with the Nuclear Project by violating the Exchange

Act.  The federal derivative claims included breach of fiduciary duty, mismanagement, corporate

waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the

Nuclear Project.

100.    On June 27, 2018, the Court denied in full the defendants' motions to dismiss the

derivative claims against them.  In denying defendants' motions to dismiss pursuant to Federal

Rule of Civil Procedure 23.1 ("Rule 23.1"), the Court concluded that "Plaintiffs create a reasonable

doubt that a majority of [the] Demand Directors are disinterested and independent or that their

decisions relating to the [Nuclear Project] were products of a valid exercise of business judgment."

*In re SCANA Corp. Derivative Litig.*, C.A. No. 3:17-3166-MBS, 2018 U.S. Dist. LEXIS 107042,

at *17 (D.S.C. June 27, 2018).  The Court concluded not only that Plaintiffs sufficiently alleged

that pre-suit demand on the Board was excused pursuant to Rule 23.1, but also that all of Plaintiffs'

claims for relief on SCANA's behalf against the defendants were adequately asserted pursuant to

Federal Rule of Civil Procedure 12(b)(6).  Thus, the Court determined that the derivative Plaintiffs

stated a claim upon which relief can be granted.[3]

---

[3]    On July 13, 2018, SCANA announced that it had added two new members to its board of
directors, John (Jeb) E. Bachman and Dr. Patricia D. Galloway, who formed a Special Litigation
Committee ("SLC") to investigate the alleged claims in the state and federal derivative claims and
to determine whether it was in SCANA's best interests to pursue those claims.  On July 24, 2018,
SCANA moved to stay the federal derivative action pending the purported "investigation" of this
belatedly formed SLC, even though the complaint in that action had already been sustained in its
entirety.  The Court denied that motion on October 31, 2018.  The ORS requested that the PSC ask

- 28 -

101.    Three derivative actions were also filed in South Carolina state court that alleged the same wrongdoing as the federal derivative action, and additionally alleged that SCANA's executives failed to manage the Nuclear Project and actively concealed its shortcomings, and that SCANA failed to hold members of management accountable for their wrongful conduct and instead rewarded management and themselves with unwarranted compensation.  On September 6, 2018, Judge Mark Hayes denied SCANA's motion to dismiss as to Rules 12(b)(6) and 23(b)(1) of the South Carolina Rules of Civil Procedure.  In denying the motions, Judge Hayes found that the derivative complaints sufficiently pleaded demand futility by making a threshold showing of a substantial likelihood of personal director liability and the Court therefore concluded that "Plaintiffs' allegations create a reasonable doubt that a majority of SCANA's board of directors are disinterested and independent or that their decisions relating to the V.C. Summer project were products of a valid exercise of business judgment."  The Court also found that both complaints contained sufficient allegations of wrongdoing to survive dismissal.  The derivative actions were consolidated on September 18, 2018 under the caption, *Crangle v. Marsh, et al.*, Case No. 2017-CP-40-05791.  On December 21, 2018, the Court denied the defendants' renewed motion to dismiss the Complaint pursuant to Rule 12(b)(8).

102.    The derivative claims were subsequently bolstered by the testimony of former SCANA employees who have come forward to report the wrongdoing they witnessed while working on the Nuclear Project.  For example, Kenneth Browne ("Browne"), a former engineer who worked at SCANA for seven years and oversaw the Nuclear Project contractors, said in a sworn deposition that SCANA executives presented a much more positive picture of the Nuclear

---

for the findings of the SLC and other information related to the failure of the Nuclear Project, but the PSC declined to do so, effectively preventing Plaintiffs and SCANA's former shareholders or the public from gleaning any information regarding whether the SLC concluded, or even conducted, its investigation or the results of such investigation.

4816-8880-4009.v2-10/15/19

Project to the public than they did within the privacy of the Company. According to Browne, the Company's public representation that the Nuclear Project was doing well was a front; it was well known within the Company that the progress of construction was actually extremely poor and the projected cost overruns were substantial. Browne's testimony supports that of Walker, whose testimony initially provided some color to the derivative allegations of wrongdoing by SCANA's officers and directors.

103.    In testimony before the PSC, Walker, who worked for SCANA for thirty-three years and spent seven years as Vice President of Nuclear Finance Administration, stated that she was concerned with the status of the Nuclear Project and the Company's reliance on and acceptance of the Consortium's[4] excuses and poor performance. According to her testimony, in 2015, Walker's team reviewed the Consortium's cost estimate at completion ("EAC") and compared it with their own. Walker's team was shocked to see that the Consortium's EAC was only $698 million, compared to her team's calculation of $1.2 billion – a difference of more than half a billion dollars. Walker presented this information to Marsh, but he replied that he would rely on the Consortium's EAC and refused to notify the PSC or the ORS of SCANA's EAC calculation. Marsh did just that. On March 12, 2015, SCANA petitioned the PSC to modify the approved cost and construction schedules for the Nuclear Project. In its filings accompanying the petition, SCANA used the Consortium's EAC and failed to disclose the existence of the Company's internal cost estimate. According to Walker's testimony before the PSC, SCANA executives unquestionably knew that the Consortium's estimate was inaccurate as it was based on a level of labor productivity that was patently unattainable. The ORS later found that:

> [SCANA's] deception with respect to cost estimates went beyond mere omission of its own estimate to include outright misrepresentations about (1) the accuracy of

---

[4]    The Consortium consisted of Westinghouse and its primary construction contractor Stone & Webster. CB&I formed part of the Consortium after it acquired Stone & Webster.

the Consortium's cost estimate and (2) the outcome of SCE&G's review of that estimate. SCE&G executives falsely testified (1) that the Consortium's estimate was the best existing estimate of anticipated costs, and (2) that SCE&G's internal review supported the Consortium's cost estimate[.]"

\*        \*        \*

SCE&G's deception extended beyond the [Nuclear] Project capital cost schedule to include the construction schedule as well. Months before the 2015 petition was filed, SCE&G senior executives acknowledged the need for an independent assessment of the Project, to include the project schedule. The Owners agreed to retain the Bechtel Corporation to perform the assessment shortly after the March 2015 petition was filed. Nonetheless, SCE&G did not reveal the existence of this assessment to ORS or the Commission. The assessment revealed that the substantial completion dates for the Units were approximately 24 months behind the existing schedule on file with the Commission. Once ORS happened to stumble on evidence that the assessment had occurred, SCE&G misrepresented the results of the assessment to ORS consultant Gary Jones on multiple occasions. In response to a written discovery request from ORS, SCE&G on multiple occasions, failed to disclose Bechtel as a consultant or even disclose that an assessment had been performed, the results of which SCE&G claimed privileged.

104.    Many of the allegations underlying the derivative claims are substantiated by the testimony of both Walker and Browne, as well as the independent findings of the PSC and the ORS. Addison himself acknowledged to the PSC that SCANA withheld key information from the PSC about the status of the Nuclear Project.

105.    If Plaintiffs' derivative claims were successful, SCANA officers and Board members may have been compelled to return some of the money they received to the Company, such as annual performance awards. As such, the Company has valuable claims for breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the Nuclear Project. Dominion has made it clear that it will not pursue these claims or the accompanying repayment to shareholders of ill-gotten proceeds – it has instead agreed to indemnify the wrongdoers in Section 5.08 of the Merger

Agreement, shielding them from personal liability.    Specifically, Dominion states in the

Registration Statement[5] that:

> [I]f the [derivative] claims are not resolved prior to the effective time of the merger, it is possible that the derivative claims will not be pursued, despite the allegation by the plaintiffs in the derivative actions that such claims have substantial value to SCANA.
>
> Moreover, while recovery, if any, on the derivative claims in the derivative actions obtained in the absence of the merger would benefit only SCANA and, indirectly as a result, SCANA shareholders, if the derivative claims are successfully pursued by Dominion Energy or its shareholders following the effective time of the merger, any recovery by them will benefit Dominion Energy, and current SCANA shareholders are only expected to own approximately 12–13% of the issued and outstanding Dominion Energy common stock as a result of the merger.  At the same time, if such claims are unsuccessfully pursued by Dominion Energy the costs related thereto will burden Dominion Energy.  In addition, any recovery by Dominion Energy after the effective time of the merger may be substantially or completely offset by the obligation of Dominion Energy under the merger agreement to indemnify, and to cause SCANA to honor its obligations to indemnify, directors and officers of SCANA for liabilities relating to their service prior to the effective time of the merger.

106.    On January 7, 2019, shortly after the Merger closed, the defendants moved for

judgment on the pleadings based on the Plaintiffs' alleged loss of standing to pursue those claims

on SCANA's behalf as a result of the Merger.  The Court granted that motion on September 9,

2019.

107.    On January 2, 2019, the Merger closed.  As in the federal derivative action, shortly

thereafter, the defendants moved for judgment on the pleadings in the state court derivative action

based on the Plaintiffs' alleged loss of standing to pursue those claims on SCANA's behalf as a

result of the Merger.  That motion has not been resolved.

---

[5]    Dominion filed an initial Registration Statement on Form S-4 with the SEC on February 14, 2018.  On March 14, 2018, Dominion filed Amendment No. 1 to its Registration Statement, filed on Form S-4 with the SEC and on June 6, 2018, filed Amendment No. 2 to Form S-4.  All references to "ARS" cite to Dominion's Second Amended Registration Statement, filed with the SEC on June 6, 2018.

4816-8880-4009.v2-10/15/19

108.    Meanwhile, Marsh and Byrne also appear to have escaped liability for their part in the Nuclear Project's ultimate failure.  Both executives announced their retirements on October 31, 2017, effective on December 31, 2017.  While the Board, no doubt under pressure from the public and South Carolina lawmakers, elected to withhold severance packages from Marsh and Byrne, Marsh retired with a pension worth over $3 million and Byrne retired with a pension in excess of $1.4 million.  Marsh received an additional $3 million and Byrne received an additional $1.1 million from the post-Merger share payout.  On information and belief, there has been no discussion of potential clawbacks of either executive's compensation to account for the huge losses SCANA suffered as a result of the mismanagement of the Nuclear Project.  Further, §5.08 of the Merger Agreement provides indemnification for SCANA's officers and directors for wrongdoing related to the Nuclear Project.

109.    In furtherance of their own self-interest and out of loyalty to former executives, the Individual Defendants approved the Merger at a time when the abandonment of the Nuclear Project and resulting fallout depressed SCANA's stock price and made it an attractive takeover target. After the Company's insiders and the Individual Defendants had benefited from the corporate waste and unjust enrichment alleged in the derivative actions, they sold the entire Company at a price that was unfair to its shareholders, while at the same time insulating themselves from personal liability to the Company resulting from their gross mismanagement of the Nuclear Project.

**The Flawed Sales Process**

110.    Because of the substantial liability that they faced in the numerous regulatory and legal proceedings set forth above, the Individual Defendants engaged in Inseparable Fraud by pursuing the Merger in an attempt to cover their massive wrongdoing.  Although SCANA may have needed to sell itself, the Individual Defendants still had a duty to maximize shareholder value,

and the law does not permit the Individual Defendants to utilize the vehicle of the Merger to absolve themselves of liability for the fraudulent conduct that necessitated the Merger.

111.    After intentionally engaging in fraudulent conduct that caused the stock price to plummet, the Individual Defendants sought an acquirer to effect a merger that would extinguish potential derivative claims during the period of upheaval described herein that provided few alternatives.  The Merger was the result of the Individual Defendants' single, cohesive plan and/or tied together, like patchwork, a snowballing pattern of fraudulent conduct and conscious neglect. The flawed process therefore resulted in a fire sale.

112.    In late 2016, SCANA began to discuss the possibility of a strategic transaction with its financial advisors, Morgan Stanley and RBC.

113.    Following Westinghouse's bankruptcy on March 29, 2017, and its consequent threat to the future of the Nuclear Project, SCANA decided to undertake a sales process. According to the Registration Statement, SCANA received its first expression of interest in a strategic transaction in late March 2017, when the CEO of another utility company, referred to in the Proxy as Party A, approached Marsh at an industry event and expressed interest in discussing a possible strategic transaction..

114.    On May 5, 2017, Marsh met with Thomas F. Farrell II ("Farrell"), Dominion's Chairman, President and CEO, in South Carolina.  During the meeting, the two spoke about a potential strategic transaction between SCANA and Dominion.

115.    According to the Proxy, on July 12, 2017, Marsh and Addison requested a meeting with Farrell and Mark McGettrick ("McGettrick"), Dominion's Executive Vice President and CFO, to provide Dominion with an update on the Nuclear Project and explore Dominion's interest in acquiring all or a percentage of Santee Cooper's ownership stake in the Nuclear Project.  Farrell told Marsh that, although Dominion was not interested in an ownership stake in the Nuclear

- 34 -

Project, it was interested in beginning the process of exploring a strategic transaction with SCANA.

116.    On July 31, 2017, Santee Cooper announced the suspension of construction on the Nuclear Project and SCANA followed suit later that day.  In the wake of the abandonment announcement and a precipitous decline in SCANA's share price, Marsh and Addison again met with Farrell and McGettrick on October 1, 2017, at Farrell's request, to discuss a potential strategic transaction.  Farrell outlined a number of possible terms for a transaction, including a rate credit for utility customers, a reduced amortization period for SCANA's investment in the Nuclear Project, and a premium of approximately 20% over the price of SCANA stock at the time – amounting to approximately $58 per share – for SCANA shareholders.  During this conversation, Farrell also outlined terms, such as an immediate credit for SCE&G's customers, maintenance of rates associated with the Nuclear Project at or below the current levels at the time, a reduced amortization period for SCANA's investment in the Nuclear Project, and a write-off of some part of the investment.  Marsh indicated that he would share Farrell's concepts and terms with the Board.

117.    On October 31, 2017, SCANA announced that Marsh would retire as CEO of SCANA and that on January 1, 2018, Addison would become CEO of SCANA, among other leadership changes, meaning Addison would also now take a more prominent role in potential transaction negotiations.  Byrne's retirement was also announced on this date.

118.    Dominion and SCANA continued the due diligence process and during the week of November 20, 2017, McGettrick and Addison spoke multiple times about a potential transaction, with McGettrick disclosing that Dominion would submit a revised proposal to SCANA.  Then, on November 27, 2017, Farrell requested a meeting with Marsh, Addison, and Hagood during which he presented the revised proposal for a strategic transaction.  Pursuant to this proposal, SCANA

shareholders would receive 75% to 80% in Dominion stock and 20% to 25% in cash for each SCANA share: a total premium of approximately 30% over the price of SCANA stock at the time, or approximately $55.40.  The proposal had otherwise similar terms to previous proposals such as distribution of cash refunds to SCE&G customers, a reduced amortization period for investments, and a write-off of capital spent on the Nuclear Project.

119.    Dominion's proposal was presented to the Board on November 29, 2017.  A mere two days later, SCANA representatives presented Dominion with an initial draft of the merger agreement.  On December 5, 2017, the two parties met to discuss a timeline for a potential transaction and the specific terms of Dominion's proposal.  The Board then met on December 8, 2017 to discuss the meeting with Dominion.  The same day, legal counsel for Dominion sent SCANA representatives a revised draft of the Merger Agreement, which included the closing condition requiring that the PSC accept all key terms of the rate settlement as proposed by Dominion, without any alteration.

120.    On December 15, 2017, Dominion returned with another updated proposal, which incorporated the due diligence performed by Dominion.  According to the Proxy, the new proposal contained the following key terms, among others:  "an all-stock, tax deferred transaction with a value of $54.50 per share of SCANA common stock . . . reflecting an implied premium of approximately 27.9% over the closing price of SCANA common stock prior to . . . November 27, 2017."  Dominion's proposal also included provisions requiring that any change in law adverse to SCANA – such as amendment or repeal of the BLRA or other utilities laws – would trigger Dominion's right to terminate the Merger Agreement and receive a termination fee.

121.    Dominion circulated a revised draft of the agreement on December 22, 2017, which granted Dominion the right not to close the Merger, *even after signing the Merger Agreement*, if any problematic laws were passed by the South Carolina legislature, such as a change to the BLRA.

This provision would give Dominion carte blanche to take for itself any potential recapture from ratepayers of the costs from the failed Nuclear Project.

122.    On December 29, 2017, the Board met with its financial advisors and legal counsel, at which time the Board was presented with the terms of the Merger Agreement related to employee benefits and executive compensation, including a description of equity-based awards and severance protections.    Later that day, SCANA's financial advisors presented a counterproposal to Dominion, including a proposed exchange ratio of 0.669 of a share of Dominion stock per each share of SCANA stock, an increase of just 0.007 from Dominion's previous proposal of 0.662.    Dominion agreed to the terms of the counterproposal on December 30, 2017, and SCANA did not attempt to negotiate any further.

123.    On January 2, 2018, after receiving fairness opinions from both Morgan Stanley and RBC, as well as a statement by Addison in unwavering support of the transaction, the Board approved the Merger Agreement and Addison executed it with representatives of Dominion.

**The Merger Consideration Was Inadequate**

124.    There were two primary components of the Merger consideration.    One was the amount of Dominion stock that SCANA shareholders would receive in the Merger, which would fluctuate wildly throughout the regulatory review process because, in the Individual Defendants' efforts to rush to secure Dominion's agreement to the Merger, they failed to negotiate a collar around Dominion's stock to provide SCANA shareholders with certainty of value.    At the Merger's completion on January 2, 2019, the Company's shareholders received 0.669 of a share of Dominion stock for each share of SCANA stock they owned.    Using Dominion's stock price on the day the Merger closed, the Merger consideration was equivalent to $47.62 per SCANA share. By contrast, on July 31, 2017, the day the market was made aware that SCANA was abandoning

the Nuclear Project, SCANA shares closed at $64.37.  Thus, the Merger consideration undervalued the damage caused by the Individual Defendants' fraud by $2.4 billion dollars.

125.    The second component of the Merger consideration was the funds that SCANA would be able to recover from ratepayers to compensate SCANA shareholders for the costs they had incurred for the failed Nuclear Project.  But, because the Individual Defendants bargained this component of the Merger consideration away to Dominion by agreeing to walk right for Dominion if regulators refused to allow recovery of the costs from ratepayers, any recovery was provided to Dominion, and not SCANA's shareholders.  On December 14, 2018, the PSC ruled that South Carolina utility customers will pay an additional $2.3 billion for the failed Nuclear Project.  Thus, as a result of the Individual Defendants' fiduciary misconduct, SCANA's shareholders were damages in the amount of $4.7 billion dollars.

126.    The unfairness of the Merger consideration is supported by the consensus price target for SCANA was $61.44 per share on December 6, 2017 – over 29% more than the Merger Consideration.  Moreover, before the Merger was announced, several analysts had price targets for SCANA, which well above the Merger Consideration.  For example, on August 10, 2017, Morgan Stanley Investment Research had a price target of $58.00-$59.00, and on August 28, 2017, Mizuho Securities USA Inc. had a price target of $58.50.  A September 1, 2017 article in the *Analyst Journal* titled "Is SCANA Corporation (SCG) Sell Now?" stated, "The analysts offering 12 month price targets for SCANA Corporation have a median target of $65, with a high estimate of $80 and a low estimate of $54."  On September 18, 2017, Williams Capital's price objective for SCANA was $70.  The average 12-month price target among analysts that have issued ratings on SCANA's stock in the last year is $63.07.  As such, the Merger Consideration severely undervalued the Company.

4816-8880-4009.v2-10/15/19

127.    Several commentators have noted that Dominion took advantage of SCANA and South Carolina legislators' misfortunes following SCANA's decision to abandon the Nuclear Project.  As a January 3, 2018 article in the *Wall Street Journal* titled "Dominion Pounces on Scana's Nuclear Woes," explained:  Dominion's bid for SCANA "is nothing short of masterful – a bold move to take advantage of [SCANA's] and local politicians' misfortune."  Discussing Dominion's insistence that South Carolina ratepayers foot the $6 billion still owed for the failed Nuclear Project, the article noted that South Carolina regulators and politicians "will have a hard time saying 'no.'"  The article concluded by noting that "Dominion is paying around $7.43 billion excluding debt for a company that would have cost it $14 billion last summer with a similar deal premium.  A master stroke."

128.    Similarly, a January 3, 2018 article on *Bloomberg Gadfly* titled "Dominion Aims to Clean Up a Nuclear Disaster" pointed out that SCANA's stock fell by almost half in 2017 as a result of the abandoned Nuclear Project.  Dominion, on the other hand, along with the energy sector as a whole, rose approximately 6%.  "Hence, while the 42 percent premium implied by Dominion's all-stock offer looks high, it looks less so when you compare the exchange ratio – 0.669 shares per SCANA share – with history:  Dominion's offer of 0.669 shares per SCANA share is well above the current ratio, but still significantly below the historical average."  As of July 31, 2017, the day SCANA announced abandonment of the Nuclear Project, the ratio of SCANA's stock price to Dominion's was 0.834.  At that ratio, the consideration would have been $59.36, or nearly 25% higher.

129.    In addition to opportunistically acquiring a highly-valued company at a discount, the Merger is immediately accretive to Dominion's earnings and is expected to increase Dominion's annual earnings per share target growth to 8% or higher through 2020.  The Merger complements Dominion's pre-existing operations in South Carolina and strengthens its grip on

- 39 -

energy production and delivery in the Southeast region.  According to Dominion's website, the company currently delivers natural gas to wholesale and direct customers in South Carolina and operates approximately 1,500 miles of transmission pipelines in South Carolina and Georgia, all of which was greatly augmented by acquiring SCANA.  Despite this, the Merger Consideration failed to adequately reflect the synergies anticipated to be generated as a result of the Merger.

**The Individual Defendants Rushed to Make a Deal With**
**Dominion to the Exclusion of Other Potential Suitors**

130.    According to the Proxy, it is abundantly clear that any consideration of other potential suitors was, at all times, lackluster and peripheral to the deal SCANA was forging with Dominion.

131.    As reported on January 12, 2018 in a *The Post and Courier* article titled "CEO: SCANA didn't push to land competing offers before inking Dominion deal," when questioned during Addison's testimony before the South Carolina PSC about whether the Company had "tried very hard" to find buyers, Addison stated, "No.  I didn't mean to even imply that."  Rather, negotiations were carried out over the course of less than two months, while the Individual Defendants were feeling enormous pressure to clean up the mess they had made and insulate themselves from personal liability.  In fact, the Individual Defendants did not try to find other buyers at all.  According to the Proxy, they "did not conduct a formal sale process to solicit other developed acquisition proposals from parties other than Dominion Energy."

132.    As the same *Post and Courier* article noted, Dominion had expressed interest in a potential transaction with SCANA as early as May of 2017, "before the abandoned expansion of the V.C. Summer Nuclear Station had exploded into a political and financial crisis."  These discussions, however, never advanced to the point of negotiating the terms of a potential transaction.  Unsurprisingly, once the Nuclear Project was abandoned, the Individual Defendants sought a transaction, any transaction, that would protect them from personal liability.

- 40 -

133.    Addison said the Company tried to find a solution to the problems caused by the abandonment of the Nuclear Project but was unable to do so.  Specifically, according to Addison's testimony before the PSC on January 11, 2018, there was little public support for SCANA's initial proposed solution to the abandonment of the Nuclear Project, which involved "an immediate rate reduction of 3½ percent, shortening the recovery period from 60 to 50 years, a shareholder-funded base-load power plant of over 500 megawatts providing 40 percent of the energy that was to come from our 55 percent portion of Units 2 and 3 of Summer."  South Carolina lawmakers were openly hostile to SCANA's proposal, with the Senate President calling it an "insult to ratepayers."

134.    This proposal was announced on November 16, 2017, to a hostile reception, and a week later Dominion reached out again to Addison, stating that Dominion was considering providing SCANA with an updated proposal for a strategic transaction.  On November 27, 2017, SCANA executives met with Farrell, where he and Dominion's CFO presented the terms of a potential transaction.  Two days later, the Board met to discuss the terms of a potential combination with Dominion, and on January 2, 2018, after only five weeks of negotiations, the Board unanimously approved the Merger.

135.    While the Board rushed to escape personal liability by inking a deal with Dominion that severely undervalued the Company, the Individual Defendants may have been able to secure a more valuable deal for SCANA's public shareholders if they had initiated a sales process.  According to a January 18, 2018 article in *The State* titled "Should SC accept Dominion's buyout of SCANA?  Lawmakers are skeptical," Florida-based NextEra Energy and North Carolina-based Duke Energy were interested in buying SCANA, too.  While neither utility publicly announced an offer to acquire SCANA, both utilities had representatives monitoring legislative hearings regarding the Merger.

- 41 -

136.    The Proxy revealed that SCANA was approached by at least three potential acquirors, all of whom expressed an interest in exploring a potential strategic transaction with SCANA.  Yet no serious, concerted effort was made by SCANA to pursue negotiations with Party B or Party C, and the Proxy does not disclose what terms may have been offered by the respective parties or why the solicitations never progressed past the initial stages.  Although discussions with Party A progressed farther than those with the other two parties, Party A eventually withdrew from all dialogue with SCANA, but the Proxy is silent as to why.

**The Board and SCANA Executives**
**Negotiate Unwarranted Financial Rewards**

137.    While the unfair price and process has caused Plaintiffs and the Company's public shareholders to receive less than the full value of their SCANA holdings in the Merger, the Merger Agreement provided unwarranted financial rewards to the very executives and directors that were responsible for placing SCANA and its shareholders in their unfavorable position.

138.    Pursuant to SCANA's Long-Term Equity Compensation Plan, executive officers received two types of awards for their service.  The first, Performance Share Awards, are denominated in shares of SCANA common stock in values based on comparative Total Shareholder Return ("TSR")[6] and earnings per share growth components measured each year, over a three-year time period.  Specifically, one half of the award amount is determined by comparing SCANA's TSR with similarly situated utility companies (the "peer group") and the other half is earned based on the level of growth SCANA achieved in "GAAP-adjusted net earnings per share targets."  For an executive to receive 100% of the first half of their target award, the Company's performance would have to rank in the fiftieth percentile in relation to the peer group's TSR during

---

[6]    TSR is equal to the change in SCANA's common stock price, plus cash dividends paid on SCANA common stock during the period, divided by the common stock price as of the beginning of the period.

a one-year cycle. Executives could receive 100% of the second half of their target payouts for every year in which SCANA had growth of 4.5% or more.

139.    The second type of award granted to SCANA executives are Restricted Stock Unit Awards ("RSUs"). RSUs are not performance based, are subject to a three-year vesting period, and are based on the fair market value of SCANA common stock on the day that they are granted. Both RSUs and Performance Share Awards accrue dividends prior to vesting.

140.    In February 2015, the Compensation Committee recommended a number of changes in the criteria for awards, which would change the measurement of performance cycles (from one to three years), increase the maximum award payout, and change the mix of performance shares and RSUs.[7]

141.    Once the gross mismanagement by SCANA executives with respect to the Nuclear Project and the SCANA's directors' and officers' concurrent failure to oversee management finally became public in July 2017, SCANA was not going to reach the targeted performance goals. Hence, share awards to executives like Marsh, Byrne, and Addison would not have vested at target levels. However, pursuant to §2.02(a) of the Merger Agreement, upon consummation of the Merger, Performance Share Awards vested at 100% of target levels and executives were paid as though they had achieved their growth and return goals. Under §2.02(b) of the Merger Agreement, the RSUs that were granted to executives during the previous performance cycles also vested, despite time restrictions that may have otherwise delayed the payout.

142.    According to the Proxy, Marsh received $3,058,911 in combined Performance Share Awards and RSUs, Addison received $3,599,065, and Byrne received $1,111,410. In addition to his merger-related equity compensation, Addison also received $5,297,314 in cash

---

[7]    Prior to February 2015, executive compensation was 80% performance-based awards and 20% RSUs. This ratio changed to 70% / 30% after February 2015.

4816-8880-4009.v2-10/15/19

rewards and $821,648 in pension payments upon consummation of the Merger, bringing his total merger-related compensation award to an incredible $9,718,027. Addison retired on February 1, 2019. Because this was within two years of the Merger, he is entitled to a severance package in excess of $5 million. He would have been entitled to the same had he been fired within two years of the Merger.

143. Finally, the executives that were directly responsible for the wrongdoing that left SCANA and its shareholders in their unfavorable position, will be indemnified by Dominion pursuant to the Merger Agreement and will therefore not face the possibility of clawbacks or other forms of reimbursement.

144. Thus, while shareholders were asked to approve a transaction that severely undervalued their investment in SCANA, the executives directly responsible for SCANA's tremendous loss in market capitalization were granted a colossal payout that they would not have otherwise received absent the Merger.

**The Preclusive Deal Protection Measures**

145. In addition to the inadequate Merger Consideration, the Individual Defendants also agreed to onerous deal protection devices that precluded a full and fair sales process for the Company and effectively locked out competing bidders to the detriment of SCANA's public shareholders. The Merger Agreement substantially favored Dominion and was calculated unreasonably to dissuade potential suitors from making competing offers. Therefore, not only did the Board fail to run a full and fair sales process on the front-end of the Merger, it also ensured no competing bid would be forthcoming on the back-end. When viewed collectively, these provisions, detailed below, furthered the interests of the Individual Defendants to the detriment of SCANA's public shareholders, and were not a justified, appropriate, or proportionate response to

any threat posed by a potential third-party bidder.  This was a clear violation of the Board's fiduciary duty to maximize shareholder value.

146.    The Individual Defendants all but ensured that no other entity would emerge with a competing proposal by agreeing to a "No Solicitation" provision in §4.02(a) of the Merger Agreement that prohibited the Individual Defendants from soliciting alternative proposals and severely constrained their ability to communicate and negotiate with potential buyers who wished to submit or submitted unsolicited alternative proposals.  Under this section, the Company could not solicit or initiate, knowingly encourage, induce, facilitate, or cooperate with any inquiries or proposals that would reasonably be expected to lead to an alternative bid or to participate in any negotiations or discussions with third parties.  In addition, under §4.02(b), the Company was required to immediately cease any and all discussions or negotiations with third parties that had begun before the Merger Agreement was signed.

147.    Further, pursuant to §4.02(c) of the Merger Agreement, the Company was required to promptly notify Dominion, within forty-eight hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Dominion could have then used the unfettered access to confidential, non-public information about competing proposals from third parties to formulate a matching bid under §4.02(f) of the Merger Agreement, virtually eliminating any leverage that the Company had in receiving the unsolicited offer, and significantly deterring an alternative buyer from coming forward.

148.    Section 4.02(f) of the Merger Agreement also severely limited the Board's ability to recommend alternative proposals to shareholders because it provided Dominion with four business days to submit a superior offer.  During this period, the Company was required to negotiate in good faith with Dominion, at Dominion's discretion, and allow Dominion to amend

- 45 -

the terms of the Merger Agreement to make a counteroffer, if the Board decided to enter into a transaction with a third party. Moreover, Dominion needed only to match, not top, a superior proposal.

149.    The matching rights provision functioned to deter potential suitors from expending the cost and effort of launching a superior proposal in the knowledge that they would effectively serve as a "stalking horse," and that Dominion would be allowed to merely piggy-back upon the additional due diligence of the second bidder, after which Dominion would only have to match the second bidder's offer to retain its right to acquire SCANA.

150.    Although the Merger Agreement contained a fiduciary out provision, it was extremely limited and only allowed the Board to enter into discussions and negotiations in response to an unsolicited acquisition proposal under very limited situations. This is because the acquisition proposal would have to be one that: (a) was not the result of any breach of, or any action inconsistent with any of the other provisions set forth in §§4.02(a) and (b) of the Merger Agreement; and (b) can reasonably lead to a superior proposal. Even then, the Board would also have to conclude in good faith, after having consulted with its outside legal counsel, that failure to take action in response to the acquisition proposal would reasonably constitute a breach of the fiduciary duties of the Board to the Company's shareholders under applicable law. Because the Company is prevented from offering access to non-public information, ultimately this provision provided little to no opportunity for a superior proposal to emerge.

151.    Further locking up control of the Company in favor of Dominion was an exorbitant termination fee. Section 7.02 of the Merger Agreement contained a termination fee provision which provided that if the Board rescinded its recommendation in favor of the Merger and agreed to a competing proposal pursuant to the lawful exercise of its fiduciary duties, the Company would have been obligated to pay Dominion an onerous $240 million termination fee, which was over

- 46 -

3% of the total value of the Merger at the time it was announced.  This further reduced any possibility of maximizing shareholder value through a superior proposal from a third party because a competing bidder would ultimately be required to pay the termination fee.  The termination fee essentially required any competing bidder to agree to pay a substantial premium for the right to provide shareholders with a superior offer.

152.    As reported by *The State* in a January 5, 2018 article titled "SCANA would have to pay $240 million to walk away from Dominion deal," Addison stated, "[Any would-be acquiror] would have to consider the [termination fee] because that would really be a cost they would end up having to pay as part of the proposal."  The article went on to note that "Wall Street analysts say the breakup fee is evidence Dominion wants to ward off other SCANA bidders."

153.    The Company would have also been obligated to pay the termination fee if SCANA's public shareholders had not voted to approve the Merger.  One prerequisite to closing was the approval by the PSC of the petition submitted by Dominion and SCANA on January 12, 2018 that would have allowed Dominion to continue to charge South Carolina ratepayers for the costs of the failed Nuclear Project.  The provision was incredibly risky at the time, considering the tumultuous political climate in South Carolina with respect to the Nuclear Project.  The fight over whether or not to allow Dominion to recuperate from South Carolina utility customers the losses incurred from the defendants' wrongdoing raged for months.  In fact, the matter was still undecided at the time that SCANA shareholders voted to approve the Merger on July 31, 2018.  It was not until December 14, 2018, that the PSC made a final decision, allowing Dominion to collect $2.3 billion from utility customers to pay for the failed Nuclear Project.

154.    In addition, given the substantial liability faced by SCANA's directors and officers as a result of their wrongdoing in connection with the Nuclear Project, it is of little surprise that the Individual Defendants made every attempt to lock-up the Merger in an effort to protect

- 47 -

themselves.  To that effect, section 5.08 of the Merger Agreement contains an indemnification

provision which states in relevant part:

> Parent shall indemnify and hold harmless . . . each present and former director of
> the Company and its Subsidiaries from and against any and all expenses,
> judgments, fines, losses, claims, damages, and liabilities incurred in connection
> with any Proceeding or investigation whether civil, criminal, administrative or
> investigative, arising out of or pertaining to matters existing or occurring at or prior
> to the Effective Time.

155.    Leaving no doubt as to the purpose of Section 5.08, and the Merger itself, the

Merger Agreement goes on to specify:

> [T]he foregoing obligation of Parent shall apply with respect to, and remain in full
> force and effect as to any pending or future claim, hearing, investigation or
> Proceeding relating to or arising out of the construction, or cessation of the
> construction, of nuclear power Units 2 and 3 at the Summer Station or the
> bankruptcy of Westinghouse Electric Company, LLC.

156.    Thus, not only did the Individual Defendants fail to negotiate for an increase in the

Merger consideration commensurate with the value of the colorable claims that exist against

SCANA's executives and directors, they all but guaranteed that Dominion would not pursue those

claims once the Merger was consummated.  Indeed, to date, Dominion has not taken any action

against the SCANA executives and directors responsible for the wrongdoing related to the Nuclear

Project.

157.    Taken together, the preclusive deal protection devices and indemnification clause

substantially and improperly limited the Board's ability to act with respect to investigating and

pursuing any superior proposals and alternatives.  Even though the Merger was negotiated in less

than three months, the Individual Defendants agreed to terms in the Merger Agreement that would

prevent any true auction of the Company from occurring.  The deal protection provisions operated

conjunctively to make the Merger a *fait accompli*, ensuring that no competing offers would

emerge, and that SCANA's shareholders would never learn what their investment in SCANA was

truly worth.  In fact, no competing offers were made, despite some South Carolina lawmakers

- 48 -

publicly asking for another bidder to step forward.  By agreeing to the onerous deal protections, the Individual Defendants breached their fiduciary duties to SCANA's public shareholders because the shareholders did not receive adequate or fair value for their SCANA common stock in the Merger.

**The Proxy Was Deficient and Misleading**

158.    Compounding the flawed sales process and inadequate consideration, SCANA filed its Proxy on June 15, 2018, which failed to provide the information necessary for shareholders to make a fully informed decision regarding the Merger.

159.    The Proxy, which generally described the process leading to the Merger and the financial analysis conducted by the Board's financial advisors, Morgan Stanley and RBC, did not provide shareholders with all the material information regarding the Merger.  Defendants withheld from the Proxy material information concerning, among other things: (i) the flawed sales process for the Company; (ii) the Individual Defendants' timing and motivations for the Merger; (iii) potential competing proposals for the Company; (iv) the Individual Defendants' conflicts of interest; and (v) Morgan Stanley's and RBC's financial analyses in support of their "fairness opinions."

160.    As such, the Proxy asked SCANA shareholders to vote in favor of the Merger without providing the information necessary for shareholders to make a fully informed decision.

161.    Accordingly, Plaintiffs seek damages for the injuries that they and the Class have suffered as a result of the Individual Defendants' fiduciary misconduct.

<u>**CLAIM FOR RELIEF**</u>

**Breach of Fiduciary Duty**
**(Against the Individual Defendants)**

162.    Plaintiffs incorporate by reference and reallege every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

- 49 -

163.    The Individual Defendants have violated their fiduciary duties of care, loyalty, and good faith owed to Plaintiffs and the public shareholders of SCANA.  By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants, individually and acting as part of a common plan, committed inseparable fraud that and deprived Plaintiffs and the Class of the value of their investment in SCANA.

164.    As members of the Company's Board and/or SCANA executives, the Individual Defendants had fiduciary obligations to:   (a) refrain from engaging in fraudulent conduct; (b) undertake an appropriate evaluation of SCANA's value as a merger/acquisition candidate without concerns for their liability for their fraudulent misconduct; (c) take all appropriate steps to enhance SCANA's value and attractiveness as a merger/acquisition candidate and not engage in a fire sale for their own benefit; (d) act independently to protect the interests of the Company's public shareholders; (e) adequately ensure that no conflicts of interest existed between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts existed, to ensure that all conflicts were resolved in the best interests of SCANA's public shareholders; and (f) actively evaluate the Merger and engage in a meaningful auction with third parties in an attempt to obtain the best value in any sale of SCANA.

165.    The Individual Defendants have breached their fiduciary duties to Plaintiffs and the Class.

166.    As alleged herein, in an effort to protect themselves, the Individual Defendants initiated a process to sell SCANA that vastly undervalued the Company in order to extinguish derivative clams and shield themselves from legal and regulatory liability for their fraudulent misconduct.  In addition, by agreeing to the Merger, the Individual Defendants capped the price of SCANA at a price that did not adequately reflect the Company's true value.

167.    The Individual Defendants also failed to sufficiently inform themselves of SCANA's value, or disregarded the true value of the Company, and agreed to a Merger that insulates themselves from liability for their substantial wrongdoing.  Further, any alternate acquiror would have been faced with engaging in discussions with a management team and Board that were already committed to the Merger with Dominion.

168.    Plaintiffs and the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Declaring that this action may be maintained as a class action and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B.    Declaring that the Individual Defendants have violated their fiduciary duty to SCANA;

C.    Awarding damages to Plaintiffs and the Class;

D.    Directing the Individual Defendants to account to Plaintiffs and the Class for their damages sustained because of the wrongs complained of herein;

E.    Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

F.    Granting such other and further relief as the Court may deem just and proper.

4816-8880-4009.v2-10/15/19

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

_____

  *s/ Daniel J. Ballou*_____
Daniel J. Ballou
MORTON & GETTYS
Fountain Park Place
331 E. Main Street, Suite 300
Rock Hill, SC 29731
Tel.: 803-366-3388
Fax: 803-366-4044

CHAPPELL SMITH & ARDEN, P.A.
MARK D. CHAPPELL
GRAHAM L. NEWMAN
2801 Devine Street, Suite 300
Columbia, SC 29205
Telephone:  803/929-3600
803/929-3604
mchappell@csa-law.com
gneman@csa-law.com

Liaison Counsel for Plaintiffs

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com
tlacomb@rgrdlaw.com

BRAGAR EAGEL & SQUIRE, P.C.
LAWRENCE P. EAGEL
MELISSA A. FORTUNATO
885 Third Avenue, Suite 3040
New York, NY 10022
Telephone:  212/308-5858
212/486-0462 (fax)
eagel@bespc.com
fortunato@bespc.com

Lead Counsel For Plaintiffs

DATED:  October 15, 2019

4816-8880-4009.v2-10/15/19