EXHIBIT B

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF SOUTH CAROLINA

3                 CHARLESTON DIVISION

4

5    In re:  SCANA CORPORATION PUBLIC

6    SHAREHOLDER LITIGATION

7

8           C.A. No. 3:18-cv-00505-MBS

9

10

11   VTC

12   DEPOSITION OF:   MAYBANK HAGOOD

13   DATE:            April 7, 2021

14   TIME:            9:43 a.m.

15   LOCATION:        205 King Street, Suite 400

16                    Charleston, SC

17   TAKEN BY:        Counsel for the Plaintiffs

18

19   REPORTED BY:

20   Roxanne Easterwood, RPR

21   Job No. 4519243

22

23

24

25

                                          Page 1

1    normal board meeting.

2         Q.   Okay.  So you would have had a

3    normal -- a normal board meeting, and there would

4    have been some follow-up for -- for each of these

5    two meetings?

6         A.   Yes.

7         Q.   Do you recall what was discussed in

8    the follow-up for these meetings?

9         A.   Well, there were several reasons for

10   meeting.

11        Q.   Okay.

12        A.   We felt strongly that even though we

13   had been in this project together, been a

14   45 percent owner, as a 55 percent owner, that

15   there had been, you know, very little

16   communication actually between the two boards and

17   that everything was being communicated to and from

18   the executive management.  So we thought it would

19   be a really good idea for the two boards to meet

20   and open up a channel of communication at the

21   board level.  So, you know, that was the -- what I

22   would say is sort of the overarching purpose,

23   particularly of the first meeting, and -- and

24   really the second one is a follow-up.

25              The March meeting there were -- I

Veritext Legal Solutions
866 299-5127

 1    believe there was a presentation made on the

 2    findings of the Bechtel report, and I believe

 3    there were -- there was a discussion around at

 4    that point, given the fixed-price option, you

 5    know, what aspects of the Bechtel report were

 6    still relevant since so many of the issues had

 7    been resolved through the fixed-price option with

 8    the consortium.

 9         Q.    You said this -- this took place at

10    which meeting?

11         A.    I believe that was the March meeting.

12         Q.    Okay.  And what -- what occurred at

13    the -- the June meeting, then?

14         A.    The June meeting was more so follow-up

15    where we -- where we were on -- the -- the main

16    thing that -- that both boards felt there was a

17    recommendation in the report, that there would be

18    a construction oversight review board that would

19    be put together of independent, you know, experts

20    in the construction industry that had no

21    involvement with the project or with either

22    company, and that was agreed to in March, and so

23    there was some follow-up on that at the June

24    meeting.

25         Q.    And was that -- was that board set up?

Veritext Legal Solutions
866 299-5127

1         Q.    Were there other things, other reasons

2    for the report being undertaken?  I mean, that you

3    were being told by Mr. Marsh and Mr. Byrne?

4         A.    There was a desire on Santee's part to

5    have a -- have a third party look at this, and

6    they had a specific desire for Bechtel.

7         Q.    Why -- why were you told that Santee

8    had a desire to have a third party to look at --

9    look at this, as you said?

10        A.    At that point, before the Bechtel

11   report started, there were -- there were some

12   schedule delays and cost overruns, and there was,

13   you know, discussions around the fact that things

14   were going to have to change to get back on -- you

15   know, to be able to hit the schedules, and so I

16   think that was the other primary purpose when they

17   started it.

18        Q.    Okay.  So you were told prior to the

19   time the Bechtel investigation started that there

20   was a concern on Santee Cooper's part about

21   schedule delays and cost overruns, right?

22        A.    And -- and SCE&G as well.

23        Q.    So, and can I -- can I say SCANA?

24        A.    Sure.

25        Q.    Sure.  It's only because my local

Page 57

1  power company is SDG&E?

2        A.   Is that right?

3        Q.   So I would constantly be stepping over

4  it.

5        A.   Okay.

6        Q.   And so SCANA was also concerned about

7  schedule delays and cost overruns that -- and that

8  prompted the Bechtel report, right?

9        A.   SCANA's primary purpose was for --

10 as -- as I remember it and was told, was for the

11 potential protection if we ever got into

12 litigation with Westinghouse.

13       Q.   Okay.  But -- but you were told by

14 who, was it Mr. Marsh or Mr. Byrne, that there

15 were some concerns about schedule delays and cost

16 overruns?

17       A.   Yes.

18       Q.   And that was prior to the time the

19 Bechtel investigation was undertaken, right?

20       A.   Yeah.  I mean, they didn't -- yes.

21       Q.   Okay.  Was there -- what were you

22 told?  Was Santee Cooper concerned, or that

23 Mr. Marsh and Mr. Byrne, did they -- they also

24 have concerns about schedule delays and cost

25 overruns?

Page 58

```
1          Q.   Well, but -- but you -- you already
2    said the litigation had already sort of passed by
3    and there was no reason for -- for -- for that to
4    be an issue anymore.  That's what you testified
5    to.
6          A.   Could I clarify that?
7          Q.   No.
8          A.   Okay.
9          Q.   So did anyone on the board ask for the
10   Bechtel report?
11         A.   I'm not aware of anybody that asked
12   for the report.
13         Q.   So did Kevin Marsh volunteer to
14   provide it to the board?
15         A.   We went through the recommendations of
16   the report.  They reported those to us.  We had a
17   joint meeting with Santee, and -- and I mentioned
18   to you, earlier in March, and we looked at the key
19   recommendations.  We were told that a number of
20   the recommendations were much -- you know, I think
21   they -- I can't remember the total number.
22              There was over 70 of them, that a
23   number of them had to do with issues that would go
24   to Fluor.  Some were issues that would be
25   addressed by Santee and SCANA, and the main one
```

Page 76

1    was doing the -- the CORB.

2        Q.    Okay.  Well, let's turn over to Page 7

3    of Exhibit 1.  So Page 7 discusses a March 21,

4    2016 Santee Cooper board meeting with SCE&G

5    management, with SCANA board in attendance.  And

6    you were at that meeting, right?

7        A.    Yes.

8        Q.    And it says, as you've already

9    testified to, that they -- you discussed the

10   Bechtel report, Santee Cooper's recommendations,

11   and then Marsh's commitments to set up CORB,

12   right?

13       A.    Could you repeat that?

14       Q.    Well, I was just sort of paraphrasing

15   what the paragraph says.

16       A.    Yeah.

17       Q.    You said -- it says it discussed the

18   Bechtel report, and you also said that you -- that

19   you discussed Santee Cooper's recommendations,

20   right?

21           MR. GREENE:  Objection to form.

22   BY MR. WISSBROECKER:

23       Q.    Or was it Bechtel's recommendation?

24       A.    It was the Bechtel recommendations.

25       Q.    Okay.  And you said there was how many

Page 77

1    coming on site, and in our view we had

2    significantly improved the situation and moved to

3    a -- you know, a better arrangement than we had

4    before we even initiated the Bechtel report.

5        Q.    Okay.  Let me -- let me just -- just

6    follow up on that.  Okay.  One of which is --

7    is -- so by testifying that Mr. Marsh informed you

8    that the scheduling just weren't credible, you --

9    you're admitting to the fact that Mr. Marsh told

10   you that there were scheduling issues identified

11   in the Bechtel report, right?

12       A.    He mentioned that they had a schedule.

13       Q.    That they -- that they -- and did

14   he -- did he mention that those scheduling

15   proposals were not credible, right?  I mean,

16   what -- what -- what does that mean?

17       A.    He stated that there's -- they base it

18   on assumptions and not on the actual factual cost

19   assessments of the per-unit cost to build the

20   plant.

21       Q.    Okay.  And so -- so he made you aware

22   of -- that Bechtel had identified scheduling

23   issues, but then he told you that they weren't

24   credible, right?

25       A.    Yes.  I -- I just don't know what --

Page 86

1    when that happened --

2          Q.    What was it --

3          A.    -- in the sequence.

4          Q.    Okay.  So, but was it around about the

5    same time you met with the Santee board or before?

6          A.    No, because at that point we were

7    completely focussed on trying to initiate and

8    decide on whether we were going to exercise the

9    fixed-price contract and what were the components

10   of the Bechtel report that both Santee and SCE&G

11   felt like were appropriate to implement.

12         Q.    Okay.  So I'm going to look at -- view

13   the timing here.

14         A.    Right.

15         Q.    Okay.  So March 2016 the board met,

16   and you -- you have said that the Bechtel report

17   wasn't credible because, one, they only spent 60

18   days, and it was finished two months after the

19   fixed-price contract was entered into, right?

20         A.    It was the -- yeah.  Yeah, I don't

21   know when it was -- the -- the report was

22   submitted, yes.

23         Q.    So they conducted the investigation

24   over a 60-day period?

25         A.    Right.

Veritext Legal Solutions
866 299-5127

1   manage the project.

2        Q.   So no third party come in for

3   construction oversight?

4        A.   That's my recollection.

5        Q.   What about the -- the hiring of

6   bankruptcy counsel?

7        A.   So they had agreed at that point.

8   They -- I think SCANA admitted that they had taken

9   longer than they had hoped to to find the right

10  bankruptcy counsel, and they agreed -- I can't

11  remember the name of the firm.  It was a firm out

12  of -- I think it was out of Chicago that

13  specialized in bankruptcy.

14       Q.   Was it Paul Singer?

15       A.   I think that's right.  I'm -- I'm not

16  sure, but I think that sounds right.  And that

17  they -- so they agreed to that, and I believe by

18  the time the December 5th meeting had happened

19  they had that counsel on board.

20       Q.   But both parties had agreed to -- to

21  counsel at that point?

22       A.   I believe so.

23       Q.   Okay.  And -- and you -- you reviewed

24  this letter, so you knew that Mr. Carter was

25  concerned that we must anticipate Westinghouse

Veritext Legal Solutions
866 299-5127

```
 1    having financial difficulty completing the project
 2    particularly in a timely manner.  Do you see that?
 3           A.    Where are you?
 4           Q.    So under the heading on the -- this is
 5    the second page of the document Bates stamped
 6    SCDOJ 1535055.
 7           A.    Yeah.
 8           Q.    Yeah.  We already talked about a
 9    bankruptcy expertise?
10           A.    Right.
11           Q.    And then he says:  Regrettably, we
12    must anticipate Westinghouse WEC having
13    difficulty -- financial difficulty completing the
14    project particularly in a timely manner.  Do you
15    see that reference?
16           A.    Which paragraph is that?
17           Q.    The one that says bankruptcy counsel.
18           A.    Yeah.  Okay.  Okay.  Yeah.  Got it.
19    Okay.
20           Q.    And so you were aware at least as of
21    November 30th, 2016 that Mr. Carter was concerned
22    that there would be issues with Westinghouse
23    having the ability to complete the project in a
24    timely manner?
25           A.    Yes.
```

Veritext Legal Solutions
866 299-5127

1      Q.   Did you discuss that issue with

2  Mr. Marsh?

3      A.   Mr. Marsh discussed that with the

4  overall board.

5      Q.   And in -- in November of 2016?

6      A.   I don't remember exactly when.  I know

7  that he had meetings with Westinghouse in

8  December.  I know that he was trying to get a

9  meeting set up with the chairman of Toshiba.

10 Offered to go over to Japan to have that meeting.

11 And so these were all issues that we were

12 concerned about, too.

13     Q.   And what did -- what -- what was --

14 what were the issues with the timing that were

15 articulated?  What -- what -- what timeframe

16 was -- was -- was being sort of thrown out there

17 as -- as the delay?

18     A.   We were -- I don't recall that.  I

19 just know that we were given assurance that they

20 were still -- they were still on the target at

21 that time.  You know, that the project had slipped

22 a couple of times over the course of eight to ten

23 years, but that at that point in December '16,

24 '17 -- and Jan- -- and early '17, you know, we

25 were told that they were standing by the

Page 100

```
 1          Q.    Mr. Hagood, I assume you had a chance
 2    to review this entire document?
 3          A.    Yes.
 4          Q.    Did you discuss this with your
 5    attorney at all?
 6          A.    No.
 7          Q.    Okay.  So this is an earnings call
 8    conference call transcript dated February 16,
 9    2017.  This is, okay, not quite -- a couple of
10    months after your meeting with the -- almost,
11    yeah, two and a half months after your meeting
12    with the Santee board, right?
13          A.    The one where Kevin and Steve and I
14    went to?
15          Q.    Yes.
16          A.    Yes.
17          Q.    Where you -- where you -- where you
18    had discussed the potential of Westinghouse and
19    Toshiba bankruptcy issues, right?
20                MR. GREENE:  Objection to form.
21                THE WITNESS:  We discussed obtaining
22    bankruptcy counsel.
23    BY MR. WISSBROECKER:
24          ██    ██████████████████████████
   ████████████████████████████████████████
```

Page 110

1 ████████████████████████████████████

████████████████████████████████

███████████████████

████    ████████████████

████    ██████

████    ██████

7       Q.    Okay.  So on this call, on the second

8  page of the transcript, which is Bates stamped

9  SCDOJ 111, Kevin Marsh references the fact that:

10  Analysts on the call share with us probably want

11  to learn more about the -- the status of

12  Westinghouse and the impact of Toshiba's financial

13  challenges on our new nuclear construction

14  project.

15            Do you see that paragraph down there?

16       A.    Yes.

17       Q.    All right.  And -- and when you --

18  when you reviewed this, did you happen to see

19  anywhere in this document where Kevin Marsh

20  disclosed that SCANA hired bankruptcy counsel and

21  was also looking at the possibility of

22  Westinghouse going bankrupt?

23       A.    In this document?

24       Q.    Yes.

25       A.    No.

Page 111

```
 1          Q.   Okay.  Did the board discuss whether
 2     or not Mr. Marsh should be disclosing the extent
 3     of Westinghouse's financial challenges?
 4               MR. GREENE:  Objection to form.
 5               THE WITNESS:  Toshiba -- Westinghouse
 6     or Toshiba?
 7     BY MR. WISSBROECKER:
 8          Q.   Oh, Westinghouse.
 9          A.   Westinghouse.  My recollection is that
10     the primary discussions we had were around
11     Toshiba's financial difficulties as stated being a
12     public company that was out there in -- in the
13     press.  I -- I don't recall conversations around
14     their subsidiary Westinghouse.
15          Q.   Yeah, but you were aware that -- that
16     there was a concern of Westinghouse's potential
17     bankruptcy, though, right?
18               MR. GREENE:  Objection to form.
19               THE WITNESS:  There was preparation as
20     a contingency.
21     BY MR. WISSBROECKER:
22          Q.   And did the board discuss whether or
23     not that -- that fact should be disclosed to
24     shareholders?
25          A.   I don't recall if we discussed it.
```

                                        Page 112

1            MR. GREENE:  Middle of the page.

2            THE WITNESS:  Middle.  Yes.  Yes.  Yes.

3    Got it.

4    BY MR. WISSBROECKER:

5        Q.    Again --

6        A.    Yeah, got it.

7        Q.    And, again, no -- no -- no disclosure

8    that you saw in here about SCANA's awareness of

9    the potential bankruptcy issues Westinghouse had?

10       A.    No.

11       Q.    Are you aware that the -- the -- the

12   charges against Kevin Marsh involved his failure

13   to disclose information that he had in December

14   about the potential for Westinghouse to -- to go

15   bankrupt on -- on these conference calls?

16       A.    I read that in the paper when that was

17   submitted, yes.

18       Q.    And you -- did you -- did you see it

19   in here when you reviewed this -- this document

20   any discussion of other concerns that SCANA may

21   have about construction delays that were not

22   associated with the Westinghouse potential

23   bankruptcy?

24       A.    Do I see them -- say that one more

25   time.

Page 115

1    you agree then that Mr. Byrne gave some

2    assurances, some reassurances to -- to the market

3    on this call that -- that SCANA would be able to

4    finish these projects on a -- as -- as -- as

5    already contemplated?

6         A.    I read it that they disclosed the new

7    dates from Westinghouse and that they were

8    reviewing the assumptions that Westinghouse made.

9    They hadn't had a chance -- they had just gotten

10   them.  They hadn't had a chance to -- to confirm

11   them at that point.

12        Q.    That he didn't -- Mr. -- Mr. --

13   Mr. Byrne didn't articulate any specific concerns

14   that they wouldn't make the deadlines, though,

15   right?

16        A.    I don't recall that in here.  I don't

17   remember seeing anything specific.

18

                                          Page 118

```
 1    ████████████████████████████████████

      ███████████████████████████████████████

      ███████████████████████████████████████

      ████     ██████████████████████████████

      ███████████████████████████████████████

      ███████████████████████████████████

      ████████████████████████

               ████████████   ███████████

               ████████████   ██████████████████

██   ████
```

11    BY MR. WISSBROECKER:

12          Q.    And then turning over to Page 23, you

13    see on this page Mr. Marsh is asked to walk --

14    asked by someone named Travis Miller, walk me

15    through a worst-case scenario on the nuclear side

16    might look like if you were to get some kind of

17    stranded cost-type situation, and Mr. Marsh took

18    some -- talks later on:  I kind of look at the

19    last case option, the abandonment provisions of

20    the BLRA -- and they discuss a little bit more on

21    that, the next page, 24, about the abandonment

22    clause and the abandonment provisions of BLRA.  Do

23    you see that discussion?

24          A.    Yes.

25          Q.    Do you see anywhere in here where

                                          Page 119

1    that -- that you maybe shouldn't have voted to

2    issue those dividends knowing that the money that

3    you got to issue them came from rate payors to pay

4    for the nuclear power plant that was now

5    abandoned?

6            A.    You know, my concern was over the

7    whole project having failed and every aspect of

8    it.

9            Q.    And -- and then the -- the money that

10   it cost rate payors, right?

11           A.    There's been a significant rebate to

12   the customers that came after the merger.

13           Q.    But not all?  They're not getting all

14   of their money back, correct?

15           A.    They did not.  You're right.

16           Q.    And were you aware that -- that part

17   of the -- the scheme -- the alleged scheme was

18   Mr. Marsh hiding information that was in the --

19   the Bechtel report about the delays in the nuclear

20   project?

21           A.    I was not.

22           Q.    Well, you're aware of that now,

23   though, right, because you have read this

24   information?

25           A.    Yes.

Page 141

1          Q.    And were you aware before you read

2    this information that that was part of the charges

3    against Mr. Marsh?

4          A.    No.

5          Q.    Did -- so today is the first time that

6    you learned that part of the charges against

7    Mr. Marsh involved him hiding details of the

8    Bechtel report?

9          A.    That -- that is -- yes.

10         Q.    So your testimony is that up until

11   today you had no understanding that Mr. Marsh was

12   being charged with hiding details of the Bechtel

13   report?

14         A.    I was not aware of that.

15         Q.    Do you -- when you had your interview

16   with the -- the FBI, did they ask you if you were

17   aware of the Bechtel report?

18         A.    Yes.

19         Q.    What -- what -- what did you tell

20   them?

21         A.    That was a pretty lengthy

22   conversation.

23         Q.    Did you -- go ahead.

24         A.    I don't remember the specific

25   questions.  That was over a year ago.  But it was

Page 142

1          A.    Okay.  So repeat your question.

2                MR. WISSBROECKER:  I don't remember.

3    What was my question?

4                (The record was read, as requested.)

5                THE WITNESS:  Yes.

6    BY MR. WISSBROECKER:

7          Q.    So including where it says:  Bechtel

8    found the nuclear project to be significantly

9    off -- off schedule and over budget.  Members of

10   the conspiracy never provided this information to

11   the regulatory agencies.

12               And then in K:  Part of the scheme was

13   that the conspirators buried the Bechtel report

14   and the information contained wherein with

15   disingenuous representations of attorney-client

16   privilege.  Do you see that reference?

17         A.    Yes, I do see that reference.

18         Q.    So you now understand that part of the

19   charges against Mr. Marsh were him burying details

20   of the Bechtel report that should have been

21   disclosed to regulators and shareholders?

22         A.    Yes.

23         Q.    On Page 10 of the information there is

24   a section called Overt Acts.

25         A.    Yes.

                                    Page 144

1          Q.   And it states, among other things:   In
2     the furtherance of the conspiracy, the defendant,
3     Kevin Marsh, committed the following overt act in
4     the District of South Carolina, that on or about
5     December 27, 2016 Mr. Marsh received a
6     confidential telephone briefing from senior
7     Westinghouse officials during which those
8     officials indicated that the cost to complete the
9     new units would be significantly higher than
10    expected, and that he also received briefing from
11    a senior Toshiba official indicating that Toshiba
12    could not absorb the financial hit suggested by
13    new estimates from Westinghouse's subcontractor,
14    and that this led Mr. Marsh to believe there
15    existed a heightened risk of further construction
16    delays.
17              Do you see that -- those -- that
18    discussion?
19         A.   I do.
20         Q.   Were you -- were you involved in those
21    telephone calls with Westinghouse?
22         A.   No.
23         Q.   Were you aware that -- that Mr. Marsh
24    had been informed by Toshiba that it could not
25    absorb the financial hit caused by the new

                                        Page 145

```
 1   estimates?
 2          A.    No.   In fact, we were led to the
 3   contrary.
 4          Q.    And you were led to the contrary by
 5   who?
 6          A.    By Kevin Marsh.
 7          Q.    So Kevin had the conversation but led
 8   you -- well, by the -- to the contrary, what do
 9   you mean?   What was the contrary?
10          A.    Conversations in January of this
11   year -- of, I guess, the next year, 2017, that
12   recommitted to the dates and recommitted to the
13   costs by Toshiba and Westinghouse.
14          Q.    And when did you learn that those
15   statements were false?
16          A.    The -- the statements that he made?
17          Q.    Right.
18          A.    Reading this.
19          Q.    So just today reading this or before
20   reading?   Any -- any time before today did you
21   learn that those statements were false?
22          A.    I mean, this was in the paper.   Yeah.
23          Q.    Okay.   So you read it in the paper?
24          A.    Yes.
25          Q.    And you read a summary of it?
```

Page 146

```
 1          A.    Yeah.
 2          Q.    When was that?  When did you first
 3   learn that?
 4          A.    When he first -- I guess the --
 5   whenever he -- they announced that he was going to
 6   plead guilty and it hit the paper.  They -- was
 7   that last fall?  Was that -- was that last fall?
 8          Q.    When he was -- when he was officially
 9   charged and -- and pled?  He didn't plead --
10          A.    Yeah, he pled -- he pled recently, but
11   they -- there was -- whenever that was, because
12   there was a fair amount in the paper that -- that
13   gave some of these terms here.
14          Q.    All right.  Well, let me -- I'm -- I'm
15   going to give you a document we'll mark as
16   Exhibit 9.
17          MR. WISSBROECKER:  And this one is
18   internal 4, Teo.
19          (Exhibit 9, Email Correspondence, re:
20   Updates, Bates Aliff SCANABOD 2046-2047, marked
21   for identification.)
22          THE WITNESS:  Okay.
23   BY MR. WISSBROECKER:
24   ███        ████████████████████████████████
██   █████████████████████████████████████████████
```

Page 147



24      Q.    And then -- and then in the transcript

25      that we looked at also misled the market for the

Page 148

1  same -- stating the same things, right, that

2  Westinghouse received a plan to complete the

3  project?

4       A.    What I don't understand is statements

5  made right before the -- the financial conference

6  call, earnings release conference call, that were

7  coming purportedly from Toshiba and Westinghouse

8  on their commitment.

9       Q.    Purportedly, right.  So, but -- but --

10  but -- but according to the information, there was

11  different information that Mr. Marsh had from

12  Toshiba and Westinghouse?

13       A.    Apparently so, yes.

14       Q.    So regardless of what Westinghouse and

15  Toshiba were telling the market, I guess they were

16  maybe also engaged in the same level of deception

17  as Mr. Marsh maybe, right?

18       A.    Possibly.

19       Q.    Yeah.  But you -- you -- you -- you

20  would agree that Mr. Marsh was deceiving you based

21  on information that he admitted that he had about

22  the likelihood that these projects would be

23  completed?

24       A.    That information was never given to

25  us.

Page 149

```
 1           Q.    Okay.  But he -- instead he told you
 2      that they planned to complete the projects, right?
 3           A.    Yes.
 4                 MR. WISSBROECKER:  I'm going to mark
 5      this as Exhibit 10.  You would think the heavier
 6      ones would fly over.
 7                 THE WITNESS:  I would.
 8                 MR. DOREMUS:  Would you mind calling
 9      out the number, please?
10                 MR. WISSBROECKER:  Yeah, sorry.  The
11      internal number is 10.
12                 (Exhibit 10, USA v. Kevin Marsh Change
13      of Plea Hearing Transcript, no Bates, marked for
14      identification.)
15                 THE WITNESS:  Is one of these federal
16      and one of these state?  Is that the difference
17      between 8 and 10?
18      BY MR. WISSBROECKER:
19           Q.    No, I don't think so.  No.  The one is
20      an information charging --
21           A.    Okay.
22           Q.    -- charging statement, and this one is
23      his -- his guilty plea, when he had originally
24      pled not guilty, I guess.  I don't have that, but
25      he changed his plea to guilty here.
```

Page 150

1    bankruptcy that were a problem for the company

2    still that led to the delays in the project?

3         A.    I -- I interpret your question,

4    because I hadn't seen the Bechtel report, that

5    there might have been differences between the

6    Bechtel report and the work that was being done in

7    July of 2017.  Is that what you're asking?

8         Q.    No.  No.  Well, because -- well --

9    the -- so is it your -- your testimony was High

10   Bridge Associates was brought in to address issues

11   specifically with -- with the Westinghouse

12   bankruptcy that caused delays or --

13        A.    No.  We were trying to get an accurate

14   understanding post filing by Westinghouse and the

15   reality that Westinghouse was no longer going to

16   be in charge of the project that if we either took

17   the project over ourselves, with Santee, whether

18   we brought in a new engineer to work with -- with

19   Fluor, what actually were -- based on the

20   information that we were provided -- finally got

21   from Westinghouse, what would be the actual cost

22   in scheduling.

23        Q.    Okay.  So -- so -- so let me ask a

24   different question then.  So -- so did you come to

25   understand that the -- the costing -- the cost

Page 161

1    overruns, scheduling issues were attributable just

2    to Westinghouse bankruptcy, or were they

3    preexisting issues?

4           A.   It was the first time that we actually

5    had the hard data from Westinghouse to be able to

6    assess it.

7           Q.   And did you -- were you able to assess

8    that those issues were preexisting prior to the

9    bankruptcy?

10          A.   Yes.

11          Q.   Okay.  And did you -- all right.  So

12   these -- these were -- these were concerns that

13   you were unaware of up until this in- -- this

14   information was provided to the board, right?

15          A.   What concerns?

16          Q.   Concerns about costing and the

17   scheduling issues that -- that you were made aware

18   of as a result of this process?

19          A.   Well, I think you could see from even

20   that the -- the analyst conference call that

21   scheduling and costs has been an issue that has

22   been top of mind for everybody for a long period

23   of time.

24          Q.   But -- but -- but -- but Mr. Marsh was

25   not providing that information to the board,

Page 162

```
 1   right, and the market?
 2         A.    The information from the December
 3   meeting?
 4         Q.    Well, the information in the Bechtel
 5   report that -- that he's accused of -- of
 6   withholding from -- from regulators and
 7   shareholders.  I guess I'm just trying to
 8   understand.  So you've identified, you know, we
 9   had some concerns about cost overruns and delays;
10   they weren't just associated with the Westinghouse
11   bankruptcy; the market was aware that there were
12   some.  And I'm -- my question is they -- were --
13   were these costs -- cost overruns and scheduling,
14   were these things that has -- that had been sort
15   of withheld from -- from the board up until that
16   point?
17         A.    Every board meeting we had, we had
18   updates around, you know, productivity ratios, you
19   know, where we were.  Very -- a very similar type
20   of presentation as Steve Byrne made on that
21   February analyst call where he went through
22   pictures, diagrams, the placement of different --
23   because it was a component manufacturing facility.
24               So that long-term schedule and where
25   we were versus the actual placement of each of the
```

Page 163

1    components was a very typical way that we talked

2    about this.

3            Q.   But did you have all of the

4    information as a board that -- that -- that came

5    to light with respect to the extensive delays that

6    you now knew about?

7            A.   No.

8            Q.   Okay.  So this is -- a lot of that

9    information was not available to you.  So you may

10   have had some discussions at board meetings, but

11   it did not include the full scope of the

12   information, which eventually led to the

13   significant delays, right?

14              I mean, because if you look at Page 14

15   of the document, completion of Unit 2 is now

16   December '22, and Unit 3 is now November 2024,

17   2022 and 2024?

18           A.   Right.

19           Q.   Up until that point you believed that

20   the project would still be completed by 2019 and

21   2020, right?

22           A.   That's what we were being told.

23           Q.   So you had new information that came

24   to light post Westinghouse bankruptcy that you

25   were now made aware of these extensive further

                                    Page 164

1    delays that were going to outlive the project,

2    right?

3         A.    Yes.

4         Q.    And those delays were not just ones

5    because the bankruptcy occurred, right?

6         A.    Yes.

7         Q.    So Page 30 of the document, final

8    conclusion and recommendation.  So it was at this

9    meeting that the board ultimately concluded that

10   it was time to abandon the nuclear project?

11        A.    It was -- I believe -- is this -- you

12   said this was on the 25 -- the 25th.  I believe

13   we -- we didn't take action at this meeting.

14        Q.    But this was --

15        A.    This -- this -- this was the

16   recommendation that was made to us at that point.

17        Q.    All right.  And was there any

18   discussion with the fact that the board didn't

19   have or some information was withheld from the

20   board that now was bringing this to a reality?

21        A.    We were told throughout the course of

22   March until July that the team was analyzing the

23   information and that -- that we would be presented

24   the information.

25        Q.    All right.  When you were presented

Page 165

1          Q.    Well, what was Project Sedona in late

2     2016/early 2017?

3          A.    My recollection of Project Sedona at

4     that point was we decided to engage Morgan Stanley

5     and RBC to begin the process of advising the board

6     on strategic -- the market and strategic

7     alternatives that may be out there for us.

8          Q.    Potentially selling the company?

9          A.    Yes, and just we -- we started by

10    engaging them in that process.

11         Q.    And then -- and then why did you

12    decide to terminate that process in February of

13    2017?

14         A.    I'm trying to remember.  Would that

15    have been in the February of 2017 minutes?  Is

16    that in here?

17         Q.    It's not.  Mr. Aliff testified it was

18    because it was some uncertainty involved with

19    Toshiba and Westinghouse, and that's why the board

20    decided to terminate those discussions.

21         A.    Yes.

22         Q.    Does that refresh your recollection?

23         A.    I mean, that's my recollection.  I was

24    thinking if the minutes were here I would look at

25    that.  But it was the, as you stated earlier, just

                                          Page 195

1    the overall uncertainty from a value standpoint,

2    didn't seem to be a prudent time to be going to

3    market.

4         Q.   And then -- and then turning over to

5    the -- the May 5th minutes, the next set of

6    minutes here.

7         A.   Yeah.

8         Q.   Mr. Marsh talks about the meeting that

9    he had with Tom Farrell and then Mr. --    Mr.

10   Farrell presented Mr. Marsh with a proposal with

11   respect to transactions whereby Dominion would

12   acquire the company, and then Mr. Marsh summarized

13   for the term -- for the board the terms of the

14   proposal that had been presented to him.

15            Do -- do you recall -- did Mr. Marsh

16   tell you what the -- the -- the general price

17   range that Dominion was proposing at the time?

18        A.    I -- I don't recall at that time any

19   specifics of the financial side of that.  I just

20   recall that it was a -- it was a serious proposal

21   that had been given -- it was clear that Dominion

22   had put a lot of thought into it, and it impressed

23   us all that they had put meat on the bone, if you

24   will, as opposed to just saying, hey, we've got an

25   interest in some form of strategic partnership

Page 196

```
1              A.    And that's on SCANA's?

2              Q.    Yes.

3              A.    No.

4              Q.    So at the meeting -- going back to the

5      minutes, which was Exhibit 16.

6              A.    So we're back in the minutes?

7      ████ █████████████████████████████████

██ █████████████████████████████████████

██ ████ ████ ████ ████

██ ████ ██████████████████████████

██ █████████████████████████████████████

██ ██████████████████████████████████████

██ ███████████████████████████████████████

██ █████████████████████████████████

██ ████████████████████████

██ ████ ████████████ █████████████ ████████

██ ████████

██ ████ ██████

██ ████ █████████████████

20             Q.    And turning over to Page 8 of the

21     document, which is the July '17 minutes.

22                   MR. WISSBROECKER:  While you look at

23     those, why don't we just go off the record and

24     change the tape quick so we get that done.

25                   VIDEOGRAPHER:  Going off the record.
```

                                             Page 200

1    BY MR. WISSBROECKER:

2        Q.   So it looks like Mr. Marsh met with --

3    with Dominion at Dominion's request.  Had -- had

4    the board authorized Mr. Marsh to engage in any

5    further sale discussions at this point?

6        A.   No.  And it -- it appears that that

7    happened at this board meeting.

8        Q.   So after the fact, after Mr. Marsh met

9    with Dominion, then the board authorized him to

10   meet with Dominion?

11       A.   Well, he informed us that he was

12   meeting with them.  But you asked did we authorize

13   him to negotiate, and the answer is, no, we did

14   not.

15       Q.   Okay.  So this -- this meeting took

16   place without the board's authorization?

17       A.   No.  The meeting was at Mr. Farrell's

18   request.  We were made aware that he was going to

19   have the meeting.

20       Q.   Okay.  Well, it took place before the

21   board meeting.  So that took place on October 1st?

22       A.   Right.

23       Q.   This meeting is October 6th?

24       A.   Right.

25       Q.   So my question was had the board

Page 206

1    authorized Mr. Marsh to engage in this meeting

2    that happened before this board meeting?

3            A.   You -- you -- did they -- did the

4    board authorize him to engage in the meeting?

5    Does that mean did we give him permission to go to

6    the meeting?

7            Q.   I guess, yeah.  I mean, because you

8    had previously said don't reach out to Dominion or

9    other buyers --

10           A.   Yeah, well, Dominion reached out to

11   us.

12           Q.   Okay.  But was he authorized to -- to

13   participate in that meeting, to actually hold that

14   meeting?

15           A.   You know, he's CEO of the company.  We

16   didn't -- that I'm aware of, it was not an issue

17   of permission or not to have a meeting with

18   another CEO.

19           Q.   About a strategic combination?  So the

20   board had told -- had told Mr. Marsh or Mr. Marsh

21   had actually said let's not reach out and the

22   board agreed, and so then he does meet with

23   Dominion --

24           A.   Yes.

25           Q.   -- without -- without the board having

Page 207

1    authorized the process to start up again, right?

2         A.   That -- that happened after -- at this

3    October 6th meeting.

4         Q.   And what -- what was -- what was

5    different about the company's status and the

6    company's problems at that point that -- that --

7    that -- that the board thought it was now -- now

8    appropriate to engage in -- in sale discussions?

9         A.   Well, one, the abandonment decision

10   had been made.  The uncertainty around what was

11   going to happen with the public service

12   corporation and whether we were going to be able

13   to -- the BLRA -- the BLRA was going to stick or

14   not and, you know, it was mounting.  It was

15   starting to build by October that we had further

16   uncertainties, and I think that's -- that's it.

17        Q.   There was no -- there are no -- no

18   further certainty around valuation of the company

19   though, right?

20        A.   There was not certainty other than

21   what the stock was trading for and, at this point,

22   what Dominion was -- in a non-solicited way was

23   proposing.

24        Q.   But -- but there was no way to

25   accurately value what the -- the real or

Page 208