# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

Civil Action Number 3:18-cv-00505-MBS

______________________________________________________

In re SCANA CORPORATION PUBLIC SHAREHOLDERS LITIGATION

______________________________________________________

This Document Relates To:

ALL ACTIONS

_____________________________________________________

VIDEO DEPOSITION OF GREGORY E. ALIFF

April 2, 2021

_____________________________________________________

A. No, I do not.

MR. WISSBROECKER: All right. Why don't we just take a lunch break now --

MR. GREENE: Sounds good.

MR. WISSBROECKER: -- and come back.

THE VIDEOGRAPHER: We are going off the record. The time is 12:28.

(Lunch recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:32. This is Media Unit 3 in the deposition of Greg Aliff.

MR. WISSBROECKER: I'm going to mark this as Exhibit 7. It's Number 6, Teo.

(Deposition Exhibit 7 was marked.)

Q. (BY MR. WISSBROECKER) So Exhibit 7 is an email from Kevin Marsh to members of the board, dated January 9, 2017.

A. Yes.

Q. Mr. Aliff, do you recall this email exchange with Mr. Marsh about the Westinghouse issues?

A. I do recall, yes.

Q. Okay. What do you recall about the context of this discussion?

A. Pretty much what it says here, that they met with Westinghouse, that they got this commitment

that they would be continuing with the construction, you know, that they'd incurred write-downs associated with the acquisition of Stone & Webster or CB&I, and that there would be more information to come once this -- once the numbers were available from Toshiba and Westinghouse.

Q. And did the board discuss the possibility that Westinghouse was headed for bankruptcy as a result of these write-downs?

A. I don't recall any specific discussions about heading to bankruptcy, no.

Q. Do you recall discussing that the company was hiring bankruptcy attorneys at this point to guard against the issues with Westinghouse?

A. Within the context of this particular message from Kevin, no.

Q. Was it -- do you recall having those discussions before receiving this message about Westinghouse?

A. I remember -- you know, as we discussed previously, there was those -- there were discussions about getting bankruptcy counsel in, specifically talking about negotiating -- continuing negotiations with Westinghouse.

Q. Was that before or after receiving this

particular message?

A. You know, I don't recall.

Q. Somewhere about the same time, though?

A. It would have been sometime in, you know, late 2016 most likely.

Q. Okay. Do you recall -- when you gave your interview to the Department of Justice, did they ask you about the timing of when you first became aware of the Westinghouse potential bankruptcy?

A. I don't recall.

Q. So you may have -- that may have been part of the interview; you just don't remember?

A. It could have been, yes.

Q. So you think right about December 2016, November, somewhere around there is when you first became aware of the bankruptcy potential for Westinghouse?

A. I don't know that I would characterize it as the bankruptcy potential for Westinghouse as much as the issues that were known to be surrounding Toshiba --

Q. Okay.

A. -- and the potential implications of Toshiba and their guarantees.

Q. And that's when you became aware that

the company was going to hire bankruptcy counsel?

A. Again, I don't recall exactly when we decided to get bankruptcy counsel.

Q. You just think the late 2016 time frame?

A. It would have been sometime after the discussions -- after the revelations around Toshiba, yes.

Q. You say -- when did you first become aware of the revelations around Toshiba?

A. Again, I don't recall the exact time frame. We were aware of the accounting scandal that Toshiba had experienced. This was all, quite frankly, from what was being reported to us by Kevin Marsh from what was, you know, in the news, that Toshiba had had an accounting scandal, as I recall, and that they were having difficulties reissuing their financial statements, that it had impacted their credit ratings.

Q. And then this issue with Westinghouse arose -- began in 2017, or was it before that? Do you recall?

MR. GREENE: Objection to form.

A. Yeah, I don't recall, but, again, the issue that we were focused on at the time was the Toshiba guaranty issue.

MR. CHAPIN: I'm sorry to interrupt.

Mr. Addison's counsel is stuck in the waiting room.
Can somebody please let her in?

(At this time Ms. Kingsley entered the proceedings.)

[redacted]

So does that refresh your recollection about hiring bankruptcy counsel involving both Westinghouse and Toshiba at this time?

A. No, it doesn't reflect. No, that's not the case.

Q. So you don't recall any discussion of Westinghouse's financial issues at this time?

A. I don't -- not of Westinghouse's financial issues, no.

[redacted]



3:18-cv-00505-MBS Date Filed 05/05/21 Entry Number 162-7 Page 9 of 17

Page 103

Veritext Legal Solutions
866 299-5127

Q. But you were aware of these issues, right, of potential write-downs as of January 9th, 2017, is the latest?

A. Yes, we were aware that they were talking about potential write-downs.

Q. What is abandonment accounting? What is that?

A. I guess at the highest level, it is when a decision is made not to continue with any sort of a project and you have recorded on your balance sheet certain assets associated with -- with that project, and you have to step back and say what is the -- you know, what is the general accepted accounting principles, accounting requirements I need to follow that's associated with the abandonment.

Q. And that was the -- so do you recall any discussions of abandonment accounting in 2017?

Q. (BY MR. WISSBROECKER) And when did you first become aware of the government's focus in this late 2016 time frame for their criminal charges against Mr. Marsh?

MR. GREENE: Objection to form.

A. Only as discussed with counsel.

Q. (BY MR. WISSBROECKER) And so if later testimony comes out that reinforces your knowledge about the Westinghouse bankruptcy and this abandonment accounting, your testimony is honest on this point; there wouldn't be any reason to call up Mr. May and let him know you committed perjury, right?

MR. GREENE: Objection to form.

A. I'm under oath, and I've made my statements under oath.

Q. (BY MR. WISSBROECKER) I just want to remind you of the context as we go on.

A. Okay.

MR. WISSBROECKER: All right. So we'll mark this as Exhibit 9, and, Teo, this is Number 8 on our list.

(Deposition Exhibit 9 was marked.)

A. Okay.

Q. (BY MR. WISSBROECKER) Do you recall receiving this email from Kevin Marsh?



A. I do.

Q. Did the SCANA board discuss whether or

not this information should be disclosed to regulators at this point?

A. I don't recall any discussions among the board at this point in time, no.

Q. Did you personally think that it was time to let regulators know what was going on with Westinghouse and Toshiba at this point?

A. By regulators, who are you referring to?

Q. Let's look at the -- back at the plea. South Carolina Public Service Commission, Office of Regulatory Staff, did you personally think they should be informed about this looming bankruptcy from Westinghouse that could affect the nuclear project?

MR. GREENE: Objection to form.

A. I don't recall any personal thoughts around that at this point in time. What I do recall associated with this was whether this was the type of information that required an 8-K to be filed with the Securities and Exchange Commission.

Q. (BY MR. WISSBROECKER) Did you think it was a good idea to file an 8-K at this point?

A. The question was raised as to whether it should or should not be.

Q. Who raised that question?

A. I would have raised that question in my

capacity as the chair of the audit committee.

Q. At the time this email was sent or after?

A. It would have been -- I'm assuming -- to the best of my recollection, it would have been at the time that this email was sent.

Q. So you questioned whether or not you -- did you think it was a good idea or were you just hypothetically asking?

A. I just questioned it from a legal standpoint. I'm not the expert on what constitutes an event that requires -- from a legal standpoint, what constitutes an event that requires the filing of an 8-K.

Q. And why did you -- why did you raise that possibility? Do you recall what your thought process was?

A. My thought process is that when there are material events that have happened, they often require the filing of an 8-K.

Q. And so you knew that this was nonpublic information you were in possession of at this point, right?

A. No, I knew that there were public reports out there at this point in time, like this

Q. (BY MR. WISSBROECKER) Okay. Why did the board engage Morgan Stanley and RBC in late 2016 to look at potential purchasers for the company? Do you recall?

A. Yes, I do.

Q. Why?

A. Well, at that point in time, there were lots of -- there was a lot of M&A activity going on in the utility industry. We were a relatively small company compared to a lot of the other companies, and as I recall, Kevin approached the board and said he felt that it would be prudent for us to be prepared in the event that we were approached by other companies that wanted to entertain a potential acquisition. It would be prudent for us to be prepared, and it would be prudent for us to have the advice of investment bankers, have them available to us; and it would be prudent for understand at least what they believed was the value of the company.

Q. And so that Project Sedona in late 2016 was prompted by Kevin Marsh, right?

A. It was Kevin's suggestion to the board, and the board concurred.

Q. And in light of the fact that you now know that Kevin Marsh was withholding information that

he had about cost overruns and delays in the project, does that give you any reason to -- concern about Mr. Marsh raising the possibility of a sale at that time?

MR. GREENE: Objection to form.

A. Again, all I know about the allegations against Mr. Marsh are what I know through discussions with counsel. I would say at that point in time we as a board felt like that we had -- we had recently gone through the process of executing a fixed price -- getting the fixed price contract. We believed that everything was going very -- yes, we were -- we were having challenges with the construction, but things were going well. There were -- you know, there were overtures of others that were potentially interested. You know, they weren't making any formal offers or anything like that, but others, I think, had -- in side bar conversations to Kevin was representing to us were interested in potential -- were we interested in potentially entertaining opportunities. So, yes, we felt that like we had an obligation at that point in time to make sure we were doing what was best for the shareholders in terms of shareholder value.

Q. (BY MR. WISSBROECKER) But looking back as you sit here today, does it -- does it cause you

MR. GREENE: Objection to form.

Q. (BY MR. WISSBROECKER) So -- I mean, looking back on it, does that cause you concern, having taken his recommendation that it's a good time to sell the company, not knowing that he was actively defrauding regulators, shareholders, it sounds like the board too?

A. Maybe -- let me answer your question this way. If I had known what the situation was at that point in time, then we would have come to a different conclusion -- I'm pretty sure we would have asked a lot more questions, and we would have much more wanted to understand what was going on before we believed it was a prudent thing to do, to go out and see if there were interested parties.

Q. All right. And so going back to the minutes -- thank you for that. Going back to the minutes, you stated that in February 2017, the board had made a terminate -- excuse me. Let me start that again. It was noted that in February 2017, the board had made a determination to terminate the consideration of Project Sedona and that there had no -- been no discussion with either Morgan Stanley or RBC about the company's strategic alternatives. So why was that decision made in February of 2017 to