# Exhibit1

### *KBC v. Marsh, et al.* Complaint
### Case No. 2019-CP-40-02522

**Exhibit 1**

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

| STATE OF SOUTH CAROLINA<br>COUNTY OF RICHLAND | IN THE COURT OF COMMON PLEAS<br>FOR THE FIFTH JUDICIAL CIRCUIT |
|---|---|
| KBC ASSET MANAGEMENT NV, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>KEVIN MARSH, GREGORY E. ALIFF, JAMES A. BENNETT, JOHN F.A.V. CECIL, SHARON A. DECKER, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES W. ROQUEMORE, MACEO K. SLOAN, and ALFREDO TRUJILLO, JIMMY ADDISON, and STEVEN BRYNE,<br><br>Defendants. | Civil Action No.:<br><br><br>**SUMMONS**<br><br>**JURY TRIAL DEMANDED** |

TO:    THE DEFENDANTS, ABOVE-NAMED:

YOU ARE HEREBY SUMMONED and required to answer the complaint herein, a copy of which is herewith served upon you, and to serve a copy of your answer to said complaint upon the subscriber, at his office at 2801 Devine Street, Suite 300, Columbia, South Carolina 29205, within thirty (30) days after the service thereof, exclusive of the day of such service, and if you fail to answer the complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in the complaint.

*SIGNATURE BLOCK ON FOLLOWING PAGE*

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

**CHAPPELL SMITH & ARDEN, P.A.**

By:  */s/ Mark D. Chappell__*
Mark D. Chappell
Graham L. Newman
2801 Devine Street, Suite 300
Columbia, South Carolina 29205
Telephone:  (803) 929-3600
Facsimile:  (803) 929-3604
Email:  mchappel@csa-law.com
　　　　gnewman@csa-law.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 486-0462
Email:  eagel@bespc.com
　　　　fortunato@bespc.com

**STURMAN LLC**
Deborah Sturman
600 Third Avenue, Suite 2101
New York, New York 10016
Telephone:  (212) 367-7017
Facsimile:  (917) 546-2544
Email:  sturman@sturman.ch

*Counsel for Plaintiff*

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

STATE OF SOUTH CAROLINA
COUNTY OF RICHLAND

IN THE COURT OF COMMON PLEAS
FOR THE FIFTH JUDICIAL CIRCUIT

| | |
|---|---|
| KBC ASSET MANAGEMENT NV, on Behalf of Itself and All Others Similarly Situated, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| KEVIN MARSH, GREGORY E. ALIFF, JAMES A. BENNETT, JOHN F.A.V. CECIL, SHARON A. DECKER, D. MAYBANK HAGOOD, LYNNE M. MILLER, JAMES W. ROQUEMORE, MACEO K. SLOAN, and ALFREDO TRUJILLO, JIMMY ADDISON, and STEVEN BRYNE, | **CLASS ACTION COMPLAINT** <br> **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff KBC Asset Management NV ("Plaintiff"), a former shareholder of SCANA Corporation ("SCANA" or the "Company"), on behalf of itself and the other former public shareholders of SCANA, by its attorneys, brings this Amended and Supplemental Class Action Complaint against former members of SCANA's Board of Directors (the "Board") and certain of SCANA's executive officers. Plaintiff's allegations are based on personal knowledge as to itself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

**PRELIMINARY STATEMENT**

1.  Counts I and II of this Class Action Complaint assert claims for damages on behalf of former SCANA shareholders as a result of the breaches of fiduciary duties, gross mismanagement, and unjust enrichment perpetrated by the officers and Board members of SCANA

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

(the "Original Derivative Defendants")[1] in connection with the construction of two nuclear reactors in Fairfield County, South Carolina (the "Nuclear Project").  The Original Derivative Defendants mismanaged the construction project and proceeded to systematically mislead the investing public by concealing the truth surrounding the construction and financing of the Nuclear Project.  As a direct and proximate result of their misdeeds, SCANA's value and goodwill suffered substantially, as the Company's management confronted investigations by state and federal authorities, including the Securities and Exchange Commission ("SEC"), and massive civil litigation.

2.     On January 2, 2019, SCANA was merged into Dominion Energy, Inc. ("Dominion"), and the shares of SCANA shareholders were exchanged for 0.669 shares of Dominion common stock (the "Merger").  Following the closing of the Merger, the Original Derivative Defendants moved to dismiss the derivative claims filed against them on the grounds that the original plaintiffs in that action lost standing to pursue those claims.

3.     As alleged herein, the Merger does not deprive SCANA shareholders of the right to pursue their original breach of fiduciary duty and related claims as direct claims on behalf of the SCANA shareholders at the time of the Merger, because the pre-Merger conduct of the original defendants made the Merger with Dominion a *fait accompli*.  Following the announcement that SCANA would abandon the Nuclear Project and the avalanche of criticism, investigations, and lawsuits that followed, SCANA's directors sought out and approved a merger that would deprive SCANA shareholders of standing to maintain their derivative claims.  The extent of the Original

---

[1]  Kevin Marsh ("Marsh"), Gregory E. Aliff ("Aliff"), James A. Bennett ("Bennet"), John F.A.V. Cecil ("Cecil"), Sharon A. Decker ("Decker"), D. Maybank Hagood ("Hagood"), Lynne M. Miller ("Miller"), James W. Roquemore ("Roquemore"), Maceo K. Sloan ("Sloan"), Alfredo Trujillo ("Trujillo"), Jimmy Addison ("Addison"), and Steven Byrne ("Bryne").

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Derivative Defendants wrongdoing, fraudulent conduct, and breaches of fiduciary duties by failing to loyally oversee the Nuclear Project and by concealing the truth concerning the Nuclear Project's completion, necessitated a corporate rescue, and individual legal protection.  A merger was one of the available alternatives that met both those objectives after the Board's allegedly fraudulent schemes.  South Carolina law recognizes a single, inseparable fraud when directors cover massive wrongdoing with an otherwise permissible merger.  Moreover, as explained herein, Dominion will not pursue the derivative claims because of provisions in the Merger Agreement (defined herein) providing for indemnification of the Original Derivative Defendants.  As a result, in these circumstances, Plaintiff's derivative claims survive the Merger and may be pursued as direct class claims as asserted herein.

4.      Count III of this Class Action Complaint seeks to recover damages caused by the fact that the Merger Defendants[2] undertook a severely flawed sales process and agreed to the inadequately priced sale of the Company to Dominion.  Rather than seeking to maximize shareholder value in the sale of the Company, the Merger Defendants rushed to complete the Merger Agreement that, despite SCANA's operational setbacks, grossly undervalued SCANA's business.  The Merger Defendants agreed to a price that not only failed to compensate SCANA's shareholders for their material claims of wrongdoing against the Original Derivative Defendants, but actually promises to indemnify those individuals – thereby allowing them to avoid personal liability for their wrongdoing by selling the Company as quickly as possible, for an inadequate price.  In pursuing and completing the Merger, the Merger Defendants failed to act reasonably and in good faith and, as a result, breached their fiduciary duties to SCANA's public shareholders.

---

[2] Aliff, Bennett, Cecil, Decker, Hagood, Miller, Roquemore, Sloan, Trujillo, and Addison.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

5.      Count IV of this Class Action Complaint seeks to recover damages against defendants Marsh, Addison, and Byrne for their unjust enrichment as described herein.

6.      The original derivative claims on behalf of SCANA were first filed in this Court by plaintiff John Crangle on September 26, 2017 (the "Crangle Action") and by plaintiff R. Wayne Todd (the "Todd Action") on October 30, 2017.  On March 2, 2018, this Court denied the Original Derivative Defendants' motions to stay that action pending the resolution of parallel proceedings.

7.      On September 6, 2018, this Court denied the Original Derivative Defendants' motions to dismiss the Crangle and Todd complaints pursuant to Rule 12(b)(6) and 23(b)(1).  On September 18, 2018, the Court consolidated the Crangle Action and the Todd Action, appointed Crangle and Todd as co-lead plaintiffs, and appointed Richard A. Harpootlian and Chappell Smith Arden, P.C. as Co-Lead Counsel of the Consolidated Action, and designated the Crangle complaint filed in this action, 2017-CP-40-05791, as the designated operative complaint.[3]

8.      On January 7, 2019, following the January 2, 2019 closing of the Merger, the Original Derivative Defendants moved to dismiss the Complaint in that action on the grounds that the plaintiffs lost standing to pursue the derivative claims following the closing of the Merger.

9.      Two shareholder class actions seeking to recover damages on account of the breaches of fiduciary duties associated with the Merger were filed in this Court in January and February 2018.[4]  Both cases were removed by Dominion, an additional defendant in those actions but not a defendant herein, to federal court.  Motions to remand those actions were granted by the

---

[3]  On February 20, 2019, Plaintiff Crangle subsequently filed a notice of dismissal of his claims under Rule 41(a)(1) of South Carolina Rules of Civil Procedure.  Richard A. Harpootlian, P.A. and Louthian Law Firm, P.A., Crangle's counsel, also withdrew from the case.

[4]  *Metzler Asset Management, Gmbh v. Gregory E. Atliff, et al.* (Common Pleas, Lex. Co., S.C. Feb 7, 2018); *City of Warren Police and Fire Retirement System v. SCANA Corporation, et al.* (Common Pleas, Lex. Co., S.C. Jan. 23, 2018).

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

district court, then appealed to the Fourth Circuit Court of Appeals, with a decision by the appellate court pending.

10.    Plaintiff files this action to pursue the original derivative claims as direct class claims and to pursue the Merger claims in the same action.

## INTRODUCTION

11.    SCANA was a corporation existing and organized under the laws of South Carolina. The Company's principal place of business and executive offices were located at 110 Operations Way, Cayce, South Carolina.

12.    SCANA was principally engaged in regulated electric and natural gas utility operations throughout North Carolina, South Carolina, and Georgia.  The Company also owned nuclear, coal, hydroelectricity, biomass, and solar generating facilities as well as gas reserves in Louisiana and Texas.

13.    In 2006, SCANA announced that, together with its subsidiary South Carolina Electric & Gas ("SCE&G"), it planned to construct two nuclear reactors at SCANA's Virgil C. Summer Nuclear Generating Station (the "V.C. Summer Station") located in Fairfield County, approximately twenty miles from Columbia, South Carolina.  The Nuclear Project was a partnership with South Carolina's state-owned electric and water utility, South Carolina Public Service Authority ("Santee Cooper"), with SCANA owning a 55% stake in the Nuclear Project.

14.    Before committing to the Nuclear Project, SCANA strategically pursued passage of the Base Load Review Act ("BLRA") by the South Carolina legislature.  The BLRA, which became law in 2007, has been described as a utility company "wish list" and allowed SCANA to transfer the risks and costs of the Nuclear Project to ratepayers.  Unsurprisingly, in the year before passage of the BLRA, SCANA's political contributions to South Carolina political candidates increased by nearly 300%.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

15.     On March 31, 2008, SCANA submitted an application to the Nuclear Regulatory Commission ("NRC") for a combined construction and operating license.  At the time the application was submitted, SCANA expected the review process to require three to four years.

16.     On May 27, 2008, SCANA announced a contractual agreement with Westinghouse Electric Company, LLC ("Westinghouse") and Stone & Webster, Inc. ("Stone & Webster")[5] for the design and construction of the Nuclear Project.

17.     On May 30, 2008, SCANA submitted its application for a Certificate of Environmental Compatibility, Public Convenience and Necessity, and for a Base Load Review Order to the South Carolina Public Service Commission ("PSC") and the South Carolina Office of Regulatory Staff ("ORS").  SCANA stated that it expected the first reactor unit to come on line in 2016 and the second reactor unit in 2019, at a cost of approximately $9.8 billion, of which SCANA's share was $5.4 billion.  Further, SCANA claimed that the BLRA would save South Carolina ratepayers approximately $4 billion over the life of the new units.

18.     In February 2009, the PSC and ORS approved the Nuclear Project and, in March 2012, the NRC approved SCANA's combined construction and operating licenses for the Nuclear Project.  Construction began on March 9, 2013.

19.     From the start, the Nuclear Project suffered repeated delays, cost overruns, and design and construction issues.

20.     On May 6, 2014, Marsh, SCANA's then Chief Executive Officers ("CEO") and Chairman of the Board, and Lonnie Carter ("Carter"), Santee Cooper's CEO, sent a letter (the "May 6, 2014 Letter") to Westinghouse President and CEO, Danny Roderick, and CB&I President

---

[5]  In 2012, Chicago Bridge & Iron Company N.V. ("CB&I") acquired Stone & Webster's nuclear construction business and formed a new subsidiary, CB&I Stone & Webster.  CB&I Stone & Webster was ultimately purchased by Westinghouse in 2015.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

and CEO, Philip Asheman, in which they outlined numerous issues with the Nuclear Project dating back to May 2008.  According to Marsh and Carter, the Nuclear Project was consistently behind schedule and over budget.  The letter also included a reminder to Westinghouse that the delays had already resulted in additional costs in excess of $100 million.  Carter and Marsh noted that the performance deficiencies and associated delays might have constituted a breach of contract and suggested that the parties hold a meeting to discuss mitigating strategies.  It is clear from the May 6, 2014 Letter that SCANA and the Original Derivative Defendants were exceedingly aware of the mounting issues with the Nuclear Project.

21.    On August 6, 2015, SCANA and Santee Cooper hired Bechtel Corporation ("Bechtel") to conduct an audit of the Nuclear Project at a cost of more than $1 million.  Bechtel delivered its initial findings to the Company on October 22, 2015 and, on November 9, 2015, submitted a first draft of its report.  In the following weeks, George Wenick ("Wenick"), an attorney hired by SCANA, battled with Bechtel about the contents of the final report.  Wenick wanted to remove any mention of the reactors not being finished before 2020 (the deadline for the Company to receive billions of dollars in federal tax credits) along with any criticism of SCANA's oversight.  Ultimately, more than thirty pages were removed from the report.

22.    Despite receiving Bechtel's initial findings in late 2015, SCANA did not disclose the findings to shareholders or regulators and, instead, while assuring the PSC that the Nuclear Project was proceeding as expected, requested that the PSC increase its nuclear budget by $800 million, which the PSC agreed to do.  During sworn testimony before legislators in September 2017, defendant Marsh claimed that Bechtel was hired to complete a study of the Nuclear Project in preparation for a possible lawsuit against former lead contractor, Westinghouse.  Marsh's assertion that the Bechtel Report (defined below) was prepared in connection with a potential legal

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

proceeding meant that the report could remain confidential and escape the scrutiny of regulators, legislators, and the public.

23.    Subsequent testimony before the PSC in November 2018 by ORS witnesses revealed that SCANA failed to fully disclose information about the Bechtel Report that it was required to provide to both the ORS and the PSC.  Specifically, one ORS witness testified that SCANA failed to disclose that Bechtel would be conducting an assessment on the Nuclear Project, and "after his ORS colleague recognized Bechtel personnel on the [Nuclear] Project site and questioned the Company about [Bechtel's] presence in October 2015, the Company stated that nothing new had been found by Bechtel and there would be no written report."  Bechtel provided the final report to SCANA on February 5, 2016 (the "Bechtel Report").  The Bechtel Report highlighted, among other things, the lack of a construction schedule, the flawed nature of the reactor design, Westinghouse's complete lack of organization, and the apparent lack of commercial motivation among the contractors to complete the Nuclear Project.  Again, rather than share the findings with shareholders and regulators, SCANA concealed the Bechtel Report.

24.    On March 29, 2017, Westinghouse filed for bankruptcy protection. Westinghouse's bankruptcy was widely viewed as a result of the myriad problems with the Nuclear Project.  It was reported at the time that Westinghouse's decision to use a completely novel reactor design and hire an inexperienced subcontractor to assist with construction were both risky choices that contributed to the Nuclear Project's repeated delays and price overruns.

25.    Despite the publicity surrounding the Westinghouse bankruptcy and the reasons for the bankruptcy, SCANA continued to claim that the construction of the reactors was proceeding as promised, with Byrne, then Executive Vice President of SCANA, stating to the PSC on April

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

12, 2017 that "work continues onsite without substantial disruption" and providing a power point presentation showing that the Nuclear Project was nearing completion.

26.    Just three months later, on July 31, 2017, SCANA announced that it was abandoning the Nuclear Project and that it would file a petition with the PSC seeking approval of its abandonment plan.   SCANA concluded that completing the Nuclear Project would be prohibitively expensive, estimating that completion of the units would cost approximately $9.9 billion, and that the reactor units could not be brought on line until December 31, 2022 and March 31, 2024 (well after the expiration of the federal tax credit in 2020).   Further, pursuant to the BLRA, SCANA stated its intention to seek amortization of the failed Nuclear Project's costs – estimated by SCANA at $4.9 billion – into electricity rates over sixty years.

27.    Following SCANA's announcement of the abandonment of construction of the Nuclear Project, on August 4, 2017, South Carolina Attorney General Alan Wilson ("Wilson") announced an investigation and state Senate leaders called for a special legislative session.   Soon thereafter, state lawmakers learned of the existence of the Bechtel Report and demanded that SCANA and Santee Cooper release it.   But it was not until South Carolina Governor Henry McMaster ("Governor McMaster") demanded the report pursuant to his authority under the South Carolina Constitution that Santee Cooper begrudgingly turned the report over to Governor McMaster on September 3, 2017.   The next day, on September 4, 2017, Governor McMaster, over Santee Cooper's objection, released the Bechtel Report to the public.

28.    Following public release of the Bechtel Report, and the coinciding revelation that SCANA knew of the numerous problems with the Nuclear Project long before they were announced publicly, the South Carolina House held a committee hearing on September 15, 2017 to discuss the Nuclear Project's failure.   A panel of eighteen legislators questioned SCANA

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

executives about who was responsible for the failure, but the focus of the hearing was on the concealment of the Bechtel Report. SCANA executives claimed that the report was not released because it was being used in preparation for litigation against the contractors on the Nuclear Project, but members of the House said that the audit was proof of SCANA's failure to manage the Nuclear Project effectively and that SCANA should be responsible for the remaining $2.2 billion in costs on the Nuclear Project.

29.     On September 21, 2017, SCANA reported that it received a subpoena issued by the U.S. Attorney's Office for the District of South Carolina. On September 25, 2017, state lawmakers asked the South Carolina Law Enforcement Division ("SLED") to investigate potential criminal activity by SCANA related to the Nuclear Project. On October 17, 2017, SCANA reported that it received a document subpoena from the SEC. The Company is also subject to numerous consumer class actions, securities class actions, and derivative actions in connection with the failed Nuclear Project.

30.     Under pressure from South Carolina lawmakers, on October 31, 2017, SCANA announced that Marsh and Byrne would retire, effective December 31, 2017. Pursuant to their employment agreements, Marsh was eligible for $13.8 million in severance payments and Byrne was eligible for $6.5 million in severance payments. This is in addition to millions of dollars in accelerated restricted stock and performance shares that they are entitled to now that the Merger has been consummated.

31.     On November 16, 2017, SCANA issued a press release outlining what the Company claimed was a "proposed solution" to the failed Nuclear Project whereby SCANA's shareholders would absorb billions of dollars of costs. Under this proposal, however, ratepayers

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

would have still paid an average of $25 per month, totaling $29.5 million per month, for the failed Nuclear Project, and shareholders would have been on the hook for billions of dollars.

32.     State lawmakers were outraged by SCANA's proposal.  Representative Kirkman Finlay said, "They have created a whole new world of bad blood.  I don't think it received anywhere near the reception they hoped for.  I don't think there is anyone in the General Assembly that is impressed by this plan."  Representative Finlay's response was echoed by other South Carolina lawmakers such as Senate President Hugh Leatherman who called the proposal "an insult to ratepayers."

33.     On October 1, 2017, Dominion approached SCANA regarding a potential transaction and, on November 27, 2017, executives from the companies met and discussed the potential transaction in detail.  Barely five weeks later, desperate to escape the massive liability they faced as a result of the failed Nuclear Project, the Board members approved the agreement and plan of merger with Dominion (the "Merger Agreement") on January 2, 2018, and it was announced on January 3, 2018.  Dominion and SCANA completed the Merger exactly one year later, on January 2, 2019.

34.     Pursuant to the terms of the Merger Agreement, Dominion acquired the Company in a stock-for-stock transaction whereby SCANA shareholders received 0.669 shares of Dominion stock for each share of SCANA stock they owned (the "Merger Consideration").  This ratio represented an implied price per share of $51.24 using Dominion's stock price of $76.59 on the day before the Merger was announced on January 3, 2018.  However, the price per share to be received by SCANA shareholders fluctuated wildly throughout 2018 as a result of the Merger Defendants' failure to negotiate a collar for the Merger Consideration.  On January 2, 2019, the day the Merger closed, the 0.669 exchange ratio represented an implied price per share of only

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

$47.62 using Dominion's stock price of $71.18. By contrast, on July 31, 2017, the day the market was made aware that SCANA was abandoning the Nuclear Project, SCANA shares closed at $64.37. On the day before the Merger was announced, January 2, 2018, SCANA shares closed at only $38.87. Further, despite abandonment of the Nuclear Project and the defendants' wrongdoing and cover-up, several securities analysts continued to have share price targets at levels significantly above the Merger Consideration. On December 6, 2017, the consensus analyst price target for SCANA was $61.44 per share – 29% higher than the Merger Consideration at the time of closing.

35.    The Merger Consideration undervalued SCANA while enriching the insiders responsible for SCANA's trouble from the Nuclear Project fallout. For example, recently retired SCANA executives Marsh and Byrne, along with current CEO Addison, have benefited immensely from the Merger. Pursuant to Section 2.02 of the Merger Agreement, restricted stock and performance share awards immediately vested at their "target" levels – targets that SCANA could not meet following the Nuclear Project's abandonment. As a result, upon consummation of the Merger, Marsh received $3.1 million and Byrne received to $1.1 million in stock payouts. Addison, who retired on February 1, 2019, will receive approximately $9.7 million in stock payouts as a result of the Merger. Further, the Merger Defendants negotiated an indemnification provision (Section 5.08) protecting themselves and SCANA's executives from liability related to the failed Nuclear Project, including liability related to criminal proceedings.

36.    The Merger Defendants, admittedly, made no concerted effort to seek a suitor willing to pay a higher price than Dominion. On January 11, 2018, Addison acknowledged during a public hearing before the PSC on the Merger that the Merger Defendants did not exercise reasonable due diligence to shop SCANA, stating that they "didn't try very hard" to identify other potential buyers. In fact, SCANA did not try at all. According to SCANA's Definitive Proxy

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Statement, filed on Form 12A with the SEC on June 15, 2018, (the "Proxy Statement"), SCANA "did not conduct a formal sale process to solicit other developed acquisition proposals from parties other than Dominion Energy." Proxy 47. The undiscerning manner in which the Merger Defendants accepted Dominion's offer and entered into the Merger Agreement provides yet another example of the extent to which the avoidance of personal liability eclipsed all consideration of the best interests of the Company and its shareholders.

37. Compounding the failure to shop the Company to other potential buyers, the Merger Defendants agreed to preclusive deal protection devices designed to prevent another bidder from emerging with a superior offer. The Merger Agreement included, *inter alia*, the following deal protection devices: (i) a "no solicitation" provision (Section 4.01(a)); (ii) a "matching rights" provision (Section 4.02(f)); and (iii) a "termination fee" provision obligating the Company to pay Dominion $240 million under certain circumstances (Section 7.02). Further, the Merger Defendants negotiated an indemnification provision (Section 5.08) protecting themselves and SCANA's executives from liability related to the failed Nuclear Project, including liability related to criminal proceedings.

38. Even more egregious, the Merger Defendants included provisions in the Merger Agreement that tied Dominion's ability to walk away with a termination fee to decisions by the South Carolina government that were entirely out of SCANA's control. For example, the Merger Agreement required that the PSC approve Dominion's petition to recover the costs related to the Nuclear Project and in the event that the PSC failed to approve the petition, Dominion would have been entitled to the $240 million termination fee. Such provisions were particularly pernicious given the political unpopularity of supporting cost recovery in connection with the Nuclear Project. As reported in an April 18, 2018 article in Bloomberg titled "*Dominion's $8 Billion Scana Deal*

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

*Dealt Another Blow in S.C.*," South Carolina legislators passed a Senate bill that would cut the amount of money SCANA can collect from customers for the Nuclear Project by 13%. The bill did in fact pass through the House and became law, but South Carolina House members increased the rate cut from 13% to 15%. SCANA unsuccessfully challenged the legislation and though its passage gave Dominion the opportunity to walk away from the Merger, it declined to do so. Indeed, Dominion would have been foolish to abandon the Merger given the incredibly advantageous terms it was able to negotiate.

39.    The unfairness of the Merger Consideration is further demonstrated by Dominion's acknowledgement that the Merger will be immediately accretive to Dominion's earnings and is expected to increase Dominion's annual earnings growth targets to 8% or higher through 2020. Further, SCANA's assets in the Southeast are complementary to Dominion's, and the Merger Consideration failed to consider the valuable synergies that will result from combining the companies. As noted by one analyst from Bank of America/Merrill Lynch, the Merger "is the 'most attractive' acquisition in recent memory across the utility sector given the discounted implied multiple."

40.    Moreover, in addition to acquiring all of SCANA's extensive business and operations, Dominion also has been granted permission by the PSC to collect as much as $2.3 billion from ratepayers for the Nuclear Project. Now that the Merger has been consummated, Dominion may collect those funds from ratepayers. However, consideration for this substantial sum was not included in the exchange ratio offered to SCANA shareholders by Dominion.

41.    Finally, as noted herein, following the abandonment of the Nuclear Project, numerous SCANA shareholders brought derivative lawsuits on behalf of the Company seeking recompense for the breaches of fiduciary duties and other wrongdoing by SCANA's officers and

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

directors.  These derivative claims belong to the Company and have a value approaching $1 billion.  However, the value of these claims was excluded from the Merger Consideration, even after their strength was substantiated by their survival of motions to dismiss in both state and federal court.  Not only were the valuable derivative claims absent from the final Merger Consideration, they do not appear to have been valued at all in negotiating the Merger Agreement.  Indeed, the Proxy Statement fails to mention the potential value of the derivative claims at all.  The Merger Defendants thus further breached their duty to SCANA shareholders by failing to account for the value of the derivative claims when negotiating the Merger Consideration and, as such, the Merger Consideration is severely undervalued.

42.      Having failed to maximize the sale price for the Company, the Merger Defendants breached the fiduciary duties they owe to Plaintiff and the Company's public shareholders because the Company was improperly valued and shareholders did not receive adequate or fair value for their SCANA common stock in the Merger.  The Board's actions, taken as a whole, were inconsistent with its obligation to seek out and obtain the highest value attainable for the Company's shareholders.

43.      The Board's actions, taken as a whole, were inconsistent with its obligations of good faith and loyalty, and its obligation with respect to the Merger to seek out and obtain the highest value attainable for the Company's shareholders.  After grossly mismanaging the Nuclear Project such that the Company was forced to abandon it altogether, the Merger Defendants then failed to maximize the sale price for the Company in an effort to avoid personal liability.  The Merger Defendants thus breached the fiduciary duties they owed to Plaintiff and the Company's public shareholders because the Company was improperly valued and shareholders did not receive adequate or fair value for their SCANA common stock in the Merger.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

44.    Compounding a lengthy string of wrongdoing, such as causing the depression of SCANA's stock price and damaging the Company's reputation through their wrongdoing, hastily entering into a Merger to avoid personal liability, and breaching their fiduciary duties by failing to negotiate favorable terms in the Merger Agreement on behalf of SCANA's public shareholders, Defendants issued a Proxy Statement that was materially deficient and misleading.  The Proxy Statement asked SCANA shareholders to vote in favor of the Merger without providing the information necessary for shareholders to make a fully informed decision.  Specifically, the Proxy Statement omitted key information concerning the valuation of the derivative claims against the Original Derivative Defendants.  In fact, the Proxy Statement makes no mention of the potential value of the derivative claims at all but instead admits that "the SCANA board did not attempt to value the claims asserted in the derivative actions."  Proxy 87.  Without this information, SCANA shareholders were unable to determine whether the share price offered in the Merger adequately reflected the true value of their stock.

45.    On May 29, 2018, SCANA issued a press release, announcing that a shareholder vote on the Merger would be held on July 31, 2018 – exactly one year to the day since SCANA announced its abandonment of the Nuclear Project.  On June 15, 2018, SCANA filed a Definitive Proxy Statement on Form 14A with the SEC dated June 8, 2018, asking SCANA shareholders to vote in favor of the Merger.

46.    SCANA's shareholders voted to approve the Merger on July 31, 2018, and the South Carolina PSC approved the Merger on December 14, 2018, thereby giving the green light to a transaction that resulted in injury to Plaintiff and SCANA's other public shareholders who did not receive the highest value available for their stock.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

47.    Plaintiff seeks to recover damages from the Original Derivative Defendants and/or the Merger Defendants for their breaches of fiduciary duty and other misconduct as alleged herein.

### JURISDICTION AND VENUE

48.    Jurisdiction is proper pursuant to South Carolina's Long Arm Statute, South Carolina Code § 36-2-803.    SCANA is headquartered and incorporated in South Carolina. Furthermore, the non-resident Defendants are members of the Board and nearly all of the acts alleged in this complaint took place in South Carolina.

49.    Venue is proper in Richland County.    Many of the acts and omissions giving rise to this claim occurred in substantial part in Richland County and certain Defendants are residents and citizens of Richland County.

### PARTIES

**Plaintiff**

50.    Plaintiff was a SCANA shareholder prior to the consumption of the Merger, and held SCANA stock during the transactions, acts, and omissions complained of herein.    When the Merger closed, Plaintiff held 9,119 shares of SCANA common stock.

**Defendants**

51.    Addison joined the Company as Controller in 1991 and served as the Chief Financial Officer ("CFO") of SCANA beginning in April 2006 and the Executive Vice President beginning in January 2012.    Addison assumed responsibility as the CEO in January 2018 until the Merger closed.    Addison also served as the president of both SCANA Energy Georgia, and SCANA Energy Marketing beginning in 2013.    Addison is a citizen of South Carolina.    Addison's total compensation for 2015, 2016, and 2017 was $2,405,419, $2,580,874, and $2,140,632, respectively.    Addison retired on February 1, 2019 and will receive approximately $9.7 million in stock payouts as a result of the Merger.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

52.     Aliff was a director of SCANA from October 2015 and the Merger closed.  Aliff was Chairman of the Audit Committee and a member of the Nominating and Governance and Executive Committees.  Aliff was also the Company's "audit committee financial expert" as defined by Item 407(d)(5) of SEC Regulation S-K, 17 CFR § 229.407(d)(5).  Aliff is a citizen and resident of Virginia.  Aliff's total compensation for 2015, 2016, and 2017 was $48,250, $213,500, and $234,000, respectively.

53.     Bennett served as a director of SCANA beginning in 1997.  Bennett was Chairman of the Compensation Committee and a member of the Audit and Executive Committees.  Bennett is a citizen and resident of Richland County, South Carolina.  Bennet's total compensation for 2015, 2016, and 2017 was $194,157, $215,867, and $235,551, respectively.

54.     Byrne joined SCANA in 1995 and held various positions until he retired in December 2017.  Byrne served as an Executive Vice President of SCANA from 2009 until his retirement, and as President, Generation and Transmission and Chief Operating Officer of SCE&G from 2011 until his retirement.  Byrne's total compensation for 2015, 2016, and 2017 was $2,314,038, $2,582,141, and $2,190,730, respectively.  Upon consummation of the Merger, Byrne received a stock payout of over $1.1 million.

55.     Cecil served as a director of SCANA beginning in 2013.  Cecil was a member of the Compensation and Audit Committees.  Cecil is a citizen and resident of North Carolina.  Cecil's total compensation for 2015, 2016, and 2017 was $193,000, $206,000, and $219,000, respectively.

56.     Decker was a director of SCANA from 2005 until 2013 and again from 2015 through the closing of the Merger.  Decker was a member of both the Compensation and the Nuclear Oversight Committees.  Decker is a citizen and resident of North Carolina.  Decker's total compensation for 2015, 2016, and 2017 was $48,250, $206,000, and $219,000, respectively.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

57.     Hagood served as a director of SCANA beginning in 1999 and was the Lead Director.  Hagood was a member of the Nominating and Governance, Nuclear Oversight, and Executive Committees.  Hagood is a citizen and resident of Charleston County, South Carolina. Hagood's total compensation for 2015, 2016, and 2017 was $207,000, $225,500, and $244,000, respectively.

58.     Marsh served as CEO and Chairman of the Board of SCANA from December 2011 through December 2017.  Before assuming the position of CEO, Marsh served as the Chief Operating Officer of SCANA beginning in January 2011 and the President of SCANA subsidiary, SCG&E, beginning in 2006.  Marsh is a citizen and resident of Richland County, South Carolina. Marsh's total compensation for 2014, 2015, 2016, and 2017 was $5,710,448, $5,733,258, $6,108,804, and $5,235,175, respectively.  Upon consummation of the Merger, Marsh received a stock payout exceeding $3 million.

59.     Miller served as a director of SCANA beginning in 1997.  Miller was a member of the Nominating and Governance and Audit Committees.  Miller is a citizen and resident of Virginia.  Miller's total compensation for 2015, 2016, and 2017 was $197,000, $206,000, and $219,000, respectively.

60.     Roquemore served as a director of SCANA beginning in 2007.  Roquemore was Chairman of the Nuclear Oversight Committee and a member of the Compensation and Executive Committees.  Roquemore is a citizen and resident of Orangeburg County, South Carolina. Roquemore's total compensation for 2015, 2016, and 2017 was $197,000, $216,000, and $231,000, respectively.

61.     Sloan served as a director of SCANA beginning in 1997.  Sloan was a member of the Nuclear Oversight and Compensation Committees.  Sloan is a citizen and resident of North

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Carolina. Sloan's total compensation for 2015, 2016, and 2017 was $201,000, $210,000, and $219,000, respectively.

62.     Trujillo served as a director of SCANA beginning in 2013. Trujillo was a member of the Nominating and Governance and Nuclear Oversight Committees. Trujillo is a citizen and resident of Georgia. Trujillo's total compensation for 2015, 2016, and 2017 was $193,000 $206,000, and $224,000, respectively.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff bring this action individually and as a class action pursuant to Rule 23 of the South Carolina Rules of Civil Procedure on behalf of itself and the public shareholders of the Company (the "Class"). Excluded from the Class are the defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with Defendants.

64.     This action is properly maintainable as a class action, and the amount in controversy exceeds one hundred dollars for each plaintiff in the class.

65.     The Class is so numerous that joinder of all members is impracticable. According to the Company's Proxy Statement filed on Form 14A with the SEC on August 10, 2018, there were approximately 143 million shares of common stock issued and outstanding, held by hundreds, if not thousands, of geographically dispersed shareholders.

66.     There are questions of law and fact that are common to the Class, including, *inter alia*, whether: (i) the defendants have breached their fiduciary duties to the detriment of Plaintiff and the Class; (ii) the defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the sale of SCANA; (iii) the Merger Consideration was unfair and inadequate; and (iv) Plaintiff and the Class were harmed as a result of the consummation of the Merger.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

67.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the Class have sustained damages arising out of Defendants' breaches of their fiduciary duties.  Plaintiff does not have any interests that are adverse or antagonistic to those of the Class and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff is committed to the vigorous prosecution of this action and has retained counsel competent and experienced in this type of litigation. Accordingly, Plaintiff is an adequate Class representative.

68.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

69.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, relief on behalf of the Class as a whole is appropriate.

### **DEFENDANTS' FIDUCIARY DUTIES**

**Duties of Original Derivative Defendants**

70.    By reason of their positions as officers and/or directors of SCANA and because of their ability to control the business and affairs of the Company, the Original Director Defendants owed the Company and its shareholders the fiduciary duties of good faith, trust, loyalty, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Original Director Defendants were required to act in furtherance of the best interest of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of personal or other interests.  Each director and officer owes the

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company.

71.     To discharge their duties, the Original Derivative Defendants were required to act in good faith and in furtherance of the best interests of SCANA and its shareholders.  By virtue of such duties, the Original Derivative Defendants were required to, among other things:

(a)     manage, conduct, supervise, and direct the business affairs of SCANA in accordance with all applicable law (including federal and state laws, government rules and regulations, and SCANA's corporate charter and bylaws);

(b)     neither violate nor knowingly permit any officer, director, or employee of SCANA to violate any applicable laws, rules, and/or regulations;

(c)     remain informed as to the status of SCANA's operations and, upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

(d)     maintain and implement an adequate, functioning system of internal controls, such that SCANA's affairs and operations are conducted in accordance with all applicable laws, rules, and regulations.

72.     SCANA's Board Charter enumerates the responsibilities of the Board and requires that the Board select the CEO and act as advisor and counselor to the CEO in monitoring the performance of the management team to effectuate the long-term value of SCANA for its shareholders.  The Board is also responsible for:

(a)     reviewing, overseeing, and approving fundamental financial and business strategies and major corporate actions;

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

(b)    reviewing and assessing identified significant risks facing SCANA and the alternatives for mitigation;

(c)    approving and maintaining a succession plan for the CEO and other senior executives;

(d)    reviewing the CEO's performance toward accomplishing the objectives of the strategic and business plans, and

(e)    reviewing with the CEO his annual assessment of senior management and other senior leaders.

73.    In addition to their fiduciary duties as members of SCANA's Board, members of the Compensation and Nuclear Oversight Committees had additional duties and responsibilities. As explained more fully below, according to the respective committee charters, these added responsibilities ensure that the Board discharges its oversight responsibilities relative to various aspects of SCANA's business operations.

74.    SCANA's Compensation Committee Charter states that the purpose of the Committee is to assist the Board in the oversight of matters relating to compensation plans, compensation of SCANA's executives, and long-term strategic plans and performance regarding management of human resources.  The Compensation Committee's duties and responsibilities include:

(a)    recommend to the Board salary and compensation levels for all officers of SCANA and its subsidiaries;

(b)    review and make recommendations to the Board with respect to all SCANA executive compensation plans, including incentive compensation plans and equity-based plans;

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

(c)     review SCANA's operating performance relative to the bonus and incentive programs;

(d)     review and approve corporate goals and objectives with respect to the compensation of the CEO, evaluate the CEO's performance in light of those goals and objectives, and, either as a committee or together with the other independent directors, determine and approve the CEO's compensation based on this evaluation;

(e)     produce an annual report on executive compensation for inclusion in SCANA's proxy statement, in accordance with applicable rules and regulations of the SEC;

(f)     review the investment policies of SCANA's Retirement Plan;

(g)     recommend to the Board about persons to serve as senior officers of SCANA and its subsidiaries;

(h)     review SCANA's overall succession and continuity planning with the CEO;

(i)     review SCANA's long-range strategic plans and performance with regard to its management of all human resources, including safety, health, labor/employee relations, and equality of treatment;

(j)     review the level of SCANA stock ownership by SCANA's executive officers to determine whether each executive officer is in compliance with the Company's minimum ownership requirement;

(k)     review the status of significant risks, if any, for which oversight has been assigned to the Committee by the Board;

(l)     conduct an annual performance evaluation to compare the performance of the Committee to the requirements of this charter and any other duties or responsibilities delegated

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

to the committee by the Board, and report to the Board the results of the evaluation, which may take the form of an oral presentation by a member of the committee to the Board; and

(m)    recommend to the Board any improvements to this charter that the committee deems to be necessary or appropriate.

75.    The Nuclear Oversight Committee's responsibilities included oversight of the nuclear safety, operational and financial performance, operational risks, and long-term plans and strategies of the Company's nuclear power program and to make appropriate reports to the Board. The Nuclear Oversight Committee was also responsible for the oversight of the construction of the two nuclear reactors at the V.C. Summer Station.

76.    Under the federal securities laws, officers and directors have a duty to speak fully and truthfully to shareholders once they undertake the affirmative act of communicating or disseminating information.  It is blackletter law that an omission is actionable under the federal securities laws if it creates "an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hosp.Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  "If one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995).

**Duties of the Merger Defendants**

77.    Where the directors of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's public shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

(a)      adversely affects the value provided to the corporation's shareholders;

(b)      will unnecessarily discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)      contractually prohibits themselves from complying with their fiduciary duties;

(d)      will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)      will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

78.      In accordance with their duties of loyalty and good faith, the Merger Defendants, as directors and/or officers of SCANA, are obligated to refrain from:

(a)      participating in any transaction in which their loyalties are divided;

(b)      participating in any transaction in which they receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the Company; and/or

(c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

79.      Plaintiff alleges herein that the Merger Defendants, separately and together, in connection with the Merger, knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and the Class.  The Merger Defendants engaged in self-dealing, obtaining for themselves personal benefits not shared equally by Plaintiff and the Class, and/or aided and abetted other defendants' breaches.  As a result of the

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Merger Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class were treated fairly in connection with the Merger.

## ADDITIONAL FACTUAL ALLEGATIONS

80.     SCANA was incorporated in 1984 following the merger of SCE&G and Carolina Energies, Incorporated.  In November 1982, two years before SCANA was formed, SCE&G received an operating license for a nuclear reactor at the V.C. Summer Station in Jenkinsville, South Carolina.  The plant cost $1.3 billion to construct and began commercial operation on January 1, 1984.

81.     In the late 1980s, US energy producers began to move away from costly nuclear energy construction and instead re-focused on natural gas and coal.  SCANA followed the natural gas trend.  As deregulation increased during the 1990s, SCANA looked to expand by diversifying its holdings and increasing its customer base.  Between 1990 and 1993, SCANA purchased natural gas reserves in Texas, Louisiana, and Oklahoma, bringing the Company's total natural gas reserves to 283 billion cubic feet.  By the early 2000s, however, interest in nuclear energy projects was renewed and power companies in Georgia and South Carolina, including Westinghouse and SCANA, started to plan for new construction.

**The Failed Expansion of the Virgil C. Summer Nuclear Generating Station**

82.     In February 2006, SCANA began plans to expand the V.C. Summer Station by building two additional nuclear reactors at the site.  The Nuclear Project was planned in partnership with Santee Cooper, with SCANA owning a 55% stake in the Nuclear Project.

83.     SCANA's first step was securing passage of the BLRA.  The BLRA is a legislative guarantee that a utility that builds a power plant in South Carolina can increase customers' electric rates to finance the costs of the project.  Pursuant to the BLRA, once the South Carolina PSC

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

approves a project, the utility can request annual increases in allowable costs – increases that are virtually guaranteed to receive approval.

84.     The BLRA has been referred to as a utility company "wish list" and it:  (i) shifted the risk of the Nuclear Project from SCANA to South Carolina power customers; (ii) made it more difficult to challenge and defeat Nuclear Project-related rate increases that SCANA requested from the PSC; and (iii) gave SCANA (and, with the Merger, Dominion) the right to charge customers for the costs associated with the Nuclear Project's failure.

85.     The BLRA was introduced in the South Carolina Senate on February 13, 2007, in the South Carolina House on April 17, 2007, and was passed by the General Assembly two days later, on April 19, 2007.  The BLRA became law less than three months after its introduction, on May 3, 2007.

86.     SCANA played an active role in assuring the successful passage of the BLRA by making campaign contributions and hiring lobbyists.  According to a September 16, 2017 article published by *The State* titled "How SCANA Spent $1.25 Million at State House Before Nuclear Project Collapsed," SCANA has donated more than $1.25 million to South Carolina political candidates since 2000.  As reported in the article, the Company donated an additional $80,000 "to legislators on a committee that names the members of a state board [the PSC] that regulates SCANA," and over $90,000 "to 31 of the 32 legislators now trying to unravel how the [Nuclear Project] failed."  According to campaign finance data collected by the National Institute on Money in State Politics, SCANA's contributions to lawmakers increased exponentially – from $64,705 in 2003-2004 to $138,850 in 2005-2006 – in the year before the BLRA was passed.  According to the Center for Responsive Politics, a nonpartisan research group, SCANA also spent more than $6.3 million on lobbyists between 2005 and 2012.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

87.     Following passage of the BLRA, on March 27, 2008, SCANA applied for a Combined Construction and Operating License with the NRC and, on May 27, 2008, entered into a contract with Westinghouse and CB&I for the design and construction of the Nuclear Project. As expected, the review process took approximately four years, and, on March 30, 2012, the NRC issued the Nuclear Project's license.  The approval was met with great excitement by leaders in the nuclear energy industry.  In a March 30, 2012 press release, Marvin Fertel, president and CEO of the Nuclear Energy Institute, commended the NRC's approval of the Nuclear Project:

> The Nuclear Energy Institute congratulates South Carolina Electric & Gas, partner Santee Cooper, Westinghouse Electric, the Shaw Group and other project participants on this important milestone.  This will be one of the largest construction and engineering projects in South Carolina history.  It will create thousands of well-paying jobs during construction and provide careers for several hundred more people over the decades that the new reactors will generate electricity.

> The V.C. Summer expansion will contribute to the electricity reliability and diversity of South Carolina and enhance its energy security.  America's energy future is getting stronger thanks to projects like this.

88.     Construction began on March 9, 2013, with expected completion by 2018 and from the start, the Nuclear Project was plagued with problems, cost overruns, and delays.

89.     As later reported, SCANA was aware of numerous problems before construction even began.  In January 2011, the NRC attempted to inspect the construction site, but had to cancel the inspection because not enough progress had been made to warrant it.  When the NRC returned to the site in November 2011, it issued a "Notice of Nonconformance" with its quality assurance program.  By July 2012, only 21 of 72 modules, which were vital components for construction, had been delivered to the site, and SCANA and Westinghouse were thus forced to revise their contractual agreement to delay the substantial completion dates for the two units.  By September 2012, at least 30 of the construction milestone dates had passed "without completion of the associated milestone event" and yet another NRC Notice of Nonconformance had been issued.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

90.     As later discovered during a South Carolina house committee hearing in August 2017, at the time construction was to begin, SCANA was using an unreliable construction timetable and a generic schedule that made it incapable of estimating project costs.  One witness stated that, deviating from standard practice in large, complex construction projects, SCANA executives allowed the Nuclear Project to move ahead without ever having received a fully integrated construction schedule from Westinghouse.  Before ground was broken on the Nuclear Project, SCANA had already requested and received two pre-construction capital cost forecast increases – $174 million in November 2010 and $283 million in May 2012.

91.     The construction delays and cost increases did not slow after construction began. Instead, five months after construction began, in September 2013, design deficiencies in the Nuclear Project's foundation were identified which forced a delay in construction while the deficiencies were corrected.  The Company's concerns over the delays were reflected in a September 5, 2013 email from Marsh, who warned Westinghouse that SCANA and Santee Cooper had serious concerns about cost overruns and design delays that put "potentially unrecoverable stress" on the existing construction schedule.  In June 2017, Marsh also wrote to the CEO of Toshiba, Westinghouse's parent company, stating that, "we have no doubt that we have been the victim of financial malfeasance by Westinghouse and Toshiba."

92.     Notwithstanding the knowledge and concern of certain SCANA executives and employees with respect to the immediate construction delays and cost overruns, SCANA's officers continuously represented to the public that everything was progressing well and on schedule.  In a June 2013 call with investors, Byrne stated, "[w]e hear about nuclear project's being over budget or costs being rampant.  I want to reinforce that is not the case with this project."

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

93.     In response to the constant problems with the Nuclear Project, SCANA sent the May 6, 2014 Letter to Westinghouse detailing numerous issues with the Nuclear Project dating back to 2008.  The May 6, 2014 Letter was ultimately published by *The Post and Courier* on September 29, 2017.  The May 6, 2014 Letter revealed that SCANA executives were aware early on that the Nuclear Project was plagued by significant delays in material delivery and construction, nonconformance with the NRC's quality assurance program, and design deficiencies, among other issues.  The May 6, 2014 Letter detailed SCANA's substantial concerns with the Nuclear Project as early as May 23, 2008:

> The events since May 23, 2008 have tested our resolve . . . .  We regret that this letter is necessary and regret its length.  Your poor performance has made both necessary.  A complete description of our grievances would make this letter even longer.  Consequently, we have chosen to focus on the events and issues concerning the structural modules, primarily CA-20 and CA-01, as well as certain design issues, and their combined effect on the expected completion date and cost of the project.  We selected these examples to illustrate our dissatisfaction.  They are not an exhaustive listing of your every shortcoming.

The letter went on to detail specific grievances from each year between 2011 and 2014.

94.     As reflected in the May 6, 2014 Letter, SCANA executives were aware that Westinghouse was not complying with NRC quality assurance requirements, was unable to adhere to construction deadlines, and was using flawed designs and defective components for construction.  Despite that knowledge and their demand that Westinghouse "demonstrate a renewed commitment to this [P]roject," SCANA executives apparently did not act to ameliorate any of these problems and the delays and cost overruns continued while the Original Derivative Defendants and SCANA's executives continued to pocket millions of dollars in compensation and from stock sales.

95.     In a July 2014 letter from Westinghouse CEO, Danny Roderick, Westinghouse placed the blame with SCANA, stating that the Company's executives knew that Westinghouse

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

did not have a finished design for the Nuclear Project when they signed the contract in 2008 and that the Company also understood that Westinghouse had yet to finish its designs for the reactors when construction first began in 2012.

96.     In addition to the numerous delays and cost overruns, there were serious concerns about the integrity of the designs being used in the construction of the reactors.  An article published on September 24, 2017 by *The Post and Courier* titled "Stamped for failure: Westinghouse and SCANA Used Unlicensed Workers to Design Abandoned S.C. Nuclear Reactors," reported that mechanical and electrical blueprints were often "unstamped" or not officially sealed by state regulators.  The article further reported that engineers were discouraged from approaching management with their concerns – "it put us in a terrible situation, because if we raised the issue, we were tagged as troublemakers."  The May 6, 2014 Letter identified similar issues, stating that the NRC wrote a letter in October 2012 documenting a "chilled work environment" at one facility "which was causing employees to believe that they are not free to raise safety concerns using all available avenues and that individuals have been retaliated against for raising safety concerns."

97.     On August 6, 2015, SCANA and Santee Cooper hired Bechtel to conduct an audit of the Nuclear Project at a cost of more than $1 million.  Bechtel delivered its initial findings to the Company on October 22, 2015, and, on November 9, 2015, submitted a first draft of its report. In the following weeks, Wenick, an attorney hired by SCANA, battled with Bechtel about the contents of the final report.  Wenick wanted any mention of the reactors not being finished before 2020 (the deadline to receive billions of dollars in federal tax credits) removed from the report along with criticism of SCANA's oversight.  Ultimately, Wenick's efforts resulted in more than thirty pages being removed from the report.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

98.     Despite receiving Bechtel's initial findings in late 2015, SCANA did not disclose the findings to shareholders or regulators and, instead, while assuring the PSC that the Nuclear Project was proceeding as planned, requested that the PSC increase its nuclear budget by $800 million, which the PSC agreed to do.  This $800 million increase was in addition to a $698 million increase in March 2015 and a $1.2 billion increase in October 2014.

99.     Bechtel provided the final report to SCANA on February 5, 2016.  The Bechtel Report highlighted, among other things, the lack of a construction schedule, the flawed nature of the reactor design, Westinghouse's complete lack of organization, and the apparent lack of commercial motivation among the contractors to complete the Nuclear Project.  Again, rather than share the findings with shareholders and regulators, SCANA concealed the report.

100.     Following receipt of the Bechtel Report, there is no evidence that SCANA made any effort to address the myriad problems with the Nuclear Project.  On September 27, 2017, *The State* reported that "an internal Santee Cooper memo written a month after the Bechtel Report was issued said the utilities needed to begin 'intrusive verification' of work the contractors were doing and suggested moving to a 'construction milestone payment schedule,' whereby contractors would only be paid as they met specific milestones."  SCANA never acted on this recommendation and instead continued spending $120 million a month on the Nuclear Project despite knowledge that completion was becoming increasingly less likely.

101.     In May 2016, Carlette Walker ("Walker"), SCANA's former vice president of finance for nuclear construction, accused the Company's executives of mismanaging the Nuclear Project and propping up the stock price as a method of ensuring that they would receive the full amount of incentive compensation.  At the time, Walker left a voicemail with an employee at Santee Cooper stating that SCANA's executive team had broken myriad laws and had failed to

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

adequately and timely disclose problems with the construction schedule in 2015. After expressing the concerns she had with the Nuclear Project, Walker was placed on a three-month medical leave by Marsh and subsequently resigned from the Company.

102.    Less than one month after the Bechtel Report was presented to the Original Derivative Defendants, three Company insiders, Russell Harris, a senior vice president, Mark Cannon, a vice president and treasurer, and James Micali, a former board member, sold a combined 11,500 shares for approximately $750,000.[6]   Using the price per share of the Merger Consideration, these shares would have been worth only $547,630, or 27% less.

103.    In March 2016, a month after receiving the Bechtel Report, Marsh wrote a letter to shareholders with assurances that, "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

104.    Not to be outdone by Marsh's fabrications, Byrne held a conference call with analysts and investors on April 28, 2016, during which he stated that construction crews were doing a "tremendous job" and that a key component of the reactor was going to be "better than we expected."

105.    SCANA's reports to analysts and investors were similarly falsely optimistic following receipt of the Bechtel Report. During the second quarter earnings conference call, on July 28, 2016, Byrne once again failed to be forthcoming about the true progress of the Nuclear Project:

> [Analyst]:  So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there; and ultimately, if and/or when you expect to do – or hear back from Flour as to more of an integrated schedule update for the overall project.

---

[6]  On May 1, 2017, less than three months before the Nuclear Project was abandoned, Martin Phalen, a senior vice president, sold 42,023 shares of stock for approximately $2.7 million.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

[Byrne]: Yes, Julien, this is Steve. The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3. We don't see anything to change those. Flour's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. And remember that on the project now, we're dealing just with Westinghouse; Flour is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. So I don't expect anything dramatic to come from that.

106.    In a September 2016 video presented at the "V.C. Summer Media Day" Byrne stated, "I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." He also enthused, "[w]e're excited about where we are, we've had challenges, we've been able to work through those challenges."

107.    On February 16, 2017, just five months before SCANA announced it was abandoning the Nuclear Project, Marsh stated during the fourth quarter 2016 earnings call that:

We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, we still anticipate completing our two new nuclear units, which will enable us to provide our customers with safe, reliable energy for decades to come. . . . As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again we will continue to monitor this situation closely and will alert you if we are made aware of any changes.

108.    On the same call, Byrne reiterated Marsh's assurances, stating that SCANA would still meet the 2020 deadline thanks to increased efficiency factors.

109.    According to a September 7, 2017 article in *The State* titled "SCE&G Failed to Heed Santee Cooper Warnings at Bungled Nuke Project, Records Show," Santee Cooper, since May 2014, had urged SCE&G, SCANA's subsidiary, to address growing problems with the failing Nuclear Project. On November 28, 2016, Santee Cooper wrote to Marsh, stating: "SCANA's project management team . . . does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

build project with complexities." Further, Santee Cooper wrote that SCE&G's refusal to release the Bechtel Report created "an untenable position" for both companies and, in a June 2016 email, that the Bechtel report "was sufficient for Santee Cooper to recognize the need (for) onboard experts to help to work on key issues and improve management of the project." SCANA did not respond to the June email.

110.    Then, on March 29, 2017, Westinghouse filed for bankruptcy protection. In response, SCANA continued to claim that the construction of the reactors was nearing completion. As later revealed, SCANA knew as early as March 2016 that Westinghouse was facing financial troubles that could impact the Nuclear Project. In fact, on March 21, 2016, Santee Cooper and SCANA met to discuss Westinghouse and the state utility asked that a bankruptcy lawyer be retained.

**Despite Knowledge that the Nuclear Project was Failing, the Original Derivative Defendants Continued to Approve Exorbitant Compensation**

111.    SCANA's annual incentive compensation plan was based on evaluating SCANA's earnings per share and each executive's level of performance in helping SCANA achieve its business objectives. SCANA's 2017 Proxy Statement (the "2017 Proxy"), filed with the SEC on Schedule 14A on March 24, 2017, stated that in 2016, all of SCANA's named executive officers earned 100% of their annual incentive awards. In addition to their regular salaries, Marsh received stock awards worth over $2.9 million and incentive plan compensation of more than $1.4 million; Addison received stock awards worth over $1 million and incentive plan compensation of over $600,000; and Byrne received stock awards worth over $1 million and incentive plan compensation of over $600,000.

112.    These awards were tied directly to the supposed success of the Nuclear Project. In explaining the reasons behind the awards, the 2017 Proxy stated that "Mr. Marsh's award was

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

based on his oversight and support of our new nuclear construction activities," while both Addison's and Byrne's awards were based on their "efforts to secure financing related to our new nuclear construction project; completing an evaluation of pricing options under the amended Engineering, Procurement and Construction Agreement relating to our new nuclear construction, and overseeing regulatory approval of additional costs associated with the selected option."

113.    SCANA would not have achieved its targeted earnings per share, and executives, in turn, would not have received millions of dollars in compensation, if the truth about the Nuclear Project had been known.

**SCANA Announces That it is Abandoning the Nuclear Project**

114.    On July 31, 2017, over a year after the Bechtel Report and just five months after SCANA assured investors and the public that progress continued to be made towards the Nuclear Project's completion, SCANA announced that it would abandon construction of the Nuclear Project.  At the time that the decision to abandon the Nuclear Project was announced – four years after construction began – the reactors were less than 40% complete.

115.    South Carolina Attorney General Wilson quickly announced an investigation into SCANA's abandonment of the Nuclear Project on August 4, 2017.

116.    SCANA's share price dropped precipitously following its announcement that it would abandon the Nuclear Project – declining from $65.97 on July 31, 2017 to just $38.86 by January 2, 2018, the day before the Merger was announced – a decline of more than 41%.

117.    On September 4, 2017, upon a mandate from South Carolina Governor McMaster, the Bechtel Report was finally released to the press, revealing that the Original Derivative Defendants had caused SCANA purposefully to conceal the Bechtel Report from the public for eighteen months.  Soon after, a South Carolina House Committee held a hearing in which it lambasted SCANA officials, stating that the Bechtel Report clearly showed that SCANA failed to

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

manage effectively both the Nuclear Project and Westinghouse.  House Committee members went on to suggest that SCANA should "eat" the $2 billion in remaining costs for the Nuclear Project rather than charge ratepayers.

118.    On September 21, 2017, SCANA announced that it had received a subpoena from the U.S. Attorney's Office for the District of South Carolina requesting audits, project assessments, and due diligence reports associated with the Nuclear Project.  The next day, on September 22, 2017, the Speaker of the South Carolina House of Representatives requested that SLED launch a criminal investigation related to the Nuclear Project.  SCANA's willful concealment of the Bechtel Report from regulators and other state officials is paramount to the investigation.

119.    On October 17, 2017, SCANA reported that it received a subpoena from the SEC in connection with the Nuclear Project.  The SEC subpoena expanded the increasingly long list of investigations and lawsuits faced by SCANA as a result of the Original Derivative Defendants' malfeasance.

120.    In addition to federal and state-led investigations, the environmental interest groups, Friends of the Earth and the Sierra Club, and others filed actions before the PSC to prevent SCANA from continuing to charge utility customers for the costs of the failed Nuclear Project. Prior to Merger, SCANA was collecting more than $445 million a year from ratepayers.  One of the actions before the PSC requested refunds for the nearly $2 billion that customers have already paid for the Nuclear Project.

121.    Another group of lawsuits, brought by South Carolina utility customers in state court sought damages for ratepayers having been forced to pay elevated rates for the failed Nuclear Project.  On December 4, 2018, SCANA reached a settlement with its 730,000 South Carolina

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

electric customers in the amount of $2.1 billion to refund the inflated electric bills used to fund the failed Nuclear Project.

122.    SCANA is also a defendant, and thus faces substantial liability, in multiple federal lawsuits brought by shareholders.  On January 18, 2018, U.S. District Court Judge Margaret Seymour designated lead plaintiffs in a class of federal shareholder lawsuits against SCANA in connection with the enormous losses shareholders incurred as a result of SCANA misleading investors regarding the successful completion of the Nuclear Project in violation of Section 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5.  The motion to dismiss had been fully briefed and oral argument is scheduled for February 12, 2019.  If the shareholders ultimately prevail there will be significant monetary damages.

123.    Also on January 18, 2018, Judge Seymour designated lead plaintiffs in a group of federal shareholder derivative actions, which allege, *inter alia*, that SCANA and its officers exposed the Company to liability in connection with the Nuclear Project by violating the Exchange Act.  The federal derivative claims against the Original Derivative Defendants and certain current and former executives include breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the Nuclear Project.

124.    On June 27, 2018, Judge Seymour denied in full the defendants' motions to dismiss the derivative claims against them.  In denying defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 23.1 ("Rule 23.1"), the Court concluded that "Plaintiffs create a reasonable doubt that a majority of [the] Demand Directors are disinterested and independent or that their decisions relating to the [Nuclear Project] were products of a valid exercise of business judgment." *In re SCANA Corp. Derivative Litig.*, No. CV 3:17-3166-MBS, 2018 WL 3141813, at *6 (D.S.C.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

June 27, 2018).  The Court concluded not only that plaintiffs sufficiently alleged that pre-suit demand on the Board was excused pursuant to Rule 23.1, but also that all of plaintiffs' claims for relief on SCANA's behalf against the defendants were adequately asserted pursuant to Federal Rule of Civil Procedure 12(b)(6).  Thus, the federal court has determined that the derivative plaintiffs have stated a claim upon which relief can be granted.[7]

125.    Three derivative actions were also filed in South Carolina state court that alleged the same wrongdoing as the federal derivative action, and additionally allege that SCANA's executives failed to manage the Nuclear Project and actively concealed its shortcomings, and that the Original Derivative Defendants failed to hold members of management accountable for their wrongful conduct and instead rewarded management and themselves with unwarranted compensation.  One of the cases was voluntarily dismissed, and SCANA moved to dismiss the remaining two derivative actions on May 23, 2018.  On September 6, 2018, Judge Mark Hayes denied SCANA's motion to dismiss as to South Carolina Rule of Civil Procedure Rules 12(b)(6) and 23(b)(1).  In denying the motions, Judge Hayes found that the derivative complaints sufficiently pleaded demand futility by making a threshold showing of a substantial likelihood of personal director liability and the Court therefore concluded that "Plaintiffs' allegations create a reasonable doubt that a majority of SCANA's board of directors are disinterested and independent

---

[7]  On July 13, 2018, SCANA announced that it had added two new members to its board of directors, John (Jeb) E. Bachman and Dr. Patricia D. Galloway, who formed a Special Litigation Committee ("SLC") to investigate the alleged claims in the state and federal derivative claims and to determine whether it was in SCANA's best interests to pursue those claims.  On July 24, 2018, SCANA moved to stay the federal derivative action pending the purported "investigation" of this belatedly formed SLC, even though the complaint in that action had already been sustained in its entirety.  The Court denied that motion on October 31, 2018.  The ORS requested that the PSC ask for the findings of the SLC and other information related to the failure of the Nuclear Project, but the PSC declined to do so, effectively preventing Plaintiff and SCANA's former shareholders or the public from gleaning any information regarding whether the SLC concluded, or even conducted, its investigation or the results of such investigation.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

or that their decisions relating to the V.C. Summer project were products of a valid exercise of business judgment." The Court also found that both complaints contained sufficient allegations of wrongdoing to survive dismissal. The derivative actions were consolidated on September 18, 2018 under the caption, *Crangle v. Marsh et al.*, Case No. 2017-CP-40-05791. On December 21, 2018, the Court denied defendants renewed motion to dismiss the Complaint pursuant to Rule 12(b)(8). On January 2, 2019, the Merger closed. Shortly thereafter, Defendants moved to dismiss the derivative claims based on the plaintiffs' alleged loss of standing to pursue those claims on SCANA's behalf as a result of the Merger.

**The Derivative Claims Were Material**

126.    The derivative claims were subsequently bolstered by the testimony of former SCANA employees who have come forward to report the wrongdoing they witnessed while working on the Nuclear Project. For example, Kenneth Browne ("Browne"), a former engineer who worked at SCANA for seven years and oversaw the Nuclear Project contractors, said in a sworn deposition that SCANA executives presented a much more positive picture of the Nuclear Project to the public than it did within the privacy of the Company. According to Browne, the Company's public representation that the Nuclear Project was doing well was a front; it was well known within the Company that the progress of construction was actually extremely poor and the projected cost overruns were substantial. Browne's testimony supports that of Walker, whose testimony initially provided some color to the derivative allegations of wrongdoing by the Original Derivative Defendants.

127.    In testimony before the PSC, Walker, who worked for SCANA for thirty-three years and spent seven years as Vice President of Nuclear Finance Administration, stated that she was concerned with the status of the Nuclear Project and the Company's reliance on and

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

acceptance of the Consortium's[8] excuses and poor performance. According to her testimony, in 2015, Walker's team reviewed the Consortium's cost estimate at completion ("EAC") and compared it with their own. Walker's team was shocked to see that the Consortium's EAC was only $698 million, compared to her team's calculation of $1.2 billion – a difference of more than half a billion dollars. Walker presented this information to Marsh, but he replied that he would rely on the Consortium's EAC and refused to notify the PSC or the ORS of SCANA's EAC calculation. Marsh did just that. On March 12, 2015, SCANA petitioned the PSC to modify the approved cost and construction schedules for the Nuclear Project. In its filings accompanying the petition, SCANA used the Consortium's EAC and failed to disclose the existence of the Company's internal cost estimate. According to Walker's testimony before the PSC, SCANA executives unquestionably knew that the Consortium's estimate was inaccurate as it was based on a level of labor productivity that was patently unattainable. The ORS later found that:

> [SCANA's] deception with respect to cost estimates went beyond mere omission of its own estimate to include outright misrepresentations about (1) the accuracy of the Consortium's cost estimate and (2) the outcome of SCE&G's review of that estimate. SCE&G executives falsely testified (1) that the Consortium's estimate was the best existing estimate of anticipated costs, and (2) that SCE&G's internal review supported the Consortium's cost estimate[.]"

> \*        \*        \*

> SCE&G's deception extended beyond the [Nuclear] Project capital cost schedule to include the construction schedule as well. Months before the 2015 petition was filed, SCE&G senior executives acknowledged the need for an independent assessment of the Project, to include the project schedule. The Owners agreed to retain the Bechtel Corporation to perform the assessment shortly after the March 2015 petition was filed. Nonetheless, SCE&G did not reveal the existence of this assessment to ORS or the Commission. The assessment revealed that the substantial completion dates for the Units were approximately 24 months behind the existing schedule on file with the Commission. Once ORS happened to stumble on evidence that the assessment had occurred, SCE&G misrepresented the results

---

[8]  The Consortium consisted of Westinghouse and its primary construction contractor: Stone & Webster. CB&I formed part of the Consortium after it acquired Stone & Webster.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

of the assessment to ORS consultant Gary Jones on multiple occasions. In response to a written discovery request from ORS, SCE&G on multiple occasions, failed to disclose Bechtel as a consultant or even disclose that an assessment had been performed, the results of which SCE&G claimed privileged.

128.    Many of the allegations underlying the derivative claims are substantiated by the testimony of both Walker and Browne, as well as the independent findings of the PSC and the ORS. Addison himself acknowledged to the PSC that SCANA withheld key information from the PSC about the status of the Nuclear Project. If plaintiffs are ultimately successful in the derivative cases, SCANA officers and Board members could be compelled to return some of the money they received to the Company, such as annual performance awards. As such, the Company has valuable claims for breach of fiduciary duty, mismanagement, corporate waste, and unjust enrichment related to the mismanagement and subsequent abandonment of the Nuclear Project. Dominion has made it clear that it will not pursue these claims or the accompanying repayment to shareholders of ill-gotten proceeds – it has instead agreed to indemnify the wrongdoers in Section 5.08 of the Merger Agreement, shielding them from personal liability. Specifically, Dominion states in the Registration Statement[9] that:

> [I]f the [derivative] claims are not resolved prior to the effective time of the merger, it is possible that the derivative claims will not be pursued, despite the allegation by the plaintiffs in the derivative actions that such claims have substantial value to SCANA.
>
> Moreover, while recovery, if any, on the derivative claims in the derivative actions obtained in the absence of the merger would benefit only SCANA and, indirectly as a result, SCANA shareholders, if the derivative claims are successfully pursued by Dominion Energy or its shareholders following the effective time of the merger, any recovery by them will benefit Dominion Energy, and current SCANA shareholders are only expected to own approximately 12–13% of the issued and

---

[9]  Dominion filed an initial Registration Statement on Form S-4 with the SEC on February 14, 2018. On March 14, 2018, Dominion filed Amendment No. 1 to its Registration Statement, filed on Form S-4 with the SEC and on June 6, 2018, filed Amendment No. 2 to Form S-4. All references to "ARS" cite to Dominion's Second Amended Registration Statement, filed with the SEC on June 6, 2018.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

> outstanding Dominion Energy common stock as a result of the merger.  At the same time, if such claims are unsuccessfully pursued by Dominion Energy the costs related thereto will burden Dominion Energy.  In addition, any recovery by Dominion Energy after the effective time of the merger may be substantially or completely offset by the obligation of Dominion Energy under the merger agreement to indemnify, and to cause SCANA to honor its obligations to indemnify, directors and officers of SCANA for liabilities relating to their service prior to the effective time of the merger.

ARS 79.

129.    Meanwhile, Marsh and Byrne also appear to have escaped liability for their part in the Nuclear Project's ultimate failure.  Both executives announced their retirements on October 31, 2017, effective on December 31, 2017.  While the Board, no doubt under pressure from the public and South Carolina lawmakers, elected to withhold severance packages from Marsh and Byrne, Marsh retired with a pension worth over $3 million and Byrne retired with a pension in excess of $1.4 million.  Marsh received an additional $3 million and Byrne received an additional $1.1 million from the post-Merger share payout.  On information and belief, there has been no discussion of potential clawbacks of either executive's compensation to account for the huge losses SCANA suffered as a result of the mismanagement of the Nuclear Project.  Further, Section 5.08 of the Merger Agreement provides indemnification for SCANA's officers and directors for wrongdoing related to the Nuclear Project.

130.    In furtherance of their own self-interest and out of loyalty to former executives, the Merger Defendants approved the Merger at a time when the abandonment of the Nuclear Project and resulting fallout depressed SCANA's stock price and made it an attractive takeover target. After the Company insiders and the Merger Defendants had benefited from the corporate waste and unjust enrichment alleged in the derivative actions, they sold the entire Company at a price that was unfair to its shareholders, while at the same time insulating themselves from personal liability to the Company resulting from their gross mismanagement of the Nuclear Project.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

**The Flawed Sales Process**

131.    In late 2016, SCANA began to discuss the possibility of a strategic transaction with its financial advisors, Morgan Stanley & Co. LLC ("Morgan Stanley") and RBC Capital Markets, LLC ("RBC").    However, in mid-December 2016, the Board elected to defer a decision on considering a strategic transaction until January 2017.    By late December 2016, the financial stability of Westinghouse had become increasingly tenuous, causing the Board to vote against commencing an exploratory process at that time.

132.    Following Westinghouse's bankruptcy on March 29, 2017, and its consequent threat to the future of the Nuclear Project, SCANA decided to revisit its available strategic alternatives.    According to the Registration Statement, SCANA received its first expression of interest in a strategic transaction in late March 2017, when the CEO of another utility company, referred to in the Registration Statement as Party A, approached Marsh at an industry event and expressed interest in discussing a possible strategic transaction.    Marsh subsequently informed Hagood of the conversation and later told the Board at its April 27, 2017 meeting.

133.    On May 5, 2017, Marsh met with Farrell in South Carolina.    During the meeting, the two spoke about a potential strategic transaction between SCANA and Dominion.    Without making an offer, Farrell suggested that Dominion would be amenable to proposed consideration of 50% cash and the remainder in Dominion stock, that would result in SCANA shareholders receiving a 15% premium over the price of SCANA common stock at the time – approximately $76.00.    Marsh told Farrell that he would respond after SCANA completed its evaluation of the Nuclear Project.    Later that day, a telephone conference was held with the Board, during which Marsh presented Farrell's proposition and the Board voted not to explore the possibility of a strategic transaction at that time, due to the uncertainty surrounding the Nuclear Project.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

134.    Then, on May 12, 2017, Marsh requested a meeting with the CEO of another utility company, referred to as Party B in the Registration Statement.  Marsh asked Party B if it would be interested in acquiring an ownership interest in the Nuclear Project.  After consideration, Party B replied in late May 2017 that it was not interested in acquiring an ownership stake in the Nuclear Project.

135.    According to the Registration Statement, on July 12, 2017, Marsh and Addison requested a meeting with Farrell and Mark McGettrick ("McGettrick"), Dominion's Executive Vice President and CFO, to provide Dominion with an update on the Nuclear Project and explore Dominion's interest in acquiring all or a percentage of Santee Cooper's ownership stake in the Nuclear Project.  Farrell told Marsh that, although Dominion was not interested in an ownership stake in the Nuclear Project, it was interested in beginning the process of exploring a strategic transaction with SCANA.  However, Marsh again told Farrell that SCANA was not prepared to proceed in that direction, but the parties agreed to keep in contact.

136.    Throughout July 2017, the Board met to discuss the future of the Nuclear Project and SCANA's options going forward, including completion of both units, completion of one unit and abandonment of the other, or abandonment of both units.  The Board did not make any definitive decisions about whether to stop construction of the units, and noted that the best strategy would depend on Santee Cooper's decision with respect to its ownership interest in the Nuclear Project.  Marsh also brought his discussion with Farrell to the Board's attention, which once again elected not to pursue further discussions about strategic transactions with Dominion or any other party.

137.    On July 31, 2017, Santee Cooper announced the suspension of construction on the Nuclear Project and SCANA followed suit later that day.  In early August 2017, Marsh was

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

contacted by yet another utility company, referred to in the Registration Statement as Party C. An executive from Party C expressed interest in discussing a potential strategic transaction with SCANA. However, the parties did not communicate again until early October 2017, when the representative of Party C requested a meeting with Marsh. Also in August 2017, Marsh was again contacted by the CEO of Party A who reiterated his company's interest in a strategic transaction. Marsh also spoke with the CEO of Party B at that time, although the possibility of a strategic transaction was not raised, and the two parties did not communicate again until early October 2017.

138.    In the wake of the abandonment announcement and a precipitous decline in SCANA's share price, Marsh and Addison again met with Farrell and McGettrick on October 1, 2017, at Farrell's request, to discuss a potential strategic transaction. Farrell outlined a number of possible terms for a transaction, including a rate credit for utility customers, a reduced amortization period for SCANA's investment in the Nuclear Project, and a premium of approximately 20% over the price of SCANA stock at the time – amounting to approximately $58 per share – for SCANA shareholders. During this conversation, Farrell also outlined terms, such as an immediate credit for SCE&G's customers, maintenance of rates associated with the Nuclear Project at or below the current levels at the time, a reduced amortization period for SCANA's investment in the Nuclear Project, and a write-off of some part of the investment. Marsh indicated that he would share Farrell's concepts and terms with the Board.

139.    On October 4, 2017, Marsh was again contacted by the CEO of Party A who stated that Party A had been approached by another party about potentially purchasing Santee Cooper, and Party A's CEO was interested in discussing a strategic transaction with SCANA but that any proposal would be contingent on SCANA's agreement to enter into exclusivity.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

140.    A representative of Party C contacted Marsh two days later to revisit discussions about a strategic transaction but did not propose concepts or terms at that time.

141.    A Board meeting was held on October 6, 2017, during which Marsh spoke about his recent discussions with Dominion, Party A, and Party C.  The Board decided to move forward with the process of exploring a strategic transaction with Dominion and Party A, including providing due diligence information to both parties.  The Board, apparently, did not discuss further a potential transaction with Party C.  SCANA subsequently entered into confidentiality agreements with Dominion and Party A on October 8, 2017.

142.    On October 10, 2017, the CEO of Party B re-opened a dialogue with Marsh, stating that Party B was not interested in acquiring an ownership stake in the Nuclear Project, but it was interested in a potential strategic transaction with SCANA.  Party B did not propose any concrete concepts or terms at that time.  Also on October 10, 2017, Marsh, Addison, and SCANA's Senior Vice President and General Counsel met with the CEO and other representatives of Party A in which Party conveyed the specific benefits and opportunities associated with a potential strategic transaction between the two parties.  However, Party A's CEO did not provide an estimate of the consideration to be received by SCANA shareholders, but nonetheless requested that SCANA enter into an exclusivity agreement with Party A, which the Board declined.  On October 13, 2017, the Board approved the engagement of Morgan Stanley and RBC as financial advisors and the due diligence process began.

143.    Party A ended its participation in the due diligence process a short time later, in mid-October 2017.

144.    On October 31, 2017, SCANA announced that Marsh would retire as CEO of SCANA and that on January 1, 2018, Addison would become CEO of SCANA, among other

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

leadership changes, meaning Addison would also now take a more prominent role in potential transaction negotiations. Byrne's retirement was also announced on this date.

145.    Dominion and SCANA continued the due diligence process and during the week of November 20, 2017, McGettrick and Addison spoke multiple times about a potential transaction, with McGettrick disclosing that Dominion would submit a revised proposal to SCANA. Then, on November 27, 2017, Farrell requested a meeting with Marsh, Addison, and Hagood during which he presented the revised proposal for a strategic transaction. Pursuant to this proposal, SCANA shareholders would receive 75% to 80% in Dominion stock and 20% to 25% in cash for each SCANA share: a total premium of approximately 30% over the price of SCANA stock at the time, or approximately $55.40. The proposal had otherwise similar terms to previous proposals such as distribution of cash refunds to SCE&G customers, a reduced amortization period for investments, and a write-off of capital spent on the Nuclear Project.

146.    Dominion's proposal was presented to the Board on November 29, 2017. Addison took the lead in summarizing the key terms of the proposal and then told the Board that he thought the transaction with Dominion merited further consideration. Marsh told the Board that he agreed with Addison's assessment.

147.    A mere two days later, SCANA representatives presented Dominion with an initial draft of the merger agreement. On December 5, 2017, the two parties met to discuss a timeline for a potential transaction and the specific terms of Dominion's proposal. The Board then met on December 8, 2017, to discuss the contents of the meeting with Dominion. The same day, legal counsel for Dominion sent SCANA representatives a revised draft of the Merger Agreement, which included the closing condition requiring that the SCPSC accept all key terms of the rate settlement as proposed by Dominion, without any alteration.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

148.     On December 15, 2017, Dominion returned with another updated proposal, which incorporated the due diligence performed by Dominion.  According to the Registration Statement, the new proposal contained the following key terms, among others:  "an all-stock, tax deferred transaction with a value of $54.50 per share of SCANA common stock . . . reflecting an implied premium of approximately 27.9% over the closing price of SCANA common stock prior to . . . November 27, 2017."  Proxy 40.  Dominion's proposal also included provisions requiring that any change in law adverse to SCANA – such as amendment or repeal of the BLRA or other utilities laws – would trigger Dominion's right to terminate the Merger Agreement and receive a termination fee.

149.     The Board subsequently met with legal counsel and its financial advisors to discuss Dominion's proposal.  This December 18, 2017 meeting included presentations of SCANA's financial projections and updates on the findings of due diligence conducted on Dominion.

150.     The next day, on December 19, 2017, Addison attended a meeting at the request of a representative of Party C, who indicated that Party C had a long-term interest in acquiring SCANA.  Party C did not offer a description of any concrete terms but did state that it would be interested in acquiring the SCANA subsidiary, Public Service Company of North Carolina, for $2.2 billion.  Addison presented this proposition to the Board but emphasized that he did not support the proposal.  The Board decided to reject Party C's offer, citing its under-valuation and desire to avoid conflicts surrounding its pending agreement with Dominion.

151.     At the same meeting, the Board discussed other open issues with the Merger Agreement, such as the proposed termination fee and Dominion's proposed closing conditions.  Later that day, SCANA's financial advisors met with Dominion to come up with a reference stock price for calculating a fixed exchange ratio that both parties could agree upon.  According to the

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Registration Statement, "SCANA's proposed method for calculating the exchange ratio reflected a value of $57 per Share of SCANA common stock." Proxy 41.

152.    Dominion circulated a revised draft of the agreement on December 22, 2017, which granted Dominion the right not to close the Merger, *even after signing the Merger Agreement*, if any problematic laws were passed by the South Carolina legislature, such as a change to the BLRA. The parties continued to negotiate the terms of the Merger Agreement during the following week.

153.    On December 29, 2017, the Board met with its financial advisors and legal counsel, at which time the Board was presented with the terms of the Merger Agreement related to employee benefits and executive compensation, including a description of equity-based awards and severance protections.    Later that day, SCANA's financial advisors presented a counterproposal to Dominion, including a proposed exchange ratio of 0.669 of a share of Dominion stock per each share of SCANA stock, an increase of just 0.007 from Dominion's previous proposal of 0.662.    Dominion agreed to the terms of the counterproposal on December 30, 2017, and SCANA did not attempt to negotiate any further.

154.    On January 2, 2018, after receiving fairness opinions from both Morgan Stanley and RBC, as well as a statement by Addison in unwavering support of the transaction, the Board approved the Merger Agreement and Addison executed it with representatives of Dominion.

**The Merger is Announced**

155.    Dominion first approached SCANA about the potential for a strategic transaction between the two companies on May 5, 2017.  However, it was not until October 2017, in the wake of the abandonment of the Nuclear Project and revelations of the Original Derivative Defendants' mismanagement – depressing SCANA's stock price and subjecting the Company and the Original Derivative Defendants to massive liability – that the Merger Defendants began to seriously consider a transaction with Dominion.  Just a few months later, on January 3, 2018, SCANA and

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Dominion announced that Dominion had agreed to acquire SCANA. The joint press release stated, in relevant part:

> RICHMOND, Va. and CAYCE, S.C., Jan. 3, 2018 /PRNewswire/ -- Dominion Energy, Inc. (NYSE: D) and SCANA Corporation (NYSE: SCG) today announced an agreement for the companies to combine in a stock-for-stock merger in which SCANA shareholders would receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock, the equivalent of $55.35 per share, or about $7.9 billion based on Dominion Energy's volume-weighted average stock price of the last 30 trading days ended Jan. 2, 2018. Including assumption of debt, the value of the transaction is approximately $14.6 billion.
>
> The agreement also calls for significant benefits to SCANA's South Carolina Electric & Gas Company subsidiary (SCE&G) electric customers to offset previous and future costs related to the withdrawn V.C. Summer Units 2 and 3 project. After the closing of the merger and subject to regulatory approvals, this includes:
>
> A $1.3 billion cash payment within 90 days upon completion of the merger to all customers, worth $1,000 for the average residential electric customer. Payments would vary based on the amount of electricity used in the 12 months prior to the merger closing.
>
> - An estimated additional 5 percent rate reduction from current levels, equal to more than $7 a month for a typical SCE&G residential customer, resulting from a $575 million refund of amounts previously collected from customers and savings of lower federal corporate taxes under recently enacted federal tax reform.
> - A more than $1.7 billion write-off of existing V.C. Summer 2 and 3 capital and regulatory assets, which would never be collected from customers. This allows for the elimination of all related customer costs over 20 years instead of over the previously proposed 50-60 years.
> - Completion of the $180 million purchase of natural-gas fired power station (Columbia Energy Center) at no cost to customers to fulfill generation needs.
>
> In addition, Dominion Energy would provide funding for $1 million a year in increased charitable contributions in SCANA's communities for at least five years, and SCANA employees would have employment protections until 2020.
>
> SCANA would operate as a wholly owned subsidiary of Dominion Energy. It would maintain its significant community presence, local management structure and the headquarters of its SCE&G utility in South Carolina.
>
> The transaction would be accretive to Dominion Energy's earnings upon closing, which is expected in 2018 upon receipt of regulatory and shareholder approvals.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

The merger also would increase Dominion Energy's compounded annual earnings-per-share target growth rate through 2020 to 8 percent or higher.

Thomas F. Farrell, II, chairman, president and chief executive officer of Dominion Energy, said:  "We believe this merger will provide significant benefits to SCE&G's customers, SCANA's shareholders and the communities SCANA serves. It would lock in significant and immediate savings for SCE&G customers – including what we believe is the largest utility customer cash refund in history – and guarantee a rapidly declining impact from the V.C. Summer project.  There also are potential benefits to natural gas customers in South Carolina, North Carolina and Georgia and to their communities.  And, this agreement protects employees and treats fairly SCANA shareholders, many of whom are working families and retirees in SCANA's communities.  The combined resources of our two companies make all this possible."

"Dominion Energy is a strong, well-regarded company in the utility industry and its commitment to customers and communities aligns well with our values," said Jimmy Addison, chief executive officer of SCANA.  "Joining with Dominion Energy strengthens our company and provides resources that will enable us to once again focus on our core operations and best serve our customers."

**Strategic combination**

The combination with SCANA would solidify Dominion Energy's position among the nation's largest and fastest-growing energy utility companies by adding significantly to its presence in the expanding Southeast markets.  SCANA's operations include service to approximately 1.6 million electric and natural gas residential and business accounts in South Carolina and North Carolina and 5,800 megawatts of electric generation capacity.  SCANA continues to experience strong growth in both customer count (more than 2 percent on average annually at SCE&G and PSNC Energy) and weather-normalized energy sales.

"SCANA is a natural fit for Dominion Energy," Farrell said. "Our current operations in the Carolinas – the Dominion Energy Carolina Gas Transmission, Dominion Energy North Carolina and the Atlantic Coast Pipeline – complement SCANA's, SCE&G's and PSNC Energy's operations.  This combination can open new expansion opportunities as we seek to meet the energy needs of people and industry in the Southeast."

Once the merger is completed, the combined company would operate in 18 states from Connecticut to California.  The company would deliver energy to approximately 6.5 million regulated customer accounts in eight states and have an electric generating portfolio of 31,400 megawatts and 93,600 miles of electric transmission and distribution lines.  It also would have a natural gas pipeline network totaling 106,400 miles and operate one of the nation's largest natural gas storage systems with 1 trillion cubic feet of capacity.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

### Regulatory, shareholder approvals and conditions

The merger is contingent upon approval of SCANA's shareholders, clearance from the U.S. Federal Trade Commission (FTC)/the U.S. Department of Justice (DOJ) under the Hart-Scott-Rodino Act, and authorization of the Nuclear Regulatory Commission (NRC) and Federal Energy Regulatory Commission (FERC).

SCANA and Dominion Energy also will file for review and approval from the public service commissions of South Carolina, North Carolina, and Georgia.

"We will seek the approval of the Public Service Commission of South Carolina for the immediate customer payments, rate refunds over time and other conditions related to resolution of the V.C. Summer Units 2 and 3 situation," said Dominion Energy's Farrell. "We believe it is in the best interests of all parties to reach an agreement on this critical issue. Having certainty on this issue can act as a catalyst for economic development and it is essential for the Dominion Energy-SCANA merger to move forward. The availability, reliability and cost of energy are often the deciding factors when businesses consider investing – and we want businesses to have every reason to continue investing in SCANA's communities."

### For SCANA shareholders

Under the terms of the merger agreement, SCANA common shareholders are to receive 0.6690 shares of Dominion Energy common stock for each share of SCANA common stock held. Based on Dominion Energy's volume-weighted average stock price of the last 30 trading days ended Jan. 2, 2018, this equates to a value of approximately $55.35 per SCANA share. This represents an approximate 30.6 percent premium to the volume-weighted average stock price of SCANA's last 30 trading days ended Jan. 2, 2018. Upon closing of the merger, SCANA shareholders would own an estimated 13 percent of the combined company.

The transaction structure contemplates that the receipt of Dominion Energy shares will be tax-deferred for SCANA shareholders.

156.    The January 3, 2018 announcement was just the beginning of a long and arduous process to consummate the Merger. Throughout 2018, Dominion vacillated between carrying out the Merger and walking away from it altogether. On June 28, 2018, the South Carolina House and Senate passed a proposal to cut SCANA's electric rates by almost 15% to eliminate the portion of customers' power bills earmarked for the repayment of the $9 billion spent on the failed Nuclear Project. This act gave Dominion the contractual right to walk away from the Merger. However, illustrating the opportunistic nature of the Merger, Dominion chose to continue with the Merger.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

On August 6, 2018, U.S. District Court Judge Michelle Childs denied SCANA's motion to block the rate cut and the 15% reduction went into effect the next day.

**The Merger Consideration is Inadequate**

157.    The Merger Consideration was grossly inadequate because, among other things, it was based on a valuation of SCANA that has been massively deflated as a result of the Merger Defendants' wrongdoing, and therefore did not reflect the true value of the company.  Having failed to maximize the sale price for the Company, the Merger Defendants breached the fiduciary duties they owed to the Company's public shareholders as the Company was improperly valued and thus shareholders did not receive adequate or fair value for their SCANA common stock. Moreover, SCANA shareholders own only approximately 13% of the post-merger company, which prevents them from meaningfully participating in the Company's long-term prospects.  The minimal percentage of ownership held by former SCANA shareholders may also have an impact on their ability to exert influence at Dominion with respect to the pursuit of the derivative claims against the former officers and directors of SCANA that were transferred to Dominion in the Merger.

158.    At the Merger's completion on January 2, 2019, the Company's shareholders received 0.669 of a share of Dominion stock for each share of SCANA stock they own.  Using Dominion's stock price on the day the Merger closed, this is equivalent to $47.62 per SCANA share and represents an approximate 18% premium over the price of SCANA on July 30, 2018, the day before the shareholder vote.

159.    The premium promised after the Merger was announced in January 2018 was illusory.  Since the Merger was announced, Dominion's stock price steadily declined.  In their rush to finalize a deal to shield themselves from liability, the Merger Defendants failed to negotiate a collar to protect SCANA's shareholders from a falling Dominion stock price, in contravention of

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

their fiduciary duties.  The Merger Consideration of $47.62 per share, represents a 26% *discount* to SCANA's closing price on July 31, 2017, the day the Company announced it was abandoning the Nuclear Project.  This significant discount shows that the Merger Defendants did not negotiate for, and Dominion is not paying for, the valuable claims that Dominion can pursue against the Original Derivative Defendants and SCANA executives following the Merger.

160.    The Merger Defendants failed to negotiate a collar despite recognizing that, "because the merger consideration is a fixed exchange ratio of shares of Dominion Energy common stock for shares of SCANA common stock, SCANA shareholders could be adversely affected by a decrease in the trading price of Dominion Energy common stock."  Proxy 47.  The failure of the Merger Defendants to negotiate a collar was particularly egregious given that a decline in Dominion's common stock price was not merely hypothetical – Dominion's stock price had begun to decline steeply, beginning in mid-December 2017, two weeks before SCANA submitted its final counterproposal for the Merger Agreement.  Even if the Board could not predict in late December 2017 that Dominion's stock price would drop precipitously, it surely knew that the nature of the transaction could cause significant fluctuations in the value of Dominion stock, yet failed to account for these risks through a price-based termination right or other mechanism.

161.    On December 6, 2017, the consensus price target for SCANA was $61.44 per share – over 29% more than the Merger Consideration.  Moreover, before the Merger was announced, several analysts had price targets for SCANA well above the Merger Consideration.  For example, on August 10, 2017, Morgan Stanley Investment Research had a price target of $58.00-$59.00, and on August 28, 2017, Mizuho Securities USA Inc. had a price target of $58.50.  A September 1, 2017 article in the Analyst Journal titled "Is SCANA Corporation (SCG) Sell Now?" states: "The analysts offering 12 month price targets for SCANA Corporation have a median target of

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

$65, with a high estimate of $80 and a low estimate of $54." On September 18, 2017, Williams Capital's price objective for SCANA was $70. The average 12-month price target among analysts that have issues ratings on SCANA's stock in the last year is $63.07. As such, the Merger Consideration severely undervalued the Company.

162.    Moreover, the Merger Consideration failed to include compensation for the valuable claims against the Merger Defendants and SCANA executives which could result in the accrual of significant payments, including clawbacks from the Original Derivative Defendants for their wrongdoing. In fact, the value of these claims does not appear to have been factored into the amount of the Merger Consideration at all. Although the worth of the derivative claims could potentially be in the billions of dollars, the Board admittedly "did not attempt to value the claims asserted in the derivative actions." Proxy 87. Rather than pursuing these claims and attempting to provide recompense to SCANA and its shareholders, the Merger Defendants negotiated an indemnification clause in the Merger Agreement that completely indemnifies the wrongdoers in the derivative actions, effectively nullifying the claims all together.

163.    On January 14, 2019, the PSC issued a ruling stating that SCANA intentionally misled the PSC about the status of the Nuclear Project as a means of gaining electric rate hikes. Although the PSC's ruling was made after the Merger closed, it lends further credence to the wrongdoing asserted in the derivative actions against former officers and directors of SCANA and clarifies the Merger Defendants' desire to execute the Merger quickly to escape personal liability.

164.    Several commentators have noted that Dominion took advantage of SCANA and South Carolina legislators' misfortunes following SCANA's decision to abandon the Nuclear Project. As a January 3, 2018 article in the *Wall Street Journal* titled "Dominion Pounces on Scana's Nuclear Woes," explained: Dominion's bid for SCANA "is nothing short of masterful –

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

a bold move to take advantage of [SCANA's] and local politicians' misfortune." Discussing Dominion's insistence that South Carolina ratepayers foot the $6 billion still owed for the failed Nuclear Project, the article noted that South Carolina regulators and politicians "will have a hard time saying 'no.'" The article concluded by noting that "Dominion is paying around $7.43 billion excluding debt for a company that would have cost it $14 billion last summer with a similar deal premium. A master stroke."

165.    Similarly, a January 3, 2018 article on *Bloomberg Gadfly* titled "Dominion Aims to Clean Up a Nuclear Disaster" pointed out that SCANA's stock fell by almost half in 2017 as a result of the abandoned Nuclear Project. Dominion, on the other hand, along with the energy sector as a whole, rose approximately 6%. "Hence, while the 42 percent premium implied by Dominion's all-stock offer looks high, it looks less so when you compare the exchange ratio – 0.669 shares per SCANA share – with history: Dominion's offer of 0.669 shares per SCANA share is well above the current ratio, but still significantly below the historical average." As recently as July 31, 2017, the day SCANA announced abandonment of the Nuclear Project, the ratio of SCANA's stock price to Dominion's was 0.834. At that ratio, the consideration would have been $59.36, or nearly 25% higher.

166.    In addition to opportunistically acquiring a highly-valued company at a discount, the Merger is immediately accretive to Dominion's earnings and is expected to increase Dominion's annual earnings per share target growth to 8% or higher through 2020. The Merger complements Dominion's pre-existing operations in South Carolina and strengthens its grip on energy production and delivery in the Southeast region. According to Dominion's website, the company currently delivers natural gas to wholesale and direct customers in South Carolina and operates approximately 1,500 miles of transmission pipelines in South Carolina and Georgia, all

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

of which will be greatly augmented by acquiring SCANA. Despite this, the Merger Consideration failed to adequately reflect the synergies anticipated to be generated as a result of the Merger.

**The Merger Defendants Rushed to Make a Deal With Dominion to the Exclusion of Other Potential Suitors**

167.    According to the Registration Statement, it is abundantly clear that any consideration of other potential suitors was, at all times, lackluster and peripheral to the deal SCANA was forging with Dominion.

168.    As reported on January 12, 2018 in a *The Post and Courier* article titled "CEO: SCANA didn't push to land competing offers before inking Dominion deal," when questioned during Addison's testimony before the South Carolina PSC about whether the Company had "tried very hard" to find buyers, Addison sated, "No.  I didn't mean to even imply that."  Rather, negotiations were carried out over the course of less than two months, while the Merger Defendants were feeling enormous pressure to clean up the mess they had made and insulate themselves from personal liability.  In fact, the Merger Defendants did not try to find other buyers at all.  According to the Proxy Statement, they "did not conduct a formal sale process to solicit other developed acquisition proposals from parties other than Dominion Energy."  Proxy 47.

169.    As the same *Post and Courier* article noted, Dominion had expressed interest in a potential transaction with SCANA as early as May of 2017, "before the abandoned expansion of the V.C. Summer Nuclear Station had exploded into a political and financial crisis."  These discussions, however, never advanced to the point of negotiating the terms of a potential transaction.  Unsurprisingly, once the Nuclear Project was abandoned, the Merger Defendants sought a transaction, any transaction, that would protect them from personal liability.

170.    Addison said the Company tried to find a solution to the problems caused by the abandonment of the Nuclear Project but was unable to do so.  Specifically, according to Addison's

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

testimony before the PSC on January 11, 2018, there was little public support for SCANA's initial proposed solution to the abandonment of the Nuclear Project, which involved "an immediate rate reduction of 3½ percent, shortening the recovery period from 60 to 50 years, a shareholder-funded base-load power plant of over 500 megawatts providing 40 percent of the energy that was to come from our 55 percent portion of Units 2 and 3 of Summer." South Carolina lawmakers were openly hostile to SCANA's proposal, with the Senate President calling it an "insult to ratepayers."

171.    This proposal was announced on November 16, 2017, to a hostile reception, and a week later Dominion reached out again to Addison, stating that Dominion was considering providing SCANA with an updated proposal for a strategic transaction. On November 27, 2017, SCANA executives met with Farrell, where he and Dominion's CFO presented the terms of a potential transaction. Two days later, the Board met to discuss the terms of a potential combination with Dominion, and on January 2, 2018, after only five weeks of negotiations, the Board unanimously approved the Merger.

172.    While the Board rushed to escape personal liability by inking a deal with Dominion that severely undervalued the Company, the Merger Defendants may have been able to secure a more valuable deal for SCANA's public shareholders if they had initiated a sales process. According to a January 18, 2018 article in *The State* titled "Should SC accept Dominion's buyout of SCANA? Lawmakers are skeptical," Florida-based NextEra Energy and North Carolina-based Duke Energy are interested in buying SCANA, too. While neither utility publicly announced an offer to acquire SCANA, both utilities had representatives monitoring legislative hearings regarding the Merger.

173.    The Registration Statement revealed that SCANA was approached by at least three potential acquirors, all of whom expressed an interest in exploring a potential strategic transaction

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

with SCANA.  No serious, concerted effort was made by SCANA to pursue negotiations with Party B or Party C, and the Registration Statement does not disclose what terms may have been offered by the respective parties or why the solicitations never progressed past the initial stages. Although discussions with Party A progressed further than those with the other two parties, Party A eventually withdrew from all dialogue with SCANA.

174.     Moreover, the terms of the Merger were structured to make it prohibitively risky for SCANA to walk away while facilitating a quick exit by Dominion if certain conditions were not met.  For example, Dominion CEO, Farrell, told the South Carolina Legislature on January 17, 2018, that Dominion would exercise its right under the Merger Agreement to walk away from the Merger if lawmakers move forward with their plans to repeal parts of the BLRA that would allow Dominion to continue to charge utility customers for the price of the botched Nuclear Project. Farrell also said that Dominion would walk away if the South Carolina Supreme Court finds that the BLRA was unconstitutional when it was passed, an assertion that the Office of the Attorney General has made since September 2017.  On June 28, 2018, the South Carolina General Assembly passed Act 287 and Resolution 285.  2018 S.C. Acts 258.  Act 287 repealed the BLRA for any future projects and provided definitions for prudency, imprudency, and fraud.  2018 S.C. Acts 258 §§ 1, 2.  This legislative act, however, did not result in Dominion abandoning the Merger.

175.     Dominion also threatened to abandon the Merger if state courts or regulators find that SCANA fraudulently obtained previous rate hikes for the Nuclear Project – thereby forcing Dominion to refund the money to SCANA's customers.

176.     These deal-killing provisions were not merely hypothetical.  As reported by a January 23, 2018 article in *The State* titled "Gov. McMaster to Veto Any Bill That Keeps the Dominion-SCANA Deal Alive," the South Carolina House and Senate were already considering a

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

proposal, supported by Governor McMaster, that would ensure that South Carolina ratepayers would not continue to pay for the failed Nuclear Project.  Indeed, the South Carolina House and Senate passed a temporary rate cut of 15% on June 28, 2018.  Act 287 instructed the South Carolina PSC to set utility rates for SCANA at a level equal to the current rate less the increases previously granted under the BLRA.  2018 S.C. Acts 258 § 3.  The rate cut was only approved through December 21, 2018, but retroactively covered any extra charges to SCANA customers starting on April 1, 2018.  SCANA challenged the decision in South Carolina state court and the case eventually reached the Fourth Circuit Court of Appeals, where the rate cut was upheld.

177.    On December 14, 2018, the PSC ruled that South Carolina utility customers will pay an additional $2.3 billion for the failed Nuclear Project.  This was less than half of the $5 billion Dominion originally expected to receive when the Merger was first announced in January 2018.

178.    A number of the supposed risks to the Merger came to fruition and gave Dominion license to walk away from the Merger.  However, Dominion did not abandon the Merger because it knew that it had effectively negotiated the purchase of a valuable company for much less than its worth, even without the substantial fiscal assistance it previously expected to receive from the BLRA.

179.    Even as the PSC voted to allow the Merger to proceed on December 14, 2018, the commissioners each publicly acknowledged that they would have preferred to keep SCANA as a standalone entity.

**The Merger Defendants and SCANA Executives Negotiate Unwarranted Financial Rewards**

180.    While the unfair price and process has caused Plaintiff and the Company's public shareholders to receive less than the full value of their SCANA holdings in the Merger, the Merger

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

Agreement provides unwarranted financial rewards to the very executives and directors that were responsible for placing SCANA and its shareholders in their current position.

181.    Pursuant to SCANA's Long-Term Equity Compensation Plan, executive officers received two types of awards for their service.  The first, Performance Share Awards, are denominated in shares of SCANA common stock in values based on comparative Total Shareholder Return ("TSR")[10] and earnings per share growth components measured each year, over a three-year time period.  Specifically, one half of the award amount is determined by comparing SCANA's TSR with similarly situated utility companies (the "peer group") and the other half is earned based on the level of growth SCANA achieved in "GAAP-adjusted net earnings per share targets."  For an executive to receive 100% of the first half of their target award, the Company's performance would have to rank in the fiftieth percentile in relation to the peer group's TSR during a one-year cycle.  Executives could receive 100% of the second half of their target payouts for every year in which SCANA had growth of 4.5% or more.

182.    The second type of award granted to SCANA executives are Restricted Stock Unit Awards ("RSUs").  RSUs are not performance based, are subject to a three-year vesting period, and are based on the fair market value of SCANA common stock on the day that they are granted. Both RSUs and Performance Share Awards accrue dividends prior to vesting.

183.    In February 2015, the Compensation Committee recommended a number of changes in the criteria for awards, which would change the measurement of performance cycles

---

[10]  TSR is equal to the change in SCANA's common stock price, plus cash dividends paid on SCANA common stock during the period, divided by the common stock price as of the beginning of the period.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

(from one to three years), increase the maximum award payout, and change the mix of performance shares and RSUs.[11]

184.    Once the gross mismanagement by SCANA executives with respect to the Nuclear Project and the Original Derivative Defendants' concurrent failure to oversee management finally became public in July 2017, SCANA was not going to reach the targeted performance goals. Hence, share awards to executives like Marsh, Byrne, and Addison would not have vested at target levels.  However, pursuant to Section 2.02(a) of the Merger Agreement, upon consummation of the Merger, Performance Share Awards vested at 100% of target levels and executives were paid as though they had achieved their growth and return goals.  Under Section 2.02(b) of the Merger Agreement, the RSUs that were granted to executives during the previous performance cycles also vested, despite time restrictions that may have otherwise delayed the payout.

185.    According to the Registration Statement, Marsh received $3,058,911 in combined Performance Share Awards and Restricted Stock Units, Addison received $3,599,065, and Byrne received $1,111,410.  In addition to his merger-related equity compensation, Addison also received $5,297,314 in cash rewards and $821,648 in pension payments upon consummation of the Merger, bringing his total merger-related compensation award to an incredible $9,718,027. Finally, Addison retired on February 1, 2019.  Because this was within two years of the Merger, he is entitled to a severance package in excess of $5 million.  He would have been entitled to the same had he been fired within two years of the Merger.

186.    Finally, the executives that were directly responsible for the wrongdoing that left SCANA and its shareholders in their current position, will be indemnified by Dominion pursuant

---

[11]  Prior to February 2015, executive compensation was 80% performance-based awards and 20% RSUs.  This ratio changed to 70% / 30% after February 2015.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

to the Merger Agreement and will therefore not face the possibility of clawbacks or other forms of reimbursement.

187.    Thus, while shareholders were asked to approve a transaction that severely undervalued their investment in SCANA, the executives directly responsible for SCANA's tremendous loss in market capitalization were granted a colossal payout that they would not have otherwise received absent the Merger.

**The Preclusive Deal Protection Measures**

188.    In addition to the inadequate Merger Consideration, the Board also agreed to onerous deal protection devices that precluded a full and fair sales process for the Company and effectively locked out competing bidders to the detriment of SCANA's public shareholders. The Merger Agreement substantially favored Dominion and was calculated unreasonably to dissuade potential suitors from making competing offers. Therefore, not only did the Board fail to run a full and fair sales process on the front-end of the Merger, it also ensured no competing bid would be forthcoming on the back-end. When viewed collectively, these provisions, detailed below, furthered the interests of the Merger Defendants to the detriment of SCANA's public shareholders, and were not a justified, appropriate, or proportionate response to any threat posed by a potential third-party bidder. This was a clear violation of the Board's fiduciary duty to maximize shareholder value.

189.    The Merger Defendants all but ensured that no other entity would emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 4.02(a) of the Merger Agreement that prohibited the Merger Defendants from soliciting alternative proposals and severely constrained their ability to communicate and negotiate with potential buyers who wished to submit or submitted unsolicited alternative proposals. Under this section, the Company could not solicit or initiate, knowingly encourage, induce, facilitate, or cooperate with any inquiries or

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

proposals that would reasonably be expected to lead to an alternative bid or to participate in any negotiations or discussions with third parties.  In addition, under Section 4.02(b), the Company was required to immediately cease any and all discussions or negotiations with third parties that had begun before the Merger Agreement was signed.

190.    Further, pursuant to Section 4.02(c) of the Merger Agreement, the Company was required to promptly notify Dominion, within forty-eight hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Dominion could have then used the unfettered access to confidential, non-public information about competing proposals from third parties to formulate a matching bid under Section 4.02(f) of the Merger Agreement, virtually eliminating any leverage that the Company had in receiving the unsolicited offer, and significantly deterring an alternative buyer from coming forward.

191.    Section 4.02(f) of the Merger Agreement also severely limited the Board's ability to recommend alternative proposals to shareholders because it provided Dominion with four business days to submit a superior offer.  During this period, the Company was required to negotiate in good faith with Dominion, at Dominion's discretion, and allow Dominion to amend the terms of the Merger Agreement to make a counteroffer, if the Board decided to enter into a transaction with a third party.  Moreover, Dominion needed only to match, not top, a superior proposal.

192.    The matching rights provision functioned to deter potential suitors from expending the cost and effort of launching a superior proposal in the knowledge that they would effectively serve as a "stalking horse," and that Dominion would be allowed to merely piggy-back upon the

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

additional due diligence of the second bidder, after which Dominion would only have to match the second bidder's offer to retain its right to acquire SCANA.

193.    Although the Merger Agreement contained a fiduciary out provision, it was extremely limited and only allowed the Board to enter into discussions and negotiations in response to an unsolicited acquisition proposal under very limited situations.  This is because the acquisition proposal would have to be one that:  (a) was not the result of any breach of, or any action inconsistent with any of the other provisions set forth in Sections 4.02(a) and (b) of the Merger Agreement; and (b) can reasonably lead to a superior proposal.  Even then, the Board would also have to conclude in good faith, after having consulted with its outside legal counsel, that failure to take action in response to the acquisition proposal would reasonably constitute a breach of the fiduciary duties of the Board to the Company's shareholders under applicable law. Because the Company is prevented from offering access to non-public information, ultimately this provision provided little to no opportunity for a superior proposal to emerge.

194.    Further locking up control of the Company in favor of Dominion was an exorbitant termination fee.  Section 7.02 of the Merger Agreement contained a termination fee provision which provided that if the Board rescinded its recommendation in favor of the Merger and agreed to a competing proposal pursuant to the lawful exercise of its fiduciary duties, the Company would have been obligated to pay Dominion an onerous $240 million termination fee, which was over 3% of the total value of the Merger at the time it was announced.  This further reduced any possibility of maximizing shareholder value through a superior proposal from a third party because a competing bidder would ultimately be required to pay the termination fee.  The termination fee essentially required any competing bidder to agree to pay a substantial premium for the right to provide shareholders with a superior offer.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

195.    As reported by *The State* in a January 5, 2018 article titled, "SCANA would have to pay $240 million to walk away from Dominion deal," Addison stated, "[Any would-be acquiror] would have to consider the [termination fee] because that would really be a cost they would end up having to pay as part of the proposal."  The article went on to note that "Wall Street analysts say the breakup fee is evidence Dominion wants to ward off other SCANA bidders."

196.    The Company would have also been obligated to pay the termination fee if SCANA's public shareholders had not voted to approve the Merger.  One prerequisite to closing was the approval by the PSC of the petition submitted by Dominion and SCANA on January 12, 2018, that would have allowed Dominion to continue to charge South Carolina ratepayers for the costs of the failed Nuclear Project.  The provision was incredibly risky at the time, considering the tumultuous political climate in South Carolina with respect to the Nuclear Project.  The fight over whether or not to allow Dominion to recuperate from South Carolina utility customers the losses incurred from the defendants' wrongdoing raged for months.  In fact, the matter was still undecided at the time that SCANA shareholders voted to approve the Merger on July 31, 2018.  It was not until December 14, 2018, that the PSC made a final decision, allowing Dominion to collect $2.3 billion from utility customers to pay for the failed Nuclear Project.

197.    In addition, given the substantial liability faced by SCANA's directors and officers as a result of their wrongdoing in connection with the Nuclear Project, it is of little surprise that the Merger Defendants made every attempt to lock-up the Merger in an effort to protect themselves.  To that effect, section 5.08 of the Merger Agreement contains an indemnification provision which states in relevant part:

> Parent shall indemnify and hold harmless . . . each present and former director of the Company and its Subsidiaries from and against any and all expenses, judgments, fines, losses, claims, damages, and liabilities incurred in connection with any Proceeding or investigation whether civil, criminal, administrative or

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

investigative, arising out of or pertaining to matters existing or occurring at or prior to the Effective Time.

198.    Leaving no doubt as to the purpose of Section 5.08, and the Merger itself, the Merger Agreement goes on to specify:

> [T]he foregoing obligation of Parent shall apply with respect to, and remain in full force and effect as to any pending or future claim, hearing, investigation or Proceeding relating to or arising out of the construction, or cessation of the construction, of nuclear power Units 2 and 3 at the Summer Station or the bankruptcy of Westinghouse Electric Company, LLC.

199.    Thus, not only did the Merger Defendants fail to negotiate for the value of the colorable claims that exist against SCANA's executives and directors be included in the Merger Consideration, they all but guaranteed that Dominion would not pursue those claims once the Merger was consummated.

200.    Taken together, the preclusive deal protection devices and indemnification clause substantially and improperly limited the Board's ability to act with respect to investigating and pursuing any superior proposals and alternatives.  Even though the Merger was negotiated in less than three months, the Merger Defendants agreed to terms in the Merger Agreement that would prevent any true auction of the Company from occurring.  The deal protection provisions operated conjunctively to make the Merger a *fait accompli*, ensuring that no competing offers would emerge, and that SCANA's shareholders would never learn what their investment in SCANA was truly worth.  In fact, no competing offers were made, despite some South Carolina lawmakers publicly asking for another bidder to step forward.  By agreeing to the onerous deal protections, the Merger Defendants breached their fiduciary duties to SCANA's public shareholders because the shareholders did not receive adequate or fair value for their SCANA common stock in the Merger and Dominion has actively aided and abetted such breaches.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

**The Proxy Statement was Deficient and Misleading**

201.    Compounding the flawed sales process and inadequate consideration, SCANA filed its Proxy Statement on June 15, 2018, which failed to provide the information necessary for shareholders to make a fully informed decision regarding the Merger.

202.    Specifically, the Proxy Statement fails to mention the value of the derivative claims against SCANA's officers and directors.  The derivative claims were substantiated by their survival of motions to dismiss in both state and federal court.  The equivalent of assets, the derivative claims belong to the Company and have a value approaching $1 billion.  However, not only were the valuable derivative claims absent from the final Merger Consideration, the Proxy Statement fails to mention the potential value of the derivative claims at all.

203.    As such, the Registration Statement asked SCANA shareholders to vote in favor of the Merger without providing the information necessary for shareholders to make a fully informed decision.

204.    Accordingly, Plaintiff seeks damages for the injury that Plaintiff and the Class will continue to suffer absent judicial intervention.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against the Original Derivative Defendants)

205.    Plaintiff incorporates by reference and realleges every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

206.    The Original Derivative Defendants, as SCANA's directors and/or officers were required to use their abilities to control and manage SCANA in a fair, just, and equitable manner. By their actions alleged above, the Original Derivative Defendants violated their fiduciary duties

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

to SCANA, including, without limitation, their duties of good faith, loyalty, due care, reasonable inquiry, and oversight.

207.    The Merger does not deprive former SCANA shareholders of the right to pursue their breach of fiduciary duty and related claims as direct claims on behalf of the SCANA shareholders at the time of the Merger, because the pre-merger conduct of the Original Derivative Defendants made the Merger with Dominion a *fait accompli*.

208.    Following announcement that SCANA would abandon the Nuclear Project and the avalanche of criticism, investigations, and lawsuits that followed, SCANA's directors sought out and approved a merger that would deprive SCANA shareholders of standing to maintain their derivative claims.

209.    The extent of the Original Derivative Defendants' wrongdoing, fraudulent conduct, and breaches of fiduciary duties by failing loyally to oversee the Nuclear Project and by concealing the truth concerning the Nuclear Project's completion necessitated a corporate rescue and individual legal protection.

210.    A merger was one of the, if not the only, available alternatives that met both those objectives after the Board's fraudulent schemes.   South Carolina law recognizes a single, inseparable fraud when directors cover massive wrongdoing with an otherwise permissible merger. As a result, Plaintiff's derivative claims survive the Merger, and may be pursued as direct class claims as asserted herein.

211.    As a direct and proximate result, SCANA shareholders have sustained significant damages as a direct and proximate result of the Original Derivative Defendants' failure to perform their fiduciary duties.   SCANA's value and goodwill suffered substantially, as the Company's management confronted investigations by state and federal authorities, including the SEC, and

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

massive civil litigation, ultimately leading and/or contributing to the depressed price paid to SCANA shareholders by Dominion in the Merger.

## SECOND CLAIM FOR RELIEF

### Gross Mismanagement
### (Against the Original Derivative Defendants for)

212.    Plaintiff incorporates by reference and realleges every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

213.    By their actions alleged above, the Original Derivative Defendants abandoned and abdicated their responsibilities and fiduciary duties regarding prudently managing SCANA's assets and business in a manner consistent with the operations of a publicly held corporation.

214.    As a direct and proximate result, SCANA shareholders have sustained significant damages.  SCANA's value and goodwill suffered substantially, as the Company's management confronted investigations by state and federal authorities, including the SEC, and massive civil litigation, ultimately leading and/or contributing to the depressed price paid to SCANA shareholders by Dominion in the Merger.

## THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty
### (Against the Merger Defendants)

215.    Plaintiff incorporates by reference and realleges every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

216.    The Merger Defendants have violated their fiduciary duties of care, loyalty, and good faith owed to Plaintiff and the public shareholders of SCANA.  By the acts, transactions, and courses of conduct alleged herein, the Merger Defendants, individually and acting as part of a common plan, deprived Plaintiff and the Class of the value of their investment in SCANA.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

217.    As members of the Company's Board and/or SCANA executives, the Merger Defendants had fiduciary obligations to:  (a) undertake an appropriate evaluation of SCANA's value as a merger/acquisition candidate; (b) take all appropriate steps to enhance SCANA's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public shareholders; (d) adequately ensure that no conflicts of interest existed between the Merger Defendants' own interests and their fiduciary obligations, and, if such conflicts existed, to ensure that all conflicts were resolved in the best interests of SCANA's public shareholders; and (e) actively evaluate the Merger and engage in a meaningful auction with third parties in an attempt to obtain the best value in any sale of SCANA.

218.    The Merger Defendants have breached their fiduciary duties to Plaintiff and the Class.

219.    As alleged herein, in an effort to protect themselves, the Merger Defendants initiated a process to sell SCANA that vastly undervalued the Company.  In addition, by agreeing to the Merger, the Merger Defendants capped the price of SCANA at a price that did not adequately reflect the Company's true value.

220.    The Merger Defendants also failed to sufficiently inform themselves of SCANA's value, or disregarded the true value of the Company, and agreed to a Merger that insulates themselves from liability for their substantial wrongdoing.  Further, any alternate acquiror would have been faced with engaging in discussions with a management team and Board that were already committed to the Merger with Dominion.

221.    Plaintiff and the Class have no adequate remedy at law.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Against Defendants Marsh, Addison, and Byrne)

222.    Plaintiff incorporates by reference and realleges every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

223.    Plaintiff, as a shareholder and representative of the Company, seeks remuneration to the Company from Marsh, Addison, and Byrne for the bonus compensation they were awarded during periods in which Marsh, Addison, and Byrne failed to uphold the duties owed to SCANA and its shareholders.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Declaring that this action may be maintained as a class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.    Declaring that the Original Derivative Defendants have violated their fiduciary duty to SCANA, and determining that Plaintiff may pursue such claims as direct claims as a result of Defendants' continuing fraudulent conduct that depressed SCANA's value and necessitated the Merger;

C.    Declaring that the Merger Defendants have violated their fiduciary duty to SCANA;

D.    Awarding damages to Plaintiff and the Class;

E.    Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

F.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

G.    Granting such other and further relief as the Court may deem just and proper.

ELECTRONICALLY FILED - 2019 May 06 4:43 PM - RICHLAND - COMMON PLEAS - CASE#2019CP4002522

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  May 6, 2019                                  Respectfully Submitted,

**CHAPPELL SMITH & ARDEN, P.A.**

By:  */s/ Mark D. Chappell*
Mark D. Chappell
Graham L. Newman
2801 Devine Street, Suite 300
Columbia, South Carolina 29205
Telephone:  (803) 929-3600
Facsimile:  (803) 929-3604
Email:  mchappel@csa-law.com
            gnewman@csa-law.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:  (212) 308-5858
Facsimile:  (212) 486-0462
Email:  eagel@bespc.com
            fortunato@bespc.com

**STURMAN LLC**
Deborah Sturman
600 Third Avenue, Suite 2101
New York, New York 10016
Telephone:  (212) 367-7017
Facsimile:  (917) 546-2544
Email:  sturman@sturman.ch

*Counsel for Plaintiff*